# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| MATTHEW CHANEY, NADIE MILLER and ARTHUR GUSTAFSON on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | **MEMORANDUM OF LAW IN SUPPORT OF AMERICAN INDUSTRIAL AQUISITION** |
| v. | ) ) ) | **CORPORATION'S AND KK BAKERY HOLDING** |
| VERMONT BREAD COMPANY, SUPERIOR BAKERY, INC., KOFFEE KUP BAKERY, INC., KOFFEE KUP DISTRIBUTION, LLC, KK BAKERY INVESTMENT COMPANY LLC, KK BAKERY HOLDING ACQUISITION COMPANY, AND AMERICAN INDUSTRIAL ACQUISITION CORPORATION, | ) ) ) ) ) ) ) ) ) ) ) | **ACQUISITION COMPANY'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO F.R.C.P. RULE 56** |
| Defendants. | )) ) | Docket No. 2:21-cv-120-wks |
| LINDA JOY SULLIVAN in her capacity as the dissolution receiver for Koffee Kup Bakery, Inc., Vermont Bread Company, Inc. and Superior Bakery, Inc., | ) ) ) ) ) | |
| Intervenor-Defendant Cross-Claimant, | ) ) ) | |
| v. | ) ) | |
| KK BAKERY INVESTMENT COMPANY, LLC KK BAKERY HOLDING ACQUISITION COMPANY, AND AMERICAN INDUSTRIAL ACQUISITION CORPORATION, | ) ) ) ) ) ) | |
| Crossclaim-Defendants. | ) ) ) | |

1

# **TABLE OF CONTENTS**

Table of Authorities …………………………………………………………… 3

Introduction ………………………………………………………… 4

Factual Background ………………………………………………… 4-11

    AIAC's Absence of Involvement ………………………………………….. 5

    Hidden Financials and the Company's Insolvency …………………….. 5-6

    Realization of the Sellers' Fraud …………………………………….. 6-8

    Lender's Reaction ………………………………………………….. 8-9

    Anticipated Negative Effect of WARN Notice ………………………….. 9

    Attempt to Keep the Company Operational ……………………………. 9-11

Rule 56 Standard …………………………………………………….. 11-12

Closures Under the WARN Act …………………………………………….. 12-13

Argument …………………………………………………………… 13

    Point I – The Company and KKBIC Are Not a Single Employer ……… 13-14

    Point II - KKBIC is Exempt from the WARN Act 60-Day
           Notice Requirement ……………………………………….. 15-20

        A.    Business Circumstances …………………………………. 16-18

        B.    Faltering Company ……………………………………… 18-20

    Point III – The Failure to Name Kup Co. as a Defendant is Fatal
           to the Complaint ……………………………………….. 21-22

Conclusion …………………………………………………………….. 22

# TABLE OF AUTHORITIES

**CASES**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ……………………………     11

Amore v. Novarro, 624 F.3d 522 (2d Cir. 2010) …………………………………..     11

Carpenters Dist. Council of New Orleans & Vicinity v.
     Dillard Dep't Stores, Inc., 15 F.3d 1275, 1286 (5th Cir. 1994) …………     15, 19

D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998) ……………....     12

Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988) ………………….     12

Freeman v. Nw. Acceptance Corp., 754 F.2d 553 (5th Cir. 1985) ………………     21

In re AE Liquidation, Inc., 866 F.3d 515 (3d Cir. 2017) …………………………     16

In re APA Transp. Corp. Consol. Litig., 541 F.3d 233 (3d Cir. 2008) …………..     13,14,18

James v. Fleet/Norstar Fin. Grp., Inc., 992 F.2d 463, 465 (2d Cir. 1993) ………     15

Jurcev v. Central Community Hospital, 7 F.3d 618 (7th Cir. 1993) ……………..     19

Loehrer v. McDonnell Douglas Corp., 98 F.3d 1056, 1061 (8th Cir. 1996) ……..     16

Grimmer v. Lord Day & Lord, 937 F. Supp. 255 (S.D.N.Y. 1996) ………………     18-19

Rubler v. Unum Provident Corp., 2007 WL 188024 (S.D.N.Y. Jan. 25, 2007) ….     21

Wagner v. Swarts, 827 F. Supp. 2d 85 (N.D.N.Y. 2011) …………………………     12

In re Tweeter OPCO, LLC., 453 B.R. 534 (Bankr. D. Del. 2011) ………………….     19

**STATUTES**

F.R.C.P Rule 56 ……………………………………………………………………….     11
29 U.S.C. § 2101(a) ………………………………………………………………….     12
29 U.S.C. § 2102(b) ………………………………………………………………....     16,18
29 U.S.C. § 2104(a) ………………………………………………………………....     13
N.Y. Comp. Codes R. & Regs. tit. 12, § 921-6.2 ……………………………………     18-19

## INTRODUCTION

Defendants, KK Bakery Investment Company, LLC ("KKBIC") and American Industrial Acquisition Corporation ("AIAC"), by and through their counsel, Kirwan Law, Terry J. Kirwan, Jr., of counsel, submits this Memorandum of Law in support of their motion for summary judgment pursuant to F.R.C.P Rule 56 with respect to both the main claim and the Intervenor's crossclaim.

## FACTUAL BACKGROUND

KKBIC entered into the Agreement ("Agreement") to invest in Kup Co. through a purchase of certain shares of stock in Kup Co. Kup Co. which owned Koffee Kup Bakery, Inc. ("KKB"), which owned VBC, Inc. ("VBC") and Superior Bakery, Inc. ("SBI") (for clarity, KKB, VBC are collectively defined as the "Company").

Pursuant to the Agreement, on April 1, 2021, KKBIC acquired 992 shares of Kup Co.'s common stock, comprising 80% of Kup Co's outstanding shares. KKBIC also purchased $14,314,000 of Kup Co.'s subordinated debt for $1,000,000 in cash and a $2,000,000 note.

The counterparties to the Agreement (collectively "Sellers") were Kup Co., its existing shareholders: Bripan SARL, Socipar SAS, and 9249-9557 Quebec Inc.; and the subordinated debt holders: Jose Aubery, Bertrand Aubery, and Hubert Aubery. The Sellers' broker was G2 Capital Advisors LLC ("G2 Capital Advisors").

**AIAC's Absence of Involvement**

AIAC owned absolutely no equity or debt in Kup Co. or in Kup Co.'s subsidiaries. AIAC did not provide or loan any funds to KKBIC for its investment in Kup Co. AIAC was not involved in the ownership, management and/or operation of the Company. As such, AIAC is not a proper party to this action.

**Hidden Financials and the Company's Insolvency**

Prior to funding the investment, pursuant to the Agreement ("Closing"), KKBIC's representative, Jeff Sands ("Sands"), requested financial information concerning the sales & earnings of the Company for the third financial period of 2021 ("P3"), which ended March 21, 2021. The purpose was to determine if the Company was achieving its projected sales and earnings before interest, taxes, depreciation, and amortization ("EBITDA").

On March 18, 2021, G2 Capital Advisors sent KKBIC copies of the 2021 budget, which still forecast that the Company would nearly break even for P3. The next day, on March 19, 2021, G2 Capital Advisors declared an information "blackout period" and prohibited KKBIC from contacting Kup Co.'s management directly. On March 20, 2021, Sands requested an indication of P3 performance from both G2 Capital Advisors and Mark Coles ("Coles"), Kup Co's CFO. Such requests went unanswered.

On March 21, 2021, Kup Co. finished P3 and had most sales and cost information in hand. The following day, on March 22, 2021, Sands again requested an indication of P3 performance from both G2 Capital Advisors and Coles. As before, such requests went unanswered. Yet again, on March 25, 2021, Sands inquired about the P3 information from

both Coles and G2 Capital Advisors.  Coles and G2 Capital Advisors indicated that there was no material change in sales from the projections provided.

The following day, on March 26, 2021, Sands requested P3 results again, and G2 Capital Advisors again indicated that there was no material change.  However, Sellers and G2 Capital Advisors failed to provide the true information, which was that the Company was far from meeting such expectations. Instead, the Sellers and their agents, repeatedly represented to KKBIC that the Company was on target to nearly break even for P3, as budgeted.

**Realization of the Sellers' Fraud**

Three business days after the Closing, after finally gaining access to the Company's true financials, KKBIC first learned that the Company's P3 gross sales were $963,693 below budget and EBITDA was ($919,649), against a budget of ($39,192), a wholly unacceptable variance of 2,247%. KKBIC also learned that the Sellers had projected a 10% decline in revenue but failed to factor that information into their financial forecasts.  These changes were material adverse changes.

KKBIC has since realized that on March 30, 2021, nine days after P3 ended and two days before the scheduled sale, Kup Co.'s Controller, Luke Morris, prepared the P3 financials, which he emailed to Coles for review. Coles reviewed and approved the P3 financials that same day. Copies of the relevant emails are attached to the Sands Affidavit as Exhibit "C."

Later, that same day at 3:31 pm, Sands emailed Coles seeking Kup Co.'s latest balance sheet. Three minutes later at 3:34pm, Coles forwarded Sands' email to Patricia Reinhardt ("Reinhardt") and Michael Williams ("Williams") of G2 Capital Advisors. In his forwarding email, Coles stated "FYI, I have not responded to him yet." At 4:00 pm, Reinhardt emailed Coles "Let's chat first" and requested that his colleagues schedule a call between G2 Capital Advisors and Coles to discuss the issue. After several scheduling emails, G2 Capital Advisors and Coles agreed to talk at 5:15 pm.

At 5:32 pm, after his conference with Reinhardt and Williams, Coles responded to Sands' 3:31 pm email by lying, indicating that he did not yet have the P3 financials, which as set forth above he had reviewed and approved earlier that day. The following day, March 31, 2021, neither G2 Capital Advisors nor Coles indicated any material change in the P3 results. Thus, they continued their plan to deceive KKBIC.

Based upon representations made by Sellers, in good faith, on April 1, 2021, KKBIC closed on the Agreement to purchase the common stock in Kup Co., believing that the projections had held true. On April 2, 2021, KKBIC representatives arrived on site for the first time since the "blackout period." This is when Coles first admitted that the Company's sales had fallen dramatically short of the false projections supplied to the KKBIC. The following workday, April 5, 2021, Coles finally shared the hidden and true P3 financial information with KKBIC.

After discovering that the Sellers had withheld material financial information, to induce KKBIC to finalize its investment, it prepared a revised forecast of EBITDA and cash flow, which projected multi-million-dollar losses and a negative cash balance by the

7

end of 2021. These hidden losses and negative cash flow issues revealed that the Company was deeply insolvent and unable to continue its operations without a massive infusion of external capital, far beyond what KKBIC had been led to believe a required investment would be to sustain the business.

In short, the new projections based on the actual P3 results showed that instead of $500,000.00 to $1,000,000.00 million in cash required to fix the business, the Company actually required at least $4,000,000.00 in new cash injections (4 times what KKBIC was led to believe).

As a brief summary of the Company finances, it averaged around $70,000,000.00 in annual revenues and lost $3,600,000.00 in 2020. KKBIC believed that progress and changes made by management of KupCo, in 2021 could improve profits by $5,000,000.00, netting the Company a slight profit. This is what induced KKBIC to make an investment to save the Company. After the true P3 results were revealed, it became obvious that the Company would lose millions more than the Sellers' false projections indicated. Moreover, keeping the Company operational required a profit improvement of nearly $10,000,000.00. This magnitude of profit improvement was not feasible.

**Lender's Reaction**

The following day, April 6, 2021, KKBIC informed Key Bank, KKB's senior secured lender, of both the Sellers' deception and the deeply insolvent state of the Company. In response to the newly revealed P3 financial information, on April 9, 2021, Key Bank issued a default notice to the Company and hired an outside advisor, Ron Teplitsky, who, ultimately, became the Key Bank Receiver. Key Bank also informed Kup Co. that it would

not extend its forbearance agreement and would not fund the Company's payroll unless the Company cooperated with the bank in the assignment of a Key Bank Receiver and the liquidation of the bank's collateral. To ensure that its employees would be paid, the shareholders of Kup Co. acquiesced.

**Anticipated Negative Effect of WARN Notice**

A WARN notice issued by Kup Co. would have absolutely prohibited an external investment and prevented a possible future sale of the Company as a going concern. Going concern status entailed maintaining the operating mode of the Company including the employment of its workforce.

Moreover, while customers were shielded from the upheaval, even the whispers of the potential of missing a day of deliveries would have cost the Company its valuable shelf space in its customers' stores. The loss of such shelf space would have killed the Company's on-going-value and eliminated any chance to sell the Company to a qualified buyer and to keep operations intact.

**Attempt to Keep the Company Operational**

Upon finding itself deceived into investing in a shockingly insolvent business, unable to rescind its investment and without bank support, Kup Co. sought additional ways to solve its financial problems. Not being able to raise the necessary infusion of funds, the only feasible solution was to find a buyer with overlapping production, distribution and administrative costs. Such a buyer could merge Kup Co. into its existing business, eliminating redundancies and achieving the necessary profit improvement.

Issuing a WARN notice would have scared off the Company's employees and customers, killing the Company's going-concern-value. Without maintaining a going-concern-value, any potential buyers would lose interest in purchasing the Company, which Kup Co. was attempting to avoid.

In an attempt to save the Company, Kup Co. immediately reached out to two qualified buyers, Gold Coast Bakery ("Gold Coast") and SatisPie Bakery ("SatisPie"). During the week of April 12-16, 2021, Kup Co. presented the opportunity to purchase the Company to both Jeff Black ("Black"), the owner of Gold Coast, and Mike Pinkowski ("Pinkowski"), the owner of SatisPie, trying to sell the Company and maintain its going-concern-value.

While Kup Co. was happy to sell, both Black and Pinkowski knew they needed to negotiate directly with Key Bank on the defaulted debt. Pinkowski promised to tour the facilities and meet with Sands on Saturday April 17, 2021, but he never showed up for the meeting. Thereafter, on April 19, 2021, Key Bank informed Sands that it no longer considered Pinkowski a credible buyer and would not support him in a purchase of the Company. This left Black as the only qualified buyer who could consummate a sale quickly enough to preserve the going-concern-value of the Company. However, Black never made an offer.

On April 20, 2021, Sands sent a memo titled "KKB Viability Assessment with Recommendation" to Kup Co.'s stakeholders including the Buyer, Seller and lenders Key Bank and Vermont Economic Development Agency, informing them that the Company was out of money and that "without a credible white knight buyer, the company is adrift

and on a "march to liquidation." A copy of such memo is attached to the Sands Affidavit as Exhibit "F." Sands pleaded for the stakeholders to "preserve going concern value and develop optionality" and suggested this would require an immediate cash infusion of $500,000.00 to "cover payroll and minimal supply needs."

Then, on Thursday April 22, 2021, Key Bank issued a formal notice of default, accelerated the amounts due under its Term Loan and Line of Credit, and communicated that it intended to exercise its rights under the loan agreements and foreclose. Immediately thereafter, the Company retained specialist labor attorneys to guide it through the layoff and WARN process. After a hurried initial attempt to deliver WARN notices on April 23, 2021, which was unsuccessful, the Company terminated its operations and employees, issuing a Worker Adjustment and Retraining Notification Act ("WARN Act") notice to its employees on Monday April 26, 2021.

## RULE 56 STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." F.R.C.P. Rule 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.")(emphasis in original).

When weighing the material facts, "[t]he court construes all evidence in the light most favorable to the non-moving party, drawing all inferences and resolving all ambiguities in [its] favor." Amore v. Novarro, 624 F.3d 522, 529 (2d Cir. 2010). Thus, the

party seeking summary judgment "must demonstrate the absence of genuine issues of material fact, a burden it can [only] meet if it can point to an absence of evidence to support an essential element of the nonmoving party's claim." Wagner v. Swarts, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), aff'd sub nom (citations omitted).

"A genuine dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)(citations omitted). However, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).

In this case, as more fully provided herein, neither KKBIC nor AIAC is liable under the WARN Act and the Court should grant their motion for summary judgment pursuant to F.R.C.P. Rule 56, in its entirety.

## CLOSURES UNDER THE WARN ACT

The WARN Act defines a plant closing as the shutdown of a single site of employment that "results in an employment loss [] during any 30-day period for 50 or more employees excluding any part-time employees." 29 U.S.C. § 2101(a)(2).

A "mass layoff [] results in an employment loss at the single site of employment during any 30-day period for -- (i)(I) at least 33 percent of the employees (excluding any part-time employees); and (II) at least 50 employees (excluding any part-time employees); or (ii) at least 500 employees (excluding any part-time employees)." 29 U.S.C. § 2101(a)(3).

In this case, the dire financial circumstances of the Company, which the Sellers misrepresented and concealed from KKBIC, crippled the Company. Indeed, the Company was unable to continue operating, so enormous was the level of the losses. Thus, the Company was forced to lay off all its employees.

## ARGUMENT

## POINT I

## NEITHER KKBIC NOR AIAC IS A SINGLE EMPLOYER WITH THE COMPANY

The Second Circuit follows a simple balancing test to determine if related companies comprise a "single employer" for the purposes of the WARN Act. In re APA Transp. Corp. Consol. Litig., 541 F.3d 233, 243 (3d Cir. 2008), as amended (Oct. 27, 2008). Such balancing test involves the review of the following five factors: "(1) common ownership, (2) common directors and/or officers, (3) de facto exercise of control, (4) unity of personnel policies emanating from a common source, and (5) dependency of operations. Id. (citations omitted).

The APA Court further noted:

> the five-factor test [is] a balancing test in which a number of facts and circumstances may be relevant. However, the factors are not balanced equally: the first and second factors, common ownership and common directors and/or officers, are not sufficient to establish that two entities are a single employer. [O]wnership—and even ownership coupled with common management—is not a sufficient basis for liability.

Id. (citations omitted).

In this case, as set forth in the accompanying Sands Affidavit:

- Neither AIAC nor KKBIC possessed de facto control over the Company's operations, which, prior to the Closing, was in a financial position under which it could no longer continue operating.

- The Company's personnel policies were established prior to the Closing, by the previous owners, and neither AIAC nor KKBIC changed such policies. Thus, the personnel policies of AIAC, KKBIC and the Company did not originate from a common source.

- AIAC, KKBIC and the Company each "possessed its own employees and its own policies regarding compensation, vacation and sick time; that the companies hired and fired employees on an individual basis; and that personnel files were maintained separately." See id. at 244.

- The Company was "autonomous in terms of finances because [it] had independent wage rates, pay scales, salaries and payrolls." Id. at 243.

- Neither AIAC nor KKBIC was involved with the operation of the Company, including the Company's employment actions (e.g. hiring, payroll, promotions, terminations, layoffs).

- All decisions were discussed and voted upon by the Board of Kup Co., not the KKBIC or AIAC.

See Sands Affidavit, ¶¶ 7, 47-57.

Thus, KKBIC and the Company are not a single employer, and KKBIC is not liable for the layoff of the Company's employees. Likewise, AIAC and the Company are not a single employer, and AIAC is not liable for the layoff of the Company's employees. See APA. As such the Court should grant AIAC's and KKBIC's motion for summary judgment pursuant to F.R.C.P. Rule 56, in its entirety.

## POINT II

## KKBIC ARE EXEMPT FROM THE WARN ACT
## 60-DAY NOTICE REQUIREMENT

The WARN Act ("Act") requires employers to provide written notice to its employees 60 days before ordering a plant closing or a mass lay-off. 29 U.S.C. § 2102(a); James v. Fleet/Norstar Fin. Grp., Inc., 992 F.2d 463, 465 (2d Cir. 1993); Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dep't Stores, Inc., 15 F.3d 1275, 1286 (5th Cir. 1994). Employers that fail to provide the 60-day notice, absent one of the recognized exceptions, is liable to the affected employees for back pay and benefits for the extent of the violation. See 29 U.S.C. § 2104(a); Carpenters Dist. at 1286 ("[I]f an employee receives less than sixty days' notice, then the employee is entitled to back pay for each day of the violation period.")(citations omitted).

Sixty days prior to the liquidation, when the Company determined it was not prudent to issue the WARN Notice, under the exemptions listed below, KKBIC was not an investor in the Company, had never met with management of the Company, shared no common ownership, management, board members or officer positions. Therefore, KKBIC could not have participated in the preparation of a WARN Notice in compliance with the WARN Act.

Once KKBIC invested in Kup Co., KKBIC and Kup Co. were not a single employer and therefore, since KKBIC was not an employer, KKBIC had no authority to make personnel decisions on behalf of Kup Co. even after making an investment into the

Company.  Furthermore, as an investor in Kup Co., KKBIC is further exempted from the WARN Act provision.

### A.    Business Circumstances

Pursuant to the Act "[a]n employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by **business circumstances** that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A)(emphasis added).

"To successfully invoke an unforeseeable business circumstances defense to liability under the Worker Adjustment and Retraining Notification Act (WARN Act), an employer must demonstrate (1) that the business circumstances that caused the layoff were not reasonably foreseeable, and (2) that those circumstances were the cause of the layoff." In re AE Liquidation, Inc., 866 F.3d 515 (3d Cir. 2017) (citations omitted). The Act allows flexibility based upon the business judgment rule. See Loehrer v. McDonnell Douglas Corp., 98 F.3d 1056, 1061 (8th Cir. 1996), noting:

> [t]he Act … necessarily recognize that even the most conscientious employers are not perfect, and they thus **allow needed flexibility for predictions about ultimate consequences** that, though objectively reasonable, proved wrong.  So long as it may still fairly be said that the eventual plant closing or mass layoff is caused by a sudden, dramatic, and unexpected event outside the employer's control, the exception applies.

Id. (citations omitted) (emphasis added).

In this case, the deep, intractable insolvency of the Company, particularly its wildly inaccurate budget, ongoing negative cash flow position and deep capital hole, was

an unforeseen business circumstance that KKBIC, as a new Shareholder, could not have realized prior to the Closing. Indeed, the Sellers', the Company's CFO, and the Company's investment banker all materially misrepresented the upcoming P3 income statement results to KKBIC.  See Sands Affidavit, ¶¶ 8,9,11, 14, 16-20.  Moreover, as detailed above, once learning the true extent of the Company's financial despair, KKBIC immediately attempted to remedy the situation by actively seeking capital and/or a suitable investor or purchaser to keep the Company operational. See Sands Affidavit, ¶¶ 30-32.  However, such efforts failed (i.e. no investor that sought to maintain the Company as a going concern was approved by Key Bank) through no fault of KKBIC. See Sands Affidavit, ¶¶ 33-34.

Moreover, because of the hidden financial despair, the Company's key lender called its loan, accelerating the payment and forcing the Company to liquidate. This unexpected and unforeseen acceleration further diminished the Company's ability to continue its operations, forcing it to terminate its employees. See Sands Affidavit, ¶38.

KKBIC could not have expected that the Company was insolvent, based upon the operating budgets and cash projections presented to the Buyer prior to the Closing. Frankly, KKBIC would never have closed on the investment had it known the Company's true financial position and its inability to pay its debts, especially payroll.  However, as detailed above, KKBIC used its best efforts to obtain financing and/or sell the Company to a qualified buyer or investor to avoid shutting down the Company's operations.

The undisputed facts show that stopping the Company's operations was due to business circumstances which were hidden and not at all foreseeable by KKBIC at the

time notice would have been required, February 26, 2021, which was prior to KKBIC purchasing the Company. As such, KKBIC qualifies for the business circumstances exception to the Act and the Court should grant its motion for summary judgment pursuant to F.R.C.P. Rule 56, in its entirety.   The State of Vermont's Labor Department reached such a decision concerning the applicability of the exception to the WARN Act. See Sands Affidavit, ¶43.

### B.    Faltering Company

Another exception to the Act's notice requirement is the faltering company exception. "In re APA Transp. Corp. Consol. Litig., 541 F.3d 233, 240 (3d Cir. 2008), as amended (Oct. 27, 2008).

Pursuant to the faltering company exception:

> [a]n employer may order the shutdown of a single site of employment before the conclusion of the 60-day period if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business.

29 U.S.C. § 2102(b)(1); see Grimmer v. Lord Day & Lord, 937 F. Supp. 255, 256 (S.D.N.Y. 1996)([T]he altering company exception[] permits an employer to order the shutdown of a site of employment less than sixty days after giving notice … .")(citations omitted); see also N.Y. Comp. Codes R. & Regs. tit. 12, § 921-6.2 ("[T]he employer shall establish that at the time notice of the plant closing, mass layoff, relocation, or covered reduction in work hours would have been required: (1) the employer was **actively seeking capital** or

18

business and identifies the specific actions taken to obtain such capital or business. For example, the employer must demonstrate its efforts to obtain financing or refinancing through the arrangement of loans, the issuance of stocks, bonds, or other methods, or to obtain additional money, credit, or business through any other commercially reasonable method; and (2) there was a **realistic opportunity to obtain the capital** or business sought; and (3) the capital or business sought would have been **sufficient to enable the facility, operating unit, or site to avoid or postpone the plant closing**, mass layoff, relocation, or covered reduction in work hours; and (4) the employer reasonably and in good faith believed that giving notice would have precluded the ability to obtain the needed capital or business. The employer must be able to objectively demonstrate that a potential customer or financing source would have been unwilling to provide the new business or capital if notice were given.")(emphasis added).

The faltering business exception applies when a mass layoff or shutdown is caused by the employer's failure to obtain sufficient capital. <u>Carpenters District Council of New Orleans v. Dillard Dept. Stores</u>, 15 F.3d 1275, 1281 (5th Cir. 1994). The exception was created because it is not the purpose of the WARN Act to require an employer to continue in business to its detriment for 60 days simply because it is economically feasible or possible to do so.  <u>Jurcev v. Central Community Hospital</u>, 7 F.3d 618 (7th Cir. 1993).

A "WARN Act employer must meet specific requirements to invoke the faltering company exception to liability under the WARN Act for failing to provide employees with 60-day notice of termination by (1) giving as much notice as is practicable, and (2)

setting forth specific facts in notice that explain reason for reducing notice period." In re Tweeter OPCO, LLC., 453 B.R. 534 (Bankr. D. Del. 2011)(citations omitted).

In this case, Kup Co. sought outside capital investment, and in fact, had induced KKBIC to invest in Kup Co. with the hopes of saving the operations. Once it was determined that KKBIC received fraudulent information during its underwriting and due diligence, KKBIC realized the Company would require additional capital beyond its resources to sustain the operations. KKBIC then worked with Kup Co. seeking external infusion of funds to raise the needed capital to continue the Company's operations. See Sands Affidavit, ¶30.

Having not been able to raise the necessary infusion of funds, KKBIC sought a true strategic buyer, another bakery with overlapping production, distribution and administration who could realize up to $10,000,000.00 in savings by eliminating redundancies. See Sands Affidavit 27, 30-34.

Once such efforts failed, the Company provided the required notice as soon as possible. See Sands Affidavit, ¶39. This notice ("Notice") provided facts sufficient to explain the reduction in notice period. A copy of the Notice is attached to the Sands Affidavit as Exhibit "G."

As such, the Company qualifies for the faltering business exception to the Act and the Court should grant KKBIC's and AIAC's motion for summary judgment pursuant to F.R.C.P. Rule 56, in its entirety.

## POINT III

## THE FAILURE TO JOIN KUP CO. AS A DEFENDANT
## IS FATAL TO PLAINTIFFS' CLAIMS

Subsidiaries are necessary parties where the parent and subsidiary are separate legal entities and the parent's liability is based on the wrongdoing of the subsidiary. See Freeman v. Nw. Acceptance Corp., 754 F.2d 553, 555 (5th Cir. 1985) (finding the subsidiary a necessary party where, "[a]lthough [parent company] was the only named defendant, the conduct complained of was that of [the parent's] wholly-owned subsidiary"); Rubler v. Unum Provident Corp., 2007 WL 188024, at *3 (S.D.N.Y. Jan. 25, 2007) (finding the subsidiary necessary where it "is still a separate legal entity with separate rights and obligations from [the parent company], and it is [the subsidiary's] rights and obligations that are at the heart of this case").

In this case, it was the conduct of Kup Co., making the decision to implement the layoff of the employees of its subsidiaries, which is at the heart of the Plaintiffs' Complaint. Kup Co. had formal board of directors' meetings at which the wind down of the Company was discussed and voted upon. Kup Co. issued WARN Act letters to employees of the Kup Co. subsidiaries. Kup Co. hired labor law specialists to properly handle the WARN Act issues. Kup Co. and KKBIC are sperate legal entities and, as such, Kup Co's obligations are separate from KKBIC. The Defendants have supplied all such documents to the Plaintiffs. For reasons known only to the Plaintiffs, the Plaintiffs have

willfully chosen to ignore the mountain of evidence that clearly demonstrate Kup Co.'s central role as the decision maker with regard to the implementation of the WARN Act and as the issuer of the WARN Act letters to employees. As such, the Plaintiffs knowingly and willfully failed to name a proper and necessary party, Kup Co., and the Court should grant the Defendants' motion for summary judgment and dismiss the Complaint.

<u>CONCLUSION</u>

For the foregoing reasons, the Court should grant AIAC's & KKBIC's motion for summary judgment pursuant to F.R.C.P Rule 56 and dismiss both the main claim and crossclaim against KKBIC and AIAC, in its entirety.

Dated:  March 31, 2023
      Syracuse, New York

Respectfully submitted,

**KIRWAN LAW**
*Attorneys for Defendants*
*American Industrial Acquisition Corporation and*
*KK Bakery Investment Company, LLC*

By: /s/ Terry J. Kirwan, Jr.
    Terry J. Kirwan, Jr.
    (Bar Roll #501821)
    2401 Burnet Avenue
    Syracuse, New York 13206
    Telephone: 315.452.2443
    tkirwan@kirwanlawpc.com

McCormick, Fitzpatrick, Kasper & Burchard P.C
*Attorney for Defendants*
*American Industrial Acquisition Corporation and*
*KK Bakery Investment Company, LLC*

By: /s/ Daniel L. Burchard
Daniel L. Burchard, Esq.
40 George Street, P.O Box 638
Burlington, Vermont 05402-0638
Telephone: (802) 863-3494 x127
dlb@mc-fitz.com

22