**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

| | | |
|---|---|---|
| MATTHEW CHANEY, et al. | ) | |
| on behalf of himself and all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 2:21-cv-120-wks |
| v. | ) | |
| | ) | |
| VERMONT BREAD COMPANY, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| LINDA JOY SULLIVAN, in her | ) | |
| capacity as the Dissolution Receiver | ) | |
| | ) | |
| Intervenor-Defendant. | ) | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The named plaintiffs, Matthew Chaney, Nadine Miller and Arthur Gustafson, on behalf of

themselves and the Class they represent, respectfully submit this brief in support of their motion

for summary judgment. The Class suffered a violation of their rights under the WARN Act, 29

U.S.C. § 2101 *et seq*, and should be awarded the statutory remedy, as set forth herein. Judgment

should be entered against defendants American Industrial Acquisition Company ("AIAC"), Koffee

Kup Bakery Investment Company ("KKBIC"), Koffee Kup Bakery, Inc. ("Koffee Kup"), Vermont

Bread Company ("Vermont Bread"), and Superior Bakery, Inc. ("Superior"), jointly and severally,

as they all constituted part of a "single employer" that violated the WARN Act.

This Court correctly summarized the WARN Act as follows in the order granting class

certification:

> The WARN Act prohibits employers of 100 or more employees from ordering "a
> plant closing or mass layoff until the end of a 60–day period after the employer

1

serves written notice of such an order." 29 U.S.C. § 2102(a); see also Cashman v. Dolce Int'l/Hartford, Inc., 225 F.R.D. 73, 78 (D. Conn. 2004). This advance notice aims to "provide[] workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market." 20 C.F.R. § 639.1(a); see also Guippone v. BH S&B Holdings LLC, 737 F.3d 221, 225 (2d Cir. 2013). Failure to provide a WARN Act notice may subject an employer to civil liability in the form of back pay and benefits for the period of the WARN Act violation up to a maximum of 60 days. See 29 U.S.C. § 2104(a)(1).

[Opinion and Order, August 17, 2022, Doc. 129 pp. 4-5].

The following is an introduction to the facts, with other facts to be discussed as relevant in later parts of this brief.

This case involves three bakeries: defendants Koffee Kup, Vermont Bread, and Superior.[1] All three ceased operations on April 26, 2021, leaving more than 400 people – Plaintiffs and the Class – out of work. All three were wholly owned by Kup Co. [Statement of Undisputed Facts ("Facts"), ¶¶ 1, 2, 13, 35].

Prior to the shutdown, the bakeries were in very poor financial condition, and were in default to their lender, Key Bank. The forbearance agreement with Key Bank had lapsed and not been renewed. The business was insolvent. [Facts, ¶¶ 49, 50, 95, 134].

Less than four weeks before the abrupt shutdown of the bakeries, 80 percent of the equity in Kup Co. had been purchased for the nominal sum of a single dollar by AIAC, acting through a newly-formed entity, KKBIC. [Facts, ¶ 133]. AIAC, through KKBIC, also paid the sellers pennies on the dollar for debt owed by Kup Co. to the sellers: $1 million to purchase $14 million of that "insider debt." [Id., ¶ 133]. AIAC used its affiliate AMTC to fund the $1 million dollars paid for

---

[1] They are represented in this litigation, as a practical matter, by the state-court-appointed Dissolution Receiver of their assets, who intervened.

the Koffee Kup acquisition. [*Id.*, ¶¶ 85, 87]. In general, as stated in the most recent Rule 30(b)(6) deposition of AIAC, "AIAC operates through affiliates." [*Id.*, ¶ 65].

In connection with the acquisition agreement, AIAC, through KKBIC, promised to put $2.5 million into the bakeries in cash, credit, and "cushion" to get the bakeries on their feet and on a sustainable path forward. [Facts, ¶ 71, 119, 133]. That money – like the money used to purchase the insider debt – would necessarily be coming from AIAC (using one or more of its affiliates as the piggybank), because KKBIC simply had no money of its own to promise. [*Id.*, ¶¶ 144, 145, 80].

AIAC bought a controlling interest in the bakeries, using KKBIC as the vehicle, in order to perform what it was in the business of doing: buying troubled businesses and "turning them around" into profitability through active managerial control. [Facts, ¶ 70-71; 53; 82; 114]. AIAC emphasized  to Koffee Kup, its former owners, KeyBank and suppliers that it would do what it always does with businesses in the AIAC "portfolio": actively manage the business, investing capital as needed without looking to outside sources, making the business decisions (including, specifically, human-resource decisions), and remaking the business under the hands of AIAC's "turnaround specialist" Jeff Sands and others on the AIAC team. [*Id.*, ¶¶ 53, 55--57, 69-70; 78; 82; 109-110; 114].

But AIAC and KKBIC quickly decided instead – within days after the purchase – not to make the promised capital investment. [Facts, ¶¶ 118-122]. They deemed the bakeries to be "dead." [*Id.*, ¶¶ 118-122]. AIAC tried, in the weeks after that, to find a purchaser who would buy the bakeries "fast," even if for practically nothing – a "trivial, fire sale" price. [*Id.*, ¶¶ 121-122; 124-129; 131-132; 158].  In its sale materials, AIAC highlighted that there was a "common

3

stakeholder" and described the ownership structure of Kup Co. as follows: "affiliate of AIAC owns 80%, individuals own 20%; **AIAC controls board**." (emphasis added). (*Id*. at ¶ 132).

By April 26, AIAC had been unable to unload the bakeries through a "fire sale", so they ordered that the business should be shutdown and that the employees should be fired,-- without any advance or even contemporaneous WARN Act notice. [Facts, ¶¶ 4, 132; 140-168].

1.    **AIAC, KKBIC, and the three bakeries constituted a "single employer" for purposes of the WARN Act.**

Beyond any genuine issue of material fact, defendants AIAC and KKBIC, along with the three bakeries, constituted a "single employer" for purposes of the WARN Act; all of them are liable for the violation. A "single employer" finding, of course, does not insulate the direct employers – Koffee Kup, Vermont Bread, and Superior – from liability. Instead, under the WARN Act, a "single employer" finding results in joint and several liability among the various entities that, together, make up the "single employer." *See*, *e.g.*, *Garner v. Behrman Bros. IV, LLC*, 260 F. Supp. 3d 369, 381-82 (S.D.N.Y. 2017) (discussing WARN Act "single employer" doctrine as involving joint and several liability).

A.    **The "single employer" doctrine under the WARN Act.**

This Court has discussed the WARN Act's "single employer" doctrine in the class-certification order in this case, stating:

> In *Guippone [v. BH S&B Holdings LLC]*, 737 F.3d 221 (2d Cir. 2013), the Second Circuit adopted a five-factor test set forth in the Department of Labor ("DOL") regulations to determine if related entities constitute a single employer. 737 F.3d at 226 (citing 20 C.F.R. § 639.3(a)(3)). The relevant DOL regulation provides that
>
>> independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as part of the parent or contracting company depending upon the degree of independence from the parent. Some of the factors to be considered in making this determination are

4

(i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.

20 C.F.R. § 639.3(a)(2). As noted by the Third Circuit, these factors are useful in determining "whether the nominally separate corporations actually functioned as a single entity." *Pearson v. Component Tech. Corp*., 247 F.3d 471, 503-04 (3d Cir. 2001). "As in any balancing test, application of these factors requires a fact-specific inquiry, no one factor set out by the DOL is controlling, and all factors need not be present for liability to attach." Guippone, 737 F.3d at 226.

[Opinion and Order, August 17, 2022, Doc. 129, pp. 7-8].

In many cases, and in this case, the "de facto exercise of control" factor is a particularly important factor which Courts consider in applying the single employer analysis.

The factor is appropriately utilized, however, if the parent or lender  was the decisionmaker responsible for the employment practice giving rise to the litigation. Further, because the balancing of the factors is not a mechanical exercise, if the de facto exercise of control was particularly striking -- for instance, were it effectuated by "disregarding the separate legal personality of its subsidiary," Esmark, Inc. v. NLRB, 887 F.2d 739, 757 (7th Cir. 1989) -- then liability might be warranted even in the absence of the other factors.

*Pearson*, 247 F.3d at 503-04.

As noted in the regulation itself, as quoted by this Court, the five DOL factors are not exclusive; they are "[s]ome of the factors." *Id.* In determining the "single employer" question, the ultimate question is to determine whether nominally separate entities were actually operating at arm's length. If an entity other than the nominal employer exercised sufficient control over or was sufficiently entangled with the nominal employer, then that other entity is also liable for the WARN Act violation.

As an initial matter, we think it important to consider the policy considerations that animate the WARN Act. The purpose of the Act is to penalize those employers that close a plant and fail to comply with the notice requirements of the statute. Thus, the question of whether two entities constitute a "single employer" for WARN Act purposes "is ultimately an inquiry into whether . . . two nominally separate entities operated at arm's length" or whether, following an "assessment of the amount of control" exercised by one entity over another, it can be determined that

5

> two entities should be considered jointly liable for the closing and the subsequent
> lack of notice. ... Accordingly, the goal of the five-factor test here is to determine
> whether APA Truck Leasing had become "so entangled with [APA Transport's]
> affairs so as to engender WARN Act liability," or whether the two continued to
> function at arm's length as separate entities.

*In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 244 (3d Cir. 2008), quoting and citing

*Pearson*.

The "single employer" doctrine, utilizing the DOL factors and looking at the realities of

entanglement and control, applies not only to "independent contractors, subsidiaries," and

"parent[s]" (20 C.F.R. § 639.3(a)(2)) but to others such as equity investors, *Guippone*, 737 F.3d at

226, and lenders, *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 496 (3d Cir. 2001). It is

therefore the test to apply to all Defendants here—the bakeries, KKBIC (which owned 80 percent

of Kup Co., which owned the three bakeries) and also to AIAC, where the real de facto power

(financial and operational) lay.

      **B.**     **On undisputed facts, all Defendants constituted part of a "single employer"
with WARN Act liability in this case.**

The *Guippone* factors from the DOL regulation, along with the overall thrust of the inquiry

into control, entanglement, and the absence of arms-length dealing, all point towards single-

employer liability on the facts in this case.

    * <u>(i) common ownership.</u>  AIAC is solely owned by Leonard Levie. Leonard Levie is the

chairman of AIAC, there are no other officers, directors or board members.  Leonard Levie owns

85 percent of KKBIC, and ███████████████████████

████████████████████ for the Koffee Kup acquisition.  Jeff Sands has held the

following titles at AIAC--"senior vice president," "managing director," "special advisor," "senior

advisor" and "SVP".  Leonard Levie and Sands were the sole members of KKBIC—Leonard Levie

is the managing member and Jeff Sands is a "member".  AIAC, through KKBIC, which it formed

for this purpose on March 29, 2021, owned 80 percent of Kup Co., a holding company which owned 100 percent of the bakeries themselves. [Facts, ¶¶ 54-58; 71-72; 74-75; 92-94; 133; 15].

    \* (ii) common directors and/or officers. Levie and Sands' roles at AIAC and KKBIC have been noted above. They also constituted two of the three members of the Board of Kup Co. The bakeries had no boards of directors of their own. [Facts, ¶¶ 14, 16, 169]. Sands also referred to himself as "CRO," or "Chief Restructuring Officer," over the bakeries, stating as early as December 2020 (months before KKBIC had even been formed) that he would be filling that role and would be reporting "to Leonard at AIAC headquarters," along with the rest of his "new team", which included Mark Gautier, who would "act as CEO" [*id.*, ¶ 78, 114]. The power that Sands had did not come from any  contractual relationship with Kup Co. or with the bakeries. [*Id.*, ¶ 96-97]. His power came from AIAC, as discussed in more detail below.

    \* (iii) de facto exercise of control. This discussion will be more lengthy, because it is the heart of this case. Still, this brief will not directly repeat everything in the lengthy Statement of Undisputed Facts, but will summarize and refer to that document.

    AIAC's very essence is that it acquires "underperforming" companies and makes the changes needed in them to turn them profitable. [Facts, ¶ 53; 69; 82; 114]. As an example of what AIAC does, AIAC touts in a "case study" that it acquired Vermont-based Champlain Cable and took it from staggering losses into profitability.  In this "case study," to exemplify its approach to acquired companies, AIAC describes what it did at Champlain Cable: "The first year turnaround action steps included a headcount reduction of 16 persons, along with reductions in labor hours, materials, selling, general, and administrative costs. …" [*Id.*, ¶ 82; 114].

    Jeff Sands, senior advisor with AIAC, is the "turnaround specialist" and author of Corporate Turnaround Artistry, Fix Any Business in 100 Days. [Facts, ¶ 55; 109-110; 113]. ■

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████ [Facts, ¶ 59-63; 68; 92-93].

As Levie testified as Rule 30(b)(6) representative for AIAC, "AIAC operates through affiliates." [Facts, ¶ 65]. When he uses the term "affiliates" he means "a corporate entity with common ownership." [*Id.*, ¶ 66]. Given the present focus on "<u>de facto</u> control," the crucial part is that <u>AIAC</u> "operates." For instance, ████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████ [Facts, ¶ 78; 80-81; 87; 141; 148; 170].

In offering itself as prospective purchaser of Kup Co., AIAC emphasized to the sellers how engaged it would be in the make-over of the then-insolvent business. In the powerpoint presentation titled "Why AIAC is the Best Future Owner of Koffee Kup Bakery," AIAC told the sellers, "AIAC currently owns and operates 78 factories in 24 countries." "AIAC is an active owner. … We manage professionally and conservatively to build strong businesses." "AIAC has over 8,500 employees with deep pools of talent to solve complex operational and financial problems." [Facts, ¶¶ 69-70]. The powerpoint noted that "AIAC Executive Leadership for Koffee Kup" would involve Mark Gauthier as CEO, and Sands. [Facts, ¶ 114].

During negotiations, AIAC's Sands communicated to the sellers' agent about the "New Team" that would lead the operations after a sale. The description of the "New Team" included "Jeff Sands, Vermont resident who will lead transition through 2021 as CRO"; Mark Gauthier who "will act as CEO"; David Cryer "AIAC CFO"; Thea Kelly "able to fill a role as Controller or

similar as needed"; and Rhonda Halladay "will lead our HR, insurance, safety and regulatory diligence." Upon concluding the list of the "New Team," Sands wrote: "We will all report to Leonard [Levie] at AIAC headquarters." [Facts, ¶ 78].

AIAC's March 4, 2021, indicative offer was to purchase a majority interest in the Koffee Kup Entities, through its "affiliate-in-formation KK Bakery Holding Company, Inc." It stated that Mr. Levie and Mr. Sands – as "Chairman AIAC" and "Senior Advisor AIAC," respectively – would be the "Ultimate Shareholders." AIAC detailed its financial and management strategies for the Koffee Kup Entities after the sale, and emphasized that AIAC itself had any needed capital to support the acquired bakeries. The only authorized contact persons for the transaction were Mr. Sands and Mr. Levie ("Llevie@aiacgroup.com"); The offer was signed "Leonard M. Levie, Chairman." It then attached appendices providing additional information on AIAC's operations, including its "financial policy" and "management methods," which specified AIAC's management practices in global procurement, lean production, marketing and sales, internet, human resources, information technology, insurance, and accounting. [Facts, ¶ 82].

As noted earlier in this brief, the acquisition closed on April 1, 2021. [Facts, ¶ 114]

AIAC replaced the Koffee Kup CEO, J.F. Morin, (who acted as CEO for all of three bakeries [Facts, ¶ 23-25; 112-113]. Sands informed Morin of his removal and of his replacement by Mark Gauthier. [Facts, ¶ 112]. ████████████████████████

████████████████████████████████████████   ████████

████████████████████████████████████ and slated him to become the CEO post acquisition. [Facts, ¶ 101-102; 69; 78; 114].

Sands and Gauthier met with then-CFO and Controller Mark Coles [who occupied that role as to all three bakeries [Facts, ¶ 113; 18; 23], at which time Coles was told that Sands and Gauthier

were on the AIAC Turnaround team--Sands would be the "chief restructuring officer" and "Gauthier was going to replace J.F. Morin as the CEO."[Facts, ¶ 113].

The day after the purchase closing, Sands emailed to Morin and Gauthier a powerpoint that he was sending to the bakeries' vendors. The presentation begins with an AIAC cover graphic and on the next page includes the statement "On April 1, 2021, AIAC made a control investment in Koffee Kup Bakery." Sands and Gauthier are again described as "AIAC Executive Leadership for Koffee Kup" and David Cryer, Rhonda Hollady and Brian Shiau are all described as "Additional AIAC Leadership for Koffee Kup." That powerpoint included the same representations about AIAC, and its planned involvement in the bakeries, as had been included in the "Best New Owner" powerpoint send to the prospective sellers some time earlier. [Facts, ¶ 114].

Sands provided to Ben Richards, VP of manufacturing for Koffee Kup, a proposed AIAC employment agreement, despite the fact that Richards already had an employment agreement with Koffee Kup. The AIAC employment agreement was provided to Richards during an in-person meeting with Sands and Gauthier in a conference room at one of the bakeries.  [Facts, ¶ 106].  The AIAC Employment Agreement, directed to Ben Richards and signed "Sincerely, Mark Gauthier AIAC" is on AIAC letterhead and begins, "Dear Ben, It is our pleasure to have you as part of the Koffee Kup team going forward and we wish to solidify your employment with a new agreement." [Facts, ¶ 107].

On the day the purchase closed, Sands sent an email to Koffee Kup managerial employees Morin, Coles, Susan Leonard, Ben Richards and Leo De Serres, with copies to Mark Gauthier and Rhonda Hollady, attaching an "FAQ's" document. [Facts, ¶ 108]. The "FAQ" stated that:

> AIAC specializes in purchasing and turning around manufacturing businesses that are not performing to their potential. AIAC currently owns and manages 79 factories around the world, all of which were formerly distressed. … AIAC has brought in their inhouse turnaround team to restructure the business, manage it

through a transition and then establish a long-term strategic plan to guide the business in the decades which follow. …  We embrace lean thinking which means trimming unnecessary costs, tidier work areas and less production shortfalls.

[Facts, ¶ 109].

On April 5, Sands emailed Key Bank – the lender to whom the bakeries were in default – seeking the bank's agreement to a proposed course of action. To persuade the bank, Sands included what he referred to as "the framework budget we walked in the door with on Friday." This budget included a heading, "EBITDA Bridge-AIAC Turnaround Plan." It promised future savings resulting from changes in employment terms and conditions: a "Reverse of 2 new days of vacation" and other benefits savings. The AIAC Turnaround Plan included a total for "AIAC Net New Profitability." [Facts, ¶ 117]. AIAC was telling the bakeries' lender that it had a plan to try to make changes, to increase profitability under AIAC's control, in order to induce the lender to do what AIAC asked.

The day after that, on April 6 – as will be further described in a later part of this brief – Levie and Sands had a change of heart and decided that the bakeries were "dead" and that AIAC could not revive them. [Facts, ¶120-122].  AIAC then turned its efforts towards trying to get rid of the bakeries. Though the purchase agreement had promised that AIAC/KKBIC would inject needed capital into the bakeries to see them through the "turnaround," Levie decided not to make good on that commitment. [Facts, ¶¶ 120-122; 151-153].

As Levie stated later, "AIAC professionals swiftly developed a vigorous national sales process." [Facts, ¶ 134]. ███████████████████████████████

███████ [Facts, ¶ 127;129].

On April 8, Levie emailed Sands, "JS Please serve as monitor to Cup Co [sic] (the "Business") on behalf of KK Investment Company [sic] and its Board of Directors. Your duties

would include monitoring the Business and its executives and reporting back observations and recommendations to the Board of Directors with regard to financial and operational strategies. …" Levie testified that the reference to "KK Investment Company" was meant to be a reference to KKBIC. Levie testified he did not know what Board of Directors he was referring to in the email (stating "that might have been a reference to the board of Kup Co. or the board of KK Bakery Investment Company." He wasn't sure). In follow-up emails, Sands and Levie negotiated Sands' pay for that assignment, to be paid by "AIAC or its affiliates." [Facts, ¶ 141].

Among the work that Sands did in that regard – in the course of work for which Levie had retained him on behalf of AIAC– was his work on the shutdown and preparation of WARN Act notices. [Facts, ¶ 141-150]. AIAC paid him for that work, using the same AMTC piggybank from which it had paid for the purchase of the bakeries along with the insider debt. [Facts, ¶ 141-150].

Even though Levie and Sands constituted a majority of the board of Kup Co. (the bakeries' parent) – even though Sands testified as Rule 30(b)(6) representative that KKBIC (owned by himself and Levie) *controlled* the board of Kup Co, the parent of the bakeries [Facts, ¶ 161], they did not bother to adopt a resolution as the Kup Co. board that the bakeries should cease operations. [Facts, ¶ 160; 169]. (They did adopt a resolution that they try to negotiate a turnover to Key Bank on certain conditions; but that is not a decision to close the bakeries.) This striking fact shows that the corporate separateness of the bakeries, and their parent Kup Co., was completely disregarded; the decisionmakers did not even bother with a corporate formality that might have given them a figleaf of a claim that it was Kup Co. that made the decision to shut down. Further, there was not a single reference to Kup Co. or its board of directors-- as the purported decision-maker, or otherwise--in the too-late and inadequate WARN Act letters. [Facts, ¶ 6]

No officer or board of the bakeries made the decision to shut down. (Recall that the CEO had been ousted, as described above; and the new AIAC-appointed CEO, Gauthier, had left the scene.)

What happened instead is that Sands came in on April 26 and told CFO Coles, and Human Resources, that it was time to terminate all of the employees. [*Id.*, ¶ 165-167]. This had been preceded three days earlier by a teleconference involving Sands, "Rhonda" (Ms. Halladay, whom AIAC had picked to "lead … HR" as described earlier) and "AIAC lawyers" regarding drafting WARN Act notices in anticipation of firing all employees. [Facts, ¶ 165].

Sands did not have an engagement agreement with Kup Co., Koffee Kup, Vermont Baking, or Superior Baking. [Facts, ¶ 96-97]. Thus those entities had not authorized him to take any action as part of any "turnaround," much less any decision to shut down the bakeries. And, as noted above, Kup Co. had taken no board action directing its subsidiary bakeries to shut down. Sands, did, however, have ██████████████████ during the relevant period through and including the date of the shutdown. [Facts, ¶ 98-99; 141-150].

It was Sands – who had no agreement with any of the bakeries or even with Kup Co., as noted above – who signed the too-late WARN Act notices that he assisted with and sent out. [Facts, ¶¶ 4; 9; 150 ]. He signed not as a board member of Kup Co., but putatively as an agent of Koffee Kup [Facts, ¶ 9] – which, as has been explained above, he was not.

Both before and after the shutdown of the bakeries on April 26, 2021, AIAC provided prospective buyers of Koffee Kup with Levie's "Executive Summary" dated April 24, 2021. [Facts, ¶ 132]. The "Executive Summary" begins: "Profile: Distressed, regional commercial Bakery with brands … WARN Act notices printed but not yet distributed yet, motivated

stakeholders, … Common Stakeholder: affiliate of AIAC owns 80%, individuals own 20%; AIAC controls board. …" [*Id*., ¶ 132].

AIAC retained legal counsel (Epstein Becker) to deal with the plant closings, including the drafting of WARN Act notice. [Facts, ¶ 170]. And AIAC treats itself, in this litigation, as being among that counsel's clients in that regard – by claiming entitlement to attorney-client privilege for such communications.[Facts ¶ 170]

In summary, AIAC – in its own name and operating through its affiliate KKBIC – exercised complete *de facto* control over the bakeries during its period of ownership, up to and including the decision to shutter the bakeries. AIAC's vision from the outset was that it would be the "active owner," managing the business. It would impose its "New Team," ousting the existing CEO and placing its own man in the position. It would empower its "turnaround specialist" and its human resources specialist to change what they thought should be changed. It would change the terms and conditions of employment of employees at the bakeries, to save money. It made sure that it controlled the Kup Co. Board. It looked for buyers once it had given up on the bakeries. It ordered the Koffee Kup executives to fire the employees and shutdown the business. It prepared and signed the too-late WARN Act notices. It used its affiliates to pay for Koffee Kup related expenditures.

On this factor, this case is reminiscent of – yet even more extreme than – the conclusion reached in *D'Amico v. Tweeter Opco, LLC*, 453 B.R. 534, 545 (Bankr. D. Del. 2011)

> The Court finds that the Plaintiff has established de facto control by [Schultze Asset Management, or "SAM"] of [Debtor Tweeter's] employment practice. The Granoff [former CEO of Debtor] termination letter evidences SAM's control over the Debtor, especially the portion that states, "we felt we needed tighter control of Tweeter within our own organization." [SAM's CEO] George Schultze repeatedly called for reductions in payroll to increase profits. Further, George Schultze ordered Kelerchian to terminate employees of the Debtor in 2007, demonstrating his control over the Debtor's employment practice. With SAM employees on the Debtor's board, SAM's inside counsel supervising their actions, and SAM employees directly involved with terminating employees of the Debtor, the Court

finds that SAM's exercise of de facto control over the Debtor on the WARN Act issue was particularly egregious. See Pearson, 247 F.3d at 504 (concluding that if the de facto exercise of control is "particularly egregious," then liability is warranted).

Even if it stood alone, this extreme degree of de facto control and complete entanglement would suffice to show "single employer" status.

\* (iv) unity of personnel policies emanating from a common source. As discussed above regarding "de facto exercise of control," the control by AIAC as part of its "turnaround plan" specifically included assertion of the power to change personnel policies – for instance, reducing vacation days for all bakery employees, benefit reductions, staff reductions and rearranging routes as a way of boosting the corporate bottom line. [Facts, ¶ 114; 117]. And AIAC emphasized that its turnaround team, and turnaround plan, would include Human Resources matters. [*Id.*, ¶¶ 114; 117].

\* (v) the dependency of operations.  As discussed above, following the purchase agreement, the bakeries were dependent on AIAC and KKBIC for the capital that they would need in order to survive long enough to "turn around." That capital was promised, in the purchase agreement. That capital could not have come from KKBIC, which had no funds of its own. That capital would have come from AIAC, which had declared to the sellers and then to the bank that it had sufficient capital that it would not need to go to any lenders, for the needs of its "portfolio companies."

For all these reasons, the undisputed facts show that AIAC and KKBIC did not allow the bakeries to operate as independent legal entities in any sense. They did not operate at arms' length or even at fingers' length. They had, and exercised, complete control over every aspect of the bakeries' business, up to and including the decision to shut down without advance WARN Act notice. This makes them liable as part of the "single employer" with the bakeries under *Guippone* and other cases cited above.

**II.**     **The Class suffered violations of the WARN Act.**

Beyond any genuine issue of material fact, the Class suffered violations of the WARN Act, when the bakeries shut down – leaving the Class out of work – without the notice required by the WARN Act.

The basic rule of the WARN Act is that no employer may order a "plant closing" without providing sixty days' advance written notice to employees as well as to state and local government. *See* 29 U.S.C. §§ 2104(a)(1), (2).

A "plant closing" is "the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees." *See* 29 U.S.C. § 2101(a)(2).

It is undisputed that there was a "plant closing" at each of the bakeries. [Facts, ¶ 3].

And it is undisputed that <u>no</u> advance or even contemporaneous written warning of the plant closings was provided by Defendants to the employees. [Facts, ¶ 4].

Therefore, there is no genuine issue of material fact. As a matter of law, the class suffered a violation of the WARN Act, absent some defense; and as shown in the next section, there is no available defense to the Defendants.

It is conceivable that defendants will contend that one or two of the bakeries was too small in its employment rolls to constitute a covered "employer" on its own. *See* 29 U.S.C. § 2104(a)(1) ("the term 'employer' means any business enterprise that employs — (A) 100 or more employees, excluding part-time employees; or (B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)."

If there is any such argument, then the answer – beyond any genuine issue of fact – is that the three bakeries meet the WARN Act's test to constitute a "single employer." Thus their employment rolls are aggregated to meet the 100-person "employer" threshold. *See*, *e.g.*, *Childress v. Darby Lumber, Inc*., 357 F.3d 1000, 1005-07 (9th Cir. 2004) (applying "single employer" doctrine to aggregate employees at two facilities, thus reaching WARN Act coverage threshold); *United Paperworkers Int'l Union v. Alden Corrugated Container Corp*., 901 F. Supp. 426 (D. Mass. 1995) (same).

Plaintiffs have already shown, above, that the entire "business enterprise," 29 U.S.C. § 2101(a)(1), encompassing AIAC, KKBIC, Kup Co., and the bakeries were one "single employer." But it is also true, beyond any genuine issue of fact, that the three bakeries and Kup Co. would constitute a "single employer" even if considered on their own – and that for this reason, too, they would all meet the numerical threshold for "employer" coverage.

All of the *Guippone* factors demonstrate that the bakeries were a single employer among themselves. They were highly integrated with each other, operationally, financially, and in terms of human resources. Even the former CFO and the original Receiver recognize that they were, functionally, a single entity. The Chief Human Resources Officer understood "it was one company serving with three different locations." There was a concerted effort to *make them* functionally a single entity in terms of personnel policies, sales, cash flow, information technology, and the like. They had, together, a single CEO and a single CFO. Salesmen nominally working for one bakery would take orders to be fulfilled by another. One of the bakeries, Superior, existed only to bake the products that the other bakeries had promised to customers but could not fulfill on their own; it did not even receive any revenue in its own name. The bakeries had no directors of their own, and were wholly owned by Kup Co. (which owned Koffee Kup, which in turn owned Superior and

Vermont). Top executives nominally employed by Koffee Kup made decisions for *all* the bakeries. Further, the WARN letters all similarly state that "'Koffee Kup'. . . has announced it will be terminating all operations, effective April 26, 2021." Facts and evidence supporting all of this are contained in the Statement of Undisputed Facts, ¶¶ 10-12; 14; 17-19; 22-48.

These facts meet *Guippone* the factors. And these facts show without question that the three bakeries were not operated as separate entities at arms-length from each other. They were a single "business enterprise," the phrase used in the WARN Act's definition of "employer," 29 U.S.C. § 2101(a)(1), and were a single employer under *Guippone*.

## III.    No defenses or WARN Act "exceptions" are available.

The WARN Act does allow less than sixty days' advance notice of a plant closing under limited circumstances. *See* 29 U.S.C. § 2102(b)(1) (sometimes termed the "faltering company" exception)[2]; 29 U.S.C. § 2012(b)(2)(A) (sometimes termed the "unforeseeable business circumstance" exception).[3] But those exceptions are inapplicable here.

First, Defendants are precluded from invoking these exceptions because, beyond genuine dispute, they did not do what the statute requires. An employer relying on these exceptions "shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 29 U.S.C. § 2102(b)(3). Here, it is undisputed that defendants

---

[2] "An employer may order the shutdown of a single site of employment before the conclusion of the 60-day period if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business."

[3] "An employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required."

gave <u>no</u> advance or even contemporaneous WARN Act notice. They terminated employees without giving WARN Act notice, and (at best) mailed putative WARN Act notices at least the next day after that. [Facts, ¶ 4]. Thus employees would not have received any putative WARN Act notice until, at best, days *after* the plant closing; and the date of "receipt of notice" is the legal operative question. 20 C.F.R. § 639.8. There is, in this case, absolutely no reason why WARN Act notice could not have been given before the closure, or at least contemporaneous with it. (AIAC's privilege log, ECF No. 193-3, reflects that WARN Act notice was being drafted as early as April 23, but was not mailed until the evening of April 27, the day after the closing. Further, Sands testified the decision to shut down was made prior to April 23, 2021. [Facts, ¶ 123].)

Therefore, defendants are precluded from invoking the exceptions. *See*, *e.g.*, *Torres v. Niche, Inc*., No. 12-12059-RGS, 2013 U.S. Dist. LEXIS 177228 (D. Mass. Dec. 18, 2013) (explaining that employer that gave written notice only after the fact was precluded from relying on exception, and further explaining very limited circumstances, not present here, in which after-the-fact notice is permitted).[4]

But even if Defendants here were able to *try* to invoke these exceptions, still the exceptions are inapplicable on the undisputed facts. The burden of proof, on these exceptions and therefore on summary judgment, is on the employer. 20 C.F.R. § 639.9. "Because the WARN Act is remedial legislation, its exceptions are construed narrowly. Moreover, an employer relying on an exception

---

[4] "After the fact" notice is permissible in some rare cases where the facility is literally shut down by forces outside the employer's control, with no possibility of advance notice. This would include truly government-ordered shutdowns (as discussed in *Torres*, *supra*) and some shutdowns caused by natural disasters, 20 C.F.R. § 639.9(c)(4). Aside from such situations, an employer simply does not have the right, under the WARN Act, to *decide* to shut down a facility without advance or even contemporaneous WARN Act notice.

bears the burden of persuasion." *Local Union 7107, UMW v. Clinchfield Coal Co.*, 124 F.3d 639, 640-41 (4th Cir. 1997).

A.    **The "faltering company" exception is inapplicable.**

The § 2102(b)(1) "faltering company" exception is inapplicable here for several reasons. That exception covers (under some defined circumstances) employers who were, "as of the time that notice would have been required" (i.e., sixty days before the plant closing) "actively seeking capital or business" that would avoid the necessity of a plant closing. *Id.*

The belated, after-closure putative WARN Act letters said nothing about any such efforts happening in February, sixty days before the April 26 closing. [Facts, ¶ 8]. In fact, there were no such efforts because Koffee Kup hired G2 in late 2021 to assist it in finding a buyer and upon deciding to go this route, stopped looking for another lender. [Facts, ¶ 51].  Accordingly, defendants may not rely on any contention that they were "actively seeking capital" as of that snapshot date. The statutory requirement of a "brief statement" of the reasons for reduced notice, 29 U.S.C. § 2102(b)(3), requires that the employer actually put the reasons in writing. It cannot, then in litigation, offer other reasons that it did not put in the notice.

> As the district court aptly pointed out, Congress included the brief statement requirement not only to provide affected employees with notice of "the basis for reducing the notification period," 29 U.S.C. § 2102(b)(3), but also "to prohibit employers who have failed to provide the requisite 60-day notice from asserting litigation-convenient but factually post hoc justifications for their actions." Weekes-Walker, 877 F. Supp. 2d at 1207; see also *Alarcon v. Keller Indus., Inc.*, 27 F.3d 386, 389 (9th Cir. 1994) (finding that a formal notice statement may be brief, but must contain sufficient specificity and detail and give some indication of the factual circumstances that made the statutory exception applicable).

*Sides v. Macon Cty. Greyhound Park, Inc.*, 725 F.3d 1276, 1285-86 (11th Cir. 2013). And without anything meeting the "actively seeking capital" exception as of that snapshot date, this exception is inapplicable by its plain terms.

But even if one was permitted to look not at the snapshot date but at things that happened after April 1 purchase agreement, still this exception would be inapplicable.

Here, the decision to shut down the bakeries at the end of April came after AIAC itself decided *not* to put in the capital that AIAC/KKBIC had *promised* in the purchase agreement, and after AIAC had failed to quickly find a new purchaser, not a lender. Sands testified that "other than rescinding the sale, the only other possibility for the company to survive was to find a strategic buyer who could get enough synergies out of it to make the business work as it was." [Facts, ¶ 122]. The exception on its own terms is inapplicable to that effort. Looking for a purchaser does not come within this exception. *Reed v. Alecto Healthcare Servs*, No. 5:19-CV-263, 2022 U.S. Dist. LEXIS 164438, at *39-40 (N.D.W. Va. Aug. 2, 2022) (collecting cases).

Furthermore, AIAC had plenty of capital and did not need to rely on outside sources; AIAC had made a point of making this known to the sellers. [Facts, ¶82]. The piggy-bank of AMTC, which AIAC used for the purchase and various other purposes related to the bakeries, held around 100 million dollars. [Facts, ¶¶ 80; 86-87]. Even if for this reason alone, the § 2102(b)(1) exception is inapplicable. 20 C.F.R. § 639.9(a)(4) ("The actions of an employer relying on the 'faltering company' exception will be viewed in a company-wide context. Thus, a company with access to capital markets or with cash reserves may not avail itself of this exception by looking solely at the financial condition of the facility, operating unit, or site to be closed.").

Moreover, the defendant invoking the § 2102(b)(1) exception must prove that there was "a realistic opportunity to obtain the financing or business sought." 20 C.F.R. ¶ 639.9(a)(2). With the bakeries already long in default to their existing lender, Key Bank – and with its forbearance agreement having expired and the fraud that AIAC alleged [Facts, ¶¶ 95; 129-130; 139] – there

will be no way to prove a realistic prospect that someone else would provide new capital for the bakeries *when AIAC itself had decided not to.*

The § 2102(b)(1) exception also requires proof that the faltering company, seeking capital, actually <u>and</u> reasonably thought that giving WARN Act notice would scare off potential capital sources.

> The employer reasonably and in good faith must have believed that giving the required notice would have precluded the employer from obtaining the needed capital or business. The employer must be able to objectively demonstrate that it reasonably thought that a potential customer or source of financing would have been unwilling to provide the new business or capital if notice were given, that is, if the employees, customers, or the public were aware that the facility, operating unit, or site might have to close.

20 C.F.R. § 639(a)(4). There will be no evidence, here, to support such a showing. AIAC was, by Levie's own admission, seeking a "fire sale" with a purchaser willing to pay a pittance. [Facts, ¶ 126]. The bakeries were, "dead." [*Id.*, ¶ 121]. Giving WARN Act notice would not have scared off any potential deal partner who, for some reason, was willing to deal with dead bakeries. (Note that when the bakeries were eventually sold through receivership, the purchaser was a competitor who bought the bakeries and gave them a proper burial, reducing competition. [*Id.*, ¶ 131].)

**B.    The "unforeseeable business circumstance" exception is inapplicable.**

The § 2012(b)(2)(A) "unforeseeable business circumstance" exception is also inapplicable here.

First, even the putative WARN Act notices mailed *after* the shutdown did not mention any unforeseeable business circumstance. Instead, to the extent that the letter discussed the reasons for the shutdown, it focused on the failed attempt to find new "investors" (i.e., purchasers) and on the long-existing default to Key Bank. [Facts, ¶ 7].

AIAC and KKBIC have taken the position that the "big" surprising thing that happened, immediately after the purchase agreement, was that they (in their telling) realized that the sellers had hidden from them the last quarter's financials, and that the bakeries were even worse off than AIAC had realized. [Facts, ¶ 139; 142]. They claim to have been defrauded, even though they themselves decided to go ahead with the closing without having seen that last's quarter's numbers. [Facts, ¶ 139]. But the putative and too-late WARN Act notice said *nothing* about any such thing. [Facts, ¶ 139-140; 142]. Therefore, as already discussed in the previous section, defendants may not rely on any such thing in this litigation. *Sides v. Macon Cty. Greyhound Park, Inc*., 725 F.3d 1276, 1285-86 (11th Cir. 2013).

Even aside from that, such circumstances – even if proven – would not constitute a covered "unforeseeable business circumstance." "An important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition <u>outside the employer's control</u>." 20 C.F.R. § 639.9(b)(1). What AIAC and KKBIC are pointing at is not something "outside the employer's control," *id.* It is instead something about the bakeries themselves, and about decisions made by AIAC and KKBIC themselves – the decision to proceed with the purchase despite not having seen the latest quarter's numbers, the decision within days after the purchase to deem the bakeries "dead" and give up, and the decision not to provide the capital that they had promised. [Facts, ¶¶ 140; 139; 120-122]

If Defendants contend that Key Bank did something in April that was "unforeseeable," that was the cause of the shutdown, that too will fail for reasons like those discussed above. For substantial time even before the April 1 purchase agreement, it was clear that the relationship with Key Bank was on very thin ice. Even the too-late putative WARN Act notice said so: "Koffee Kup has been operating at a loss for some time. It has been in default of certain terms and conditions

of its outstanding loans including those with its senior lender. This lender had allowed the company to continue operating pursuant to a forbearance agreement that has expired." [Facts, ¶ 7]. The agreement with Key Bank actually required the bank's approval of any transaction such as the AIAC/KKBIC purchase agreement, yet the parties to that sale/purchase transaction proceeded with the sale without having that necessary approval. [Facts, ¶ 159; 162]. Then, just days after the April 1 purchase, as Sands testified, on April 6 "we told Key our opinion's changed on this, the business is -- is dead." [Facts, ¶ 121.]

It was certainly foreseeable that Key Bank would extend no more patience and would take any steps it believed appropriate to protect its interests as it saw them. *See* United *Paperworkers Int'l Union v. Alden Corrugated Container Corp.*, 901 F. Supp. 426, 443 (D. Mass. 1995) ("In light of this deepening downward fiscal spiral, the Bank of Boston's ultimate order to cease operations cannot be viewed as an unforeseen business circumstance within the meaning of the WARN Act. While certainly dramatic, the decision was neither unforeseen or sudden, but rather the culmination of the continuing, and admittedly worsening, financial devastation of Alden and Bates.").

For these reasons, there is no WARN Act "exception" that can save defendants from liability.

**IV.    Appropriate relief for the Class is to be awarded, as set out in the WARN Act.**

The WARN Act provides for mathematically calculated relief, including back pay and ERISA benefits for each day of violation. 29 U.S.C. § 2104(a)(1).

The calculation of the appropriate judgment for the Class is reflected in the Statement of Undisputed Facts, ¶¶ 181-183, with accompanying evidentiary support. The total amount is Three Million Five Hundred Ninety-One Thousand Five Hundred Forty-Eight Dollars and Ninety-Seven

Cents ($3,591,548.97), and judgment should be entered in that amount, jointly and severally against Defendants.

The WARN Act allows a discretionary, equitable, reduction in the recovery if the defendant "proves to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter," 29 U.S.C. § 2104(a)(4). Defendants will not be able to meet their burden of proof in that regard.

Indeed Defendants should not even be allowed to *try* to meet their burden of proof in that regard, having invoked the attorney-client privilege to avoid discovery of their communications with counsel about the WARN Act. Refusing to allow discovery of the critical communications about this very issue – whether defendants actually had both a subjective and objectively reasonable belief about what WARN Act compliance would require – is incompatible with proving good faith. *See*, *e.g.*, *Barnett v. Jamesway Corp.*, 235 B.R. 329, 345-46 & n.14 (Bankr. S.D.N.Y. 1999); *Wilson v. Airtherm Prods.*, No. 2-01-CV-00055-WRW, 2004 U.S. Dist. LEXIS 29334, at *43-44 (E.D. Ark. Sep. 29, 2004) ("It is also true that the attorney-client communications often become discoverable when the good faith is raised as an affirmative defense.").

## Conclusion

Judgment should be entered against AIAC, KKBIC, Koffee Kup, Vermont Bread and Superior, jointly and severally, in the amount of Three Million Five Hundred Ninety-One Thousand Five Hundred Forty-Eight Dollars and Ninety-Seven Cents ($3,591,548.97). The Class also requests that the Court order, for the sake of completeness, that the Receiver – who intervened voluntarily in the case – is bound by the judgment not in the sense of being personally liable but in the sense of being bound by the Court's findings, conclusions and judgment.

Respectfully submitted this 31st day of March, 2023.

By:    /s/      Mary E. Olsen
       THE GARDNER FIRM
       Mary E. Olsen (OLSEM4818)
       M. Vance McCrary (MCCRM4402)
       182 St. Francis Street
       Suite 103
       Mobile, Alabama 36602
       P: (251) 433-8100
       F: (251) 433-8181

       LANKENAU & MILLER, LLP
       Stuart J. Miller (SJM 4276)
       Johnathan Miller
       100 Church Street, 8th FL
       New York, NY 10007
       P: (212) 581-5005
       F: (212) 581-2122

       CLEARY SHAHI & AICHER P.C.
       Thomas P. Aicher, Esq.
       110 Merchants Row, Third Floor
       Rutland, VT 05701
       (802) 775-8800
       tpa@clearyshahi.com

       *Counsel for the Class*