UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| MATTHEW CHANEY, et al. ) <br> on behalf of himself and all others ) <br> similarly situated, ) <br> ) <br> Plaintiffs, ) <br> v. ) <br> ) <br> VERMONT BREAD COMPANY, et al. ) <br> ) <br> Defendants. ) <br> ) <br> and ) <br> ) <br> LINDA JOY SULLIVAN, in her ) <br> capacity as the Dissolution Receiver ) <br> ) <br> Intervenor-Defendant. ) | Civil Action No. 2:21-cv-120-wks |

**PLAINTIFFS' BRIEF IN OPPOSITION TO THE
MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS AIAC AND KKBIC [ECF
NO. 202]**

The named Plaintiffs and the Class they represent respectfully submit this brief opposing the motion for summary judgment filed by defendants AIAC and KKBIC ("AIAC Defendants").

To reduce the amount of unnecessarily duplicative reading, Plaintiffs will not repeat every fact that is stated in Plaintiffs' own filings seeking summary judgment in Plaintiffs' favor. The Court will be considering the cross-motions together, and so unnecessary duplication of reading is unwarranted. Plaintiffs incorporate, as part of their opposition to summary judgment, the brief and statement of undisputed facts in support of Plaintiffs' own motion for summary judgment as well as Plaintiffs' Motion to Strike the Affidavit of Jeffrey Sands, filed contemporaneously herewith and discussed in footnote 1, below. Here, Plaintiffs simply show that there are – at the very least – genuine issues of material fact that preclude summary judgment for AIAC Defendants.

1

AIAC Defendants make three arguments. Facts, showing at least genuine issues of material fact, will be discussed separately as to each.

**1. AIAC Defendants constituted a "single employer" along with the bakeries.**

First, AIAC Defendants argue that they do not constitute a "single employer" under the WARN Act. The governing precedent in this Circuit, which they do not cite, is *Guippone v. BH S&B Holdings LLC*, 737 F.3d 221, 225 (2d Cir. 2013).

Plaintiffs made an extensive argument in their brief in support of their summary judgment motion, showing that the undisputed facts show so much *de facto* control by AIAC Defendants – along with the other *Guippone* factors – that they are a "single employer" as a matter of law. *A fortiori* that extensive discussion shows that there is, at the very least, a sufficient showing to preclude summary judgment against the Plaintiffs.

AIAC Defendants argue otherwise, based solely on an affidavit by Jeff Sands ("Sands") that is full of conclusory statements that AIAC Defendants had nothing to do with any of this and that Kup Co. was the mastermind behind everything. Sands swears in conclusory fashion that AIAC had no involvement at all (Sands Affidavit, ECF No. 202-4 ¶¶ 7; 47) and that KKBIC's involvement was minimal at best.[1]

---

[1] As noted above, the Plaintiffs have contemporaneously filed a motion to strike the Sands affidavit as it is not only conclusory in these respects, but is contrary to indisputable facts. Consider, for instance, Sands' claim that KKBIC (or that Sands, as a representative of KKBIC) asked for, and received, and was precluded from knowing, various things on or before March 26, 2021. (Sands Affdavit, ECF No. 202-4, ¶¶ 8-14). But KKBIC did not even exist until March 29, 2021. [Plaintiffs' Facts, ¶ 74]. So Sands's affidavit on this point is nonsensical at best, perjurious at worst. Sands admitted, as 30(b)(6) representative of AIAC, that when he was asking for information about Koffee Kup prior to the birth of KKBIC, he was doing so on behalf of AIAC. [Additional Facts ¶ 2]. Consider also his claim that Kup Co. issued WARN Act notices on April 26. (Sands Affidavit, ¶ 39). In reality, the too-late and non-compliant WARN Act notices were signed by Sands himself putatively as agent of Koffee Kup (not Kup Co.). [Plaintiffs' Facts ¶¶ 6-9; ECF No. 201-29]. He signed as such, even though he had never been retained by Kup Co. or Koffee Kup to do anything.

As shown in Plaintiffs' summary judgment brief (ECF No. 203-2), AIAC is by its own description a "global acquirer of underperforming companies." It brags that it finds such companies, buys them, and – with the help of its touted "turnaround specialist" Sands – remakes them into profitability. [Plaintiffs' Statement of Undisputed Facts ("Plaintiffs' Facts") (ECF No. 203-3, ¶¶ 53; 57; 70; 82; 109].

According to its owner and chair Mr. Levie when testifying as its Rule 30(b)(6) witness, AIAC "operates through affiliates." [Plaintiffs' Facts, ¶ 65-66]. That's how it chooses to operate. For instance, it created a new affiliate, KKBIC, as the vehicle to buy the controlling interest in Kup Co. (which owned the bakeries) for one dollar, with Mr. Levie personally owning 85 percent of KKBIC and Mr. Sands owning the other 15 percent (which AIAC provided Sands pursuant to Sands' commission agreement with AIAC). [Plaintiffs' Facts, ¶¶ 71; 85; 92-94] It used another affiliate, AMTC – which is basically just a big bank account – to fund the purchase of the insider debt that was a related part of the purchase of the controlling interest. [Plaintiffs' Facts, ¶¶ 87; 133]

AIAC had touted itself, to the then-owners of Kup Co., as "The Best Future Owner of Koffee Kup Bakery," a "long term holder" with turnaround, long term and investment plans for Koffee Kup. It identified the people to consist of "AIAC Executive Leadership for Koffee Kup."

---

[Plaintiffs' Facts ¶¶ 96-97]. Rather, AIAC retained Sands, and promised to pay him directly or through an affiliate. [Plaintiffs' Facts ¶¶ 98-99, 141-142]. Levie testified that he, as chairman of AIAC had the authority to promise Jeff Sands, as he did in the directive email, to pay him either from AIAC or its affiliates. [Plaintiffs' Facts ¶ 141]. AIAC produced proof of this payment made via wire transfer-- through AIAC's affiliate piggybank AMTC for Sands' work on the closure of the facilities, among other things [Plaintiffs' Facts ¶¶ 143, 147-150]. And the notices, though dated April 26, undisputedly were not mailed until April 27 – and thus were received some unknown number of days later. [*See*, *e.g.*, Plaintiffs' Facts, Exhibit 47, AIAC Defendants' Privilege Log 3/1/2023, entry 32 (email from Sands, sent April 28, subject line "WARN Letter were mailed last night"; Exhibit 5, AIAC and KKBIC Supplemental Responses to Plaintiffs' Requests For Documents, S-11 (Sands communicated by email with a mailing house on Tuesday, April 27, 2021, and stated "Per federal regulations we have to mail these today. We're willing to pay an expedite [sic] fee to help.")]

3

It described itself as an "active owner," stating "We manage professionally and conservatively to build strong businesses." [Plaintiffs' Facts ¶¶ 69-70, 114]. AIAC made similar statements to the purchasers in an attachment to its offer letter, touting the team that AIAC would put into place – including a team-member over human resource matters. [Plaintiffs' Facts ¶ 82]. And, as Sands indicated in an email to Pat Reinhardt of G2, the "New Team" (described as including Jeff Sands, "Vermont resident who will lead transition through 2021 as CRO"; Mark Gauthier who "will act as CEO"; David Cryer "AIAC CFO"; Thea Kelly "able to fill a role as Controller or similar as needed"; Rhonda Halladay "will lead our HR, insurance, safety and regulatory diligence"; "Brian Shiau and Lyle Deitch will support DD activities") would "all report to Leonard at AIAC headquarters." [Plaintiffs' Facts ¶ 78]. AIAC (through Sands), post-acquisition, prepared a similar pitch for Koffee Kup suppliers, identifying Sands and Gauthier as "AIAC Executive Leadership for Koffee Kup" and Dave Cryer, Rhonda Hollady and Brian Shiau as "Additional AIAC Leadership for Koffee Kup." [Plaintiffs' Facts ¶ 114; Exhibit 35, pp. 62-80 of 92]. This same document included the following April 2 update: "AIAC closed on the acquisition yesterday (4/1) and today is our first day on the job. . ." [*Id.*] AIAC made similar statements to key Koffee Kup executives, in writing, shortly after the purchase, emphasizing that it "manages" the companies in its portfolio, and had brought in its "turnaround team." [Plaintiffs' Facts ¶¶ 108-110]. Sands, in his capacity as AIAC 30(b)(6) representative, specifically verified the accuracy of the statement from the FAQs Memo provided to Koffee Kup managerial employees Morin, Coles, Susan Leonard, Ben Richards and Leo De Serres that "AIAC has brought in their in-house turnaround team". [Plaintiffs' Facts ¶110].

AIAC, again through Sands, wrote to Key Bank shortly after the stock purchase, giving details of an "AIAC turnaround plan" for the bakeries, which included AIAC control over

4

employment-related decisions such as staffing, terms and conditions of employment, and pay raises. [Plaintiffs' Facts ¶ 117]. The same email touted the prospect of significant "AIAC Net New Profitability." [*Id.*]

AIAC replaced the Koffee Kup CEO, and proposed a new employment agreement on AIAC letterhead to Koffee Kup's VP for manufacturing. [Plaintiffs' Facts ¶ 101; 106-107; 112-114].

When AIAC Defendants quickly decided that they didn't want the bakeries after all, AIAC looked for a new purchaser—and according to Levie, eventually found the purchaser Flowers Bakeries. [Plaintiffs' Facts ¶ 120-122; 125-129; 134]. In a November 4, 2021 email from Leonard Levie to Key Bank personnel and others, Levie stated:

> Shortly after purchasing the company AIAC discovered that the company was much worse than had been described by the selling shareholders or its investment bankers and a turnaround was unlikely. AIAC notified Key Bank of the situation immediately. . .AIAC professionals swiftly developed a vigorous national sales process which pitted Bimbo Bakeries, the largest privately held bakery in the world against Flowers Bakeries, the largest publicly traded baked goods company in the world. This battle of the giants for Koffee Kup resulted in an astonishing $21 million in cash proceeds, including $16 million in cash from Flowers and $5 million in cash from the collection of the accounts receivable. The receiver, Ron Teplitsky, who was appointed by Key Bank, did not find Flowers. AIAC found Flowers. We contacted Flowers' head of mergers and acquisitions originally, held his hand for weeks and helped him to understand and appreciate the value of the assets of the company, particularly the brand name "Vermont Bread.". .

[Plaintiffs' Facts ¶ 134].

Even though Levie and Sands constituted the majority of the Kup Co. board of directors, they did not even bother to adopt a resolution for Kup Co. that the bakeries would shut down. [Plaintiffs' Facts ¶ 160]. (Sands' conclusory affidavit says that Kup Co. made the decision to shut down, but that conclusory statement is worth nothing as it contains no detail, and is contradicted

5

by the absence of any formal action by Kup Co. to that effect.) Indeed, the WARN Act letters provided to the State of Vermont and Connecticut contain no reference to Kup Co. or its board of directors, at all. [Plaintiffs' Facts ¶ 6]. AIAC hired WARN Act counsel to represent them and Kup Co., with Levie taking care to handwrite on the retainer agreement (which was kept in AIAC's records) that he was signing as Chairman of AIAC. [Plaintiffs' Facts ¶ 170]. AIAC Defendants withheld documents/communications in this matter on the basis of "Attorney Client Privilege", described in their March 2, 2023 "privilege log." [*Id*.] Many of these documents/communications withheld on the basis of "Attorney Client Privilege", involved the Epstein Becker lawyers (Cannavino and Mandelman) and concerned the closure of the bakeries and WARN issues. [*Id*.]

As noted above, Sands signed the too-late and non-compliant WARN Act notice, purporting to do so on behalf of Koffee Kup though he had never been retained by Koffee Kup or by any of the bakeries. [Plaintiffs' Facts ¶¶ 7-9; 96-97; ECF No. 201-29].

As AIAC trumpeted while attempting to sell Kup Co, "AIAC controls board." And as Sands testified as 30(b)(6) witness, KKBIC controlled the board of Kup Co. [Plaintiffs' Facts ¶¶ 132; 161]. Further, KKBIC's own answer to Plaintiffs' interrogatory 12 – signed under oath by Sands himself [See, Plaintiffs' Facts ¶ 89; Exhibit 31 to Plaintiffs' Facts, Interrogatory Response No. 12] – states in part that "While Kup Co. owned KKB, and therefore, SBI and VBC, there was a period where KKBIC was involved in operational decision-making for KKB, SBI and VBC. Jeff Sands would have been the person primarily involved on behalf of KKBIC." [Plaintiffs' Facts ¶ 169]. Further, Sands signed two prior affidavits, in which he claimed to "informally serve as chief restructuring officer of KK Investment Company ("KKIC") [sic]. . .the majority shareholder of KUP Co. and its subsidiaries. . ." [Additional Facts ¶¶ 10-11].

These and all of the other facts set forth in Plaintiffs' own summary judgment submission, show that AIAC Defendants are not entitled to summary judgment on the "single employer" issue.

6

Indeed, their factual submission is not enough even to create a genuine issue of material fact, much less to warrant judgment in their favor on this issue.

The *Guippone* factors all weigh in favor of a "single employer" finding, or at the very least demonstrate that there are genuine issues of material fact. Thus:

* On common ownership, and common officers and directors (factors 1 and 2), Sands states in conclusory fashion that KKBIC and Kup Co. "maintained separate and distinct officers and directors." [Sands Aff., ¶ 47]. Sands disavows any ownership, management, control or interest by AIAC, ignoring the fact that in his testimony and *his own* written communications (one of which he even attaches as Exhibit F to his affidavit), *AIAC* is described as having ownership of Koffee Kup (e.g., AIAC referenced as "buyer"; AIAC described as having "made a control investment in Koffee Kup Bakery"; stated that "AIAC closed on the acquisition yesterday (4/1) and today is our first day on the job.") [ECF No. 202-10; Plaintiffs' Facts ¶¶ 114; 159]. Sands, as the 30(b)(6) representative for AIAC, testified that AIAC was defrauded in the acquisition "by the parties who withheld the third period information from us"—namely "G2 and the seller. . . the owners. . . and their executives. . .Mark Coles." When Sands, as AIAC's 30(b)(6) representative was asked whether AIAC has done anything to recoup its losses as a result of the fraud that it contends happened as a result of the acquisition process, Sands stated "not yet. . .AIAC is looking at all their options, civil and criminal." [Plaintiffs' Facts ¶ 130]. Sands does not mention the undisputed fact that AIAC used its affiliate AMTC to fund the $1 million dollars paid for the Koffee Kup acquisition [Plaintiffs' Facts ¶ 87]. Further, Sands does not mention the undisputed fact that Levie was the AIAC "Chairman," sole director and sole member of AIAC's board of directors, sole owner and sole officer of AIAC; that Levie and Sands purportedly owned 85% and 15%, respectively, of the stock in KKBIC (Sands' 15% having been provided to him *by AIAC, pursuant*

7

*to Sands' commission agreement with AIAC*, while Levie claimed to obtain his 85% share in KKBIC by paying a nominal amount). [Plaintiffs' Facts ¶¶ 55; 92-94]. Sands does not mention the undisputed fact that he and Levie were the sole members of KKBIC-- Levie is the managing member and Jeff Sands is a "member". [Plaintiffs' Facts ¶ 75]. Sands does not mention that he and Levie were two of the three board members of Kup Co. [Plaintiffs' Facts ¶ 169]. Sands' affidavit is not honest on any of these points.

\* On unity of personnel policies emanating from a common source (factor 4), Sands states in conclusory fashion that AIAC Defendants had nothing to do with personnel policies at the bakeries. This claim is belied by the undisputed facts. AIAC (with Sands integrally involved) trumpeted that it would bring in its own HR specialist, as part of its turnaround team. [Plaintiffs' Facts ¶¶ 114; 78]. AIAC (through Sands) promised Key Bank that there would be substantial savings from employment-policy changes that were part of the "AIAC Turnaround Plan." [Plaintiffs' Facts ¶ 117]. AIAC replaced the Koffee Kup CEO, and offered a new AIAC-letterhead employment contract to at least one other top executive. [Plaintiffs' Facts ¶ 101; 106-107; 112-114]. Sands previously testified he *didn't know* who he was acting on behalf of, when asked about that, point-blank during his May 10, 2022 individual deposition in this matter. [Additional Facts ¶ 12 (Q. "You don't consider yourself having been representing AIAC throughout all of this?" A. "I don't know. Or Leonard or, quite frankly even myself for my 15 percent.")]. Sands' sworn, conclusory disavowal of any involvement by AIAC, whatsoever, and sworn, conclusory disavowal of any operational involvement by KKBIC are both remarkably disingenuous, at best.

\* On dependency of operations (factor 5), Sands once again denies it in conclusory fashion. But he ignores the fact that it was known even at the time of the purchase that, in order to survive, the bakeries would need the infusion of cash that AIAC/KKBIC promised in connection with their

8

purchase. They were, literally, dependent on AIAC Defendants for the funds needed to continue in business, but AIAC Defendants pulled the plug. [Plaintiffs' Facts ¶ 105; 117-121].

\* On *de facto* control – and on the ultimate inquiry into whether there was an arms'-length relationship – the facts are all as stated above and in Plaintiffs' summary judgment submission. The whole nature of the relationship between AIAC/KKBIC and Kup Co./bakeries was that AIAC, acting through itself and KKBIC, was going to take over control—managing it with AIAC's turn-around team. That's what AIAC does, acting directly and through its affiliates. In this instance, AIAC (through itself and KKBIC) set about to do exactly that, but decided instead to dump the bakeries through an attempted fire sale and ultimately shut the bakeries down. AIAC Defendants constituted part of a single employer; there is, at the very least, a genuine issue of material fact about that.

**2.    The "unforeseeable business circumstance" and "faltering company" provisions for reduced notice are not available in this case.**

Second, AIAC Defendants invoke the "unforeseeable business circumstance" and "faltering company" provisions for reduced notice. But those are not available in this case, especially not as a basis for summary judgment for the defendants; in fact, summary judgment should be entered against all defendants on these points. On these points, the burden of proof is on the defendants. 20 C.F.R. § 639.9; *Local Union 7107, UMW v. Clinchfield Coal Co*., 124 F.3d 639, 640-41 (4th Cir. 1997). So, their burden on summary judgment is to make such a compelling and undisputed case, that a reasonable fact-finder would *have to* agree with them.[2]

---

[2] AIAC Defendants represent that the State of Vermont determined that the Company was exempt from the notice requirement under the WARN Act.  This is incorrect—there was no determination by the State of Vermont with regard to the applicability of the federal WARN Act in this matter. . Further, the exhibit cited by the AIAC Defendants is not  a letter from the State Labor Department's General Counsel .  And even if the AIAC Defendants had correctly cited the letter,  it is quite

A.     "Unforeseeable business circumstance"

AIAC Defendants claim, as an "unforeseeable business circumstance" that caused the plant closings, that they were defrauded into purchasing the controlling interest in Kup Co. The fraud, they say, is that the financial report for the last prior reporting period was withheld from them before the closing, such that they closed on the purchase without knowing that the bakeries were in even worse shape than they thought.

AIAC Defendants mention some other things in their "unforeseeable business circumstance" argument; but they do not even attempt to prove that any of those other things was unforeseeable. They note the "the deep, intractable insolvency" of the business (Sands Affidavit, ¶ 45) but that is not an "unforeseeable business circumstance" in itself. It is instead inherently a

---

obviously not a basis for summary judgment; at most it would be a piece of evidence, against which Plaintiffs can create a genuine issue of material fact.

Such a letter is not even admissible as evidence. Its only conceivable basis for admissibility would be Fed. R. Evid. 803(8) (allowing, as a hearsay exception, "A record or statement of a public office if: (A) it sets out: … (iii) … factual findings from a legally authorized investigation; and (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.").

The Rule "bars the admission of statements not based on factual investigation." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169, 109 S. Ct. 439, 450 (1988). "It is the methodology of factual investigation which provides a threshold safeguard against untrustworthiness." *Ariza v. City of N.Y.,* 139 F.3d 132, 134 (2d Cir. 1998). In other words, under *Ariza*, where there is no methodology that creates a threshold safeguard against untrustworthiness – as there is not, here – there is not even an "investigation." But even if there is an investigation, then the question turns more particularly to its lack of trustworthiness.

Here, the miscited letter would show that the only things that led up to it were (1) a query to Sands as to why the normally-required amount of notice had not been given under Vermont's Notice of Potential Layoffs Act , and (2) a response from Epstein Becker. That is not an "investigation" (Fed. R. Evid. 803(8)) in any meaningful sense, because there was no "methodology" (*Ariza*, *supra*) that created a threshold safeguard of factual reliability. Even if it were an investigation, "the source of information or other circumstances" – i.e., relying *solely* on a letter from counsel retained by AIAC – "indicate a lack of trustworthiness," *id.*

10

thing about the business itself on an ongoing basis, not about something sudden and external that happened. AIAC Defendants mention their inability to find an investor or purchaser to take the bakeries off their hands (ECF No. 202-1, p. 17), but they cite no evidence that the failure to find a purchaser was "unforeseeable." (It hardly could be, when AIAC Defendants obtained a controlling interest just weeks earlier at a purchase price of $1, and were now claiming that the business wasn't even worth what they paid, and were refusing to fund the operations through a turnaround as they had promised in the purchase agreement.) They mention that Key Bank "called its loan" on April 22 (*id.*), but they cite absolutely no evidence that this was unforeseeable in light of the long default already existing at the time of the April 1 purchase, and in light of AIAC Defendants' stated refusal to fund the operations through a turnaround as they had promised. Recall that AIAC Defendants quickly decided – within days after the purchase – not to make the promised capital investment. [Plaintiffs' Facts, ¶¶ 118-122]. AIAC deemed the bakeries to be "dead" and told Key Bank as much on April 6, 2021, after Levie and Dave Cryer[3] called Sands, saying "[t]here's just no way this company is saveable." [*Id.*, ¶¶ 118-122]. AIAC tried, in the weeks after that, to find a purchaser who would buy the bakeries "fast," even if for practically nothing – a "trivial, fire sale" price. [*Id.*, ¶¶ 121-122; 124-129; 131-132; 158].  In its sale materials, AIAC highlighted that there was a "common stakeholder" and described the ownership structure of Kup Co. as follows: "affiliate of AIAC owns 80%, individuals own 20%; **AIAC controls board**." (emphasis added). [*Id*. at  ¶ 132]. AIAC Defendants' lawyers call it unforeseeable that Key Bank "called its loan" on April 22; but the only evidence cited is paragraph 38 of the Sands affidavit, which says no such thing. As shown in the brief in support of Plaintiffs' motion for summary judgment, it was entirely foreseeable.

---

[3] As shown herein, Cryer was described in a Sands' email to G2 as "AIAC CFO" and as "AIAC Additional Leadership for Koffee Kup" in an AIAC pitch intended for Koffee Kup suppliers. [Plaintiffs' Facts ¶ 78; 114; Exhibit 35, pp.  62-80 of 92].

11

Further, with regard to AIAC Defendants' story that they were defrauded into closing on the purchase there is absolutely no mention of that anywhere in the too-late WARN notice--in fact, the too-late WARN Act letters contain no reference to any unforeseeable or surprising event that was the cause of the layoffs referenced therein. [Plaintiffs' Facts ¶¶ 7-8; ECF No. 201-29]. Therefore the defense is categorically unavailable, as described below.

And, there are genuine issues of material fact as to whether their story is even correct. A reasonable fact-finder could reject their claim that Kup Co. had prepared the financial report for the last prior period ("P3"), prior to the closing, and withheld it. AIAC Defendants, in contending that, rely on the Sands' Affidavit, but Sands states no basis for personal knowledge of the historical fact of when the P3 report was finished. He says in his affidavit (¶ 18) that he later saw an email chain reflecting that it was finished on March 30, two days before the closing. But the cited attachment, Exhibit C to his affidavit, simply does not reflect any such fact. Nor does Exhibit D or any other exhibit. A finder of fact, on this record and taking the evidence in the light most favorable to the Plaintiffs, could believe that Koffee Kup's CFO Coles told Sands the truth: that the P3 report was not yet finalized. [Additional Facts, ¶ 3].

A reasonable fact-finder could further conclude that AIAC and KKBIC had access to information, prior to closing, that told them that revenues were down during that last reporting period. Koffee Kup gave AIAC access, starting March 12 through the acquisition date, to its "BIRST" system which tracked sales, as well as training on how to use the BIRST system; it would have shown AIAC and KKBIC that sales were down in P3, resulting in less-than-expected revenue. [Additional Facts, ¶ 4, 6, 7]. And that reduction in revenue was the main reason for the greater-than-expected loss during that last reporting period. [Additional Facts, ¶ 6]. Further, Sands, when testifying in the involuntary bankruptcy proceeding involving Koffee Kup, did not dispute that

12

Gauthier was provided BIRST access on March 12, 2021 through the date of the acquisition. [Additional Facts, ¶ 7].

A reasonable fact-finder could find – indeed it is undisputed – that Koffee Kup, through Coles, told Sands before the closing that sales for the period had been soft resulting in lower income. [Additional Facts, ¶ 5].

And a reasonable fact-finder could further note that AIAC Defendants were not under any contractual obligation to close before getting the formal report for the last reporting period prior to the acquisition—Sands was unaware of any contractual obligation to close by April 1, 2021-- yet, in spite of efforts to get the P3 financials, the closing on the acquisition occurred without the P3 financials having been provided. [Plaintiffs' Facts, ¶ 139].

For these reasons, a reasonable fact-finder could reject their "unforeseeable business circumstance" story entirely; there is at least a genuine issue of material fact. Indeed, the *only* reasonable conclusion that a finder of fact could reach was that the very sorry state of the business was *not* "unforeseeable."

Second, AIAC Defendants' story – even if proven – would not constitute an "unforeseeable business circumstance" within the meaning of the WARN Act. It is a story that is all internal to the employer itself, about the financial well-being of the employer itself, not caused by any sudden and unforeseeable external thing. "An important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control." 20 C.F.R. § 639.9(b)(1).

Third, AIAC Defendants are precluded from relying on the "unforeseeable business circumstance" because they *never* provided a proper WARN Act notice. "Courts to consider the issue appear to have uniformly held that giving proper shortened notice is a prerequisite to

invoking one of the statutory exceptions." *Newman v. Crane*, 435 F. Supp. 3d 834, 843 (N.D. Ill. 2020). In order to be a lawful shortened notice due to unforeseeable business circumstances, the notice must explain what the unforeseeable business circumstance is. 29 U.S.C. § 2102(b)(3); *Alarcon v. Keller Indus.*, 27 F.3d 386 (9th Cir. 1994).

> This requirement exists in part to allow employees to assess whether the notice period was properly shortened, see *Grimmer v. Lord Day & Lord*, 937 F. Supp. 255, 257 (S.D.N.Y. 1996) (citing *Alarcon v. Keller Indus.*, 27 F.3d 386, 389 (9th Cir. 1994)), and also "to prohibit employers who have failed to provide the requisite 60-day notice from asserting litigation- convenient but factually post hoc justifications for their actions." *Sides v. Macon Cty. Greyhound Park, Inc*., 725 F.3d 1276, 1285-86 (11th Cir. 2013) (quoting *Weekes-Walker*, 877 F. Supp. 2d at 1207).

*Newman*, 435 F. Supp. 3d at 843-44. "All notice must be specific." 20 C.F.R. § 639.7(1).

Even the belated notice, mailed to employees after the plant closings,[4] did not contain the required information. It said nothing about AIAC or KKBIC having been defrauded, or about their not knowing how badly-off the business was when they bought it. Although that is the centerpiece of their current "unforeseeable business circumstance" argument, they did not mention it in the belated notice. This was a complete failure to comply with 29 U.S.C. § 2102(b)(3); and so there was *never* any "proper" notice (*Newman*, *supra*) at all. Therefore the defense is categorically unavailable.

### B. "Faltering company"

Next, AIAC and KKBIC invoke the WARN Act's "faltering company" provision which, under certain defined circumstances, refers to businesses that are "actively seeking capital" that

---

[4] A reasonable fact-finder could find – as the evidence shows--– that notice was not mailed until April 27. [Receiver's Facts ¶ 35-36; Plaintiffs' Facts, Exhibit 47, AIAC Defendants' Privilege Log 3/1/2023, entry 32 (email from Sands, sent April 28, subject line "WARN Letter were mailed last night"; Exhibit 5, AIAC and KKBIC Supplemental Responses to Plaintiffs' Requests For Documents, S-11 (Sands communicated by email with a mailing house on Tuesday, April 27, 2021, and stated "Per federal regulations we have to mail these today. We're willing to pay an expedite [sic] fee to help.")].

would avoid a plant closing. Everything that Plaintiffs said about this provision, in the brief in support of their motion for summary judgment, remains applicable. Without repeating all of that, but still relying on it, Plaintiffs state as follows.

There is no evidence that AIAC, KKBIC, or Kup Co. were attempting to raise "capital" in the sense of issuing new shares to sell in order to infuse Kup Co.'s bank account with capital. Instead, the evidence shows (undisputedly, but at the very least with the facts taken in the light most favorable to Plaintiffs) that AIAC was attempting to *sell* Koffee Kup [Plaintiffs' Facts ¶¶ 125-129; 131-132]. As shown in Plaintiffs' brief in support of their motion for summary judgment, an attempt to find a *purchaser* for a company does not come within the "faltering company" provision. *Reed v. Alecto Healthcare Servs*, No. 5:19-CV-263, 2022 U.S. Dist. LEXIS 164438, at *39-40 (N.D.W. Va. Aug. 2, 2022) (collecting cases).

AIAC Defendants may or may not be contending that they were also seeking "capital" in the sense of finding a new additional lender. Their evidence on this, such as it is, consists of an oblique reference in paragraph 30 of Sands's affidavit: "KKBIC attempted to secure external funding or a new investor to keep the Company operational. Not being able to raise the necessary infusion of additional funds, …" That is entirely insufficient to meet the defendants' burden of proof on the "faltering company" provision—Sands does not even bother to identify any lender from whom the alleged external funding was sought. With regard to the so-called "two qualified investors," Sands previously testified that, of the *buyers* that he spoke to before the shutdown, *only two* proceeded to a level of starting to talk about a potential *price*. Those two potential *buyers* were Mike Pinkowski and Jeff Black (the same ones he now references as "two qualified investors," see paragraphs 31-32 of the Sands' Affidavit), but the amount they offered to pay for the company was so little that "Key Bank told them to get lost." [Plaintiffs' Facts ¶ 124].

15

A defendant invoking this provision must show that there was "a realistic opportunity to obtain the financing or business sought." 20 C.F.R.¶ 639.9(a)(2). AIAC Defendants have not even attempted to show (and cannot show) that they had a realistic likelihood of success in finding a new lender, given the state of the business and given that the business was already deep in the hole with its existing lender, Key Bank. Moreover, as noted in Plaintiffs' prior brief, this provision is not available in this case given that AIAC itself – part of the single employer – had ample funds of its own to infuse into the business. It is just that AIAC had decided to break its promise and not to infuse the business with that capital. *See* 20 C.F.R. § 639.9(a)(4) ("The actions of an employer relying on the 'faltering company' exception will be viewed in a company-wide context. Thus, a company with access to capital markets or with cash reserves may not avail itself of this exception by looking solely at the financial condition of the facility, operating unit, or site to be closed.").

### 3. Joinder of Kup Co. was not required.

Finally, AIAC Defendants argue that Kup Co. – the parent of Koffee Kup which was in turn the parent of Vermont and Superior – is a "necessary party." Although AIAC Defendants don't mention Rule 19, or any other Rule as the basis for this argument, Rule 19 would govern the issue. AIAC Defendants make no attempt to explain how Kup Co. supposedly comes within the language of Rule 19(a), which describes who will count as "persons required to be joined if feasible."

If this were a serious argument, AIAC and KKBIC would have made it a long time ago, because the remedy for the absence of a "person[] required to be joined if feasible" (Rule 19) is to *join them* if possible. *See* Rule 19(a)(2). Kup Co. could be joined, if required.

But it is not a serious argument.

> A plaintiff asserting a single employer claim under the WARN Act, however, may choose not to name a direct employer without foundering on Rule 19, as the Supreme Court has held that joint tortfeasors are not indispensable parties under

16

>Rule 19(a). *See Temple v. Synthes Corp. Ltd*., 498 U.S. 5, 8, 111 S. Ct. 315, 112 L. Ed. 2d 263 (1990). According to the Advisory Committee Notes to Rule 19(a), "a tortfeasor with the usual 'joint-and-several' liability is merely a permissive party to an action against another with like liability.". …
>
>A direct employer, in the context of a WARN Act claim brought under a single employer theory, is such a joint tortfeasor.

*Garner v. Behrman Bros. IV, LLC*, 260 F. Supp. 3d 369, 381 (S.D.N.Y. 2017); *Law v. Am. Capital Strategies, Ltd.*, 2007 U.S. Dist. LEXIS 5936, *51-52 (M.D. Tenn. Jan. 26, 2007) (likewise holding that direct employer was not an indispensable party against alleged "single employer" defendant; "because of joint and several liability, joint tortfeasors and co-conspirators are not indispensable parties under the Federal Rules of Civil Procedure").

Kup Co. is even less like a "necessary" party in this case than the "direct" employers found to be non-necessary in *Garner* and *Law*. Kup Co. was a parent corporation, not the direct employer. While AIAC Defendants assert that Kup Co. was the decisionmaker in all respects, that is not true (and certainly not undisputed). As noted above, in its sale materials, AIAC highlighted that there was a "common stakeholder" and described the ownership structure of Kup Co. as follows: "affiliate of AIAC owns 80%, individuals own 20%; AIAC controls board." [Plaintiffs' Facts ¶ 132]. Kup Co. did not make the decision to shut down; there was no action by the board of Kup Co. to that effect (as contrasted with an earlier action by Kup Co.'s board seeking a deal with Key Bank. [Plaintiffs' Facts, ¶¶ 160; 162-164]. Further, the engagement agreement with Epstein Becker (the law firm that provided the WARN Act advice in this matter) was signed by Levie as chairman of AIAC and was kept in AIAC's records. The Epstein Becker retainer was paid—not by Kup Co. or KKBIC--but by an AIAC affiliate, Titanium Fabrication Corporation. That payment from Titanium Fabrication Corporation to Epstein Becker was authorized by Levie. [Plaintiffs' Facts, ¶ 170]. Titanium Fabrication Corporation has also paid for Koffee Kup-related work by other

17

professionals including the law firms of Cummings & Lockwood (a firm that represented AIAC/KKBIC in arbitration proceedings commenced by the former owners of Kup Co. against AIAC/KKBIC); Dinse (retained by AIAC in Koffee Kup related matters). These payments were authorized by Levie from Titanium Fabrication Corporation. [Plaintiffs' Facts, Exhibit 26, pp. 45, 73 of 95; Exhibit 21, p. 20 of 21; Exhibit 19, AIAC/KKBIC 30(b)(6) Deposition (Levie) Excerpts, p. 87, Lines 9-23]. And Titanium Fabrication Corporation has paid for services *provided to AIAC* by David Cryer (recall that Cryer was described by Sands as "AIAC CFO" ) including services Cryer performed *specifically related* to Koffee Kup, pre- and post-acquisition, which were invoiced *to AIAC*. [Additional Facts ¶ 1; Plaintiffs' Facts, ¶ 78; Exhibit 26, p. 44 of 95].

And, as referenced herein, Kup Co. is not mentioned in the too-late WARN Act notice; rather, the too-late WARN Act notice indisputably states that "Koffee Kup. . .has announced that it will be terminating all operations." Koffee Kup employees assisted Sands with the WARN letter, which Sands signed, alleging himself to be an agent of Koffee Kup though he had never been retained by Koffee Kup in any capacity. [Plaintiffs' Facts ¶¶ 7-9; 11-12; 96-97; see also ECF No. 201-29 ("'Koffee Kup' must terminate all operations effective immediately. . ." ].

The cases cited by AIAC Defendants are inapposite. *Freeman v. Nw. Acceptance Corp.*, 754 F.2d 553 (5th Cir. 1985) involved an attempt to manufacture diversity jurisdiction by suing not the tortfeasor but its parent corporation, not based on any alleged involvement by the parent corporation but simply on the theory that it was an "alter ego." *Id.* at 559 ("The Freemans seek to impose liability on Northwest not for its own acts, but for those of First Commercial."). *Rubler v. Unum Provident Corp.*, 2007 U.S. Dist. LEXIS 7791 (S.D.N.Y. Jan. 25, 2007), was likewise an attempt to manufacture diversity jurisdiction by dropping the non-diverse defendant whose conduct was *undisputedly* the whole issue in the case (it was the issuer of insurance policies, and

it refused to pay). The court in *Rubler* rejected the parties' attempt to create jurisdiction by substituting, as the defendant, a parent incorporated elsewhere.

Here, unlike in those cases, AIAC Defendants are sued for their own acts. Kup Co. is not a necessary party.

Based on all of the foregoing facts, arguments and authorities, Plaintiffs respectfully request the Court to deny AIAC Defendants' motion for summary judgment.

Respectfully submitted this 1st day of May, 2023.

By: /s/ Mary E. Olsen
THE GARDNER FIRM
Mary E. Olsen (OLSEM4818)
M. Vance McCrary (MCCRM4402)
182 St. Francis Street
Suite 103
Mobile, Alabama 36602
P: (251) 433-8100
F: (251) 433-8181

LANKENAU & MILLER, LLP
Stuart J. Miller (SJM 4276)
Johnathan Miller
100 Church Street, 8th FL
New York, NY 10007
P: (212) 581-5005
F: (212) 581-2122

CLEARY SHAHI & AICHER P.C.
Thomas P. Aicher, Esq.
110 Merchants Row, Third Floor
Rutland, VT 05701
(802) 775-8800
tpa@clearyshahi.com

*Counsel for the Class*