## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| MATTHEW CHANEY, NADIE MILLER and ARTHUR GUSTAFSON on behalf of themselves and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| VERMONT BREAD COMPANY, SUPERIOR BAKERY, INC., KOFFEE KUP BAKERY, INC., KOFFEE KUP DISTRIBUTION, LLC, KK BAKERY INVESTMENT COMPANY LLC, KK BAKERY HOLDING ACQUISITION COMPANY, AND AMERICAN INDUSTRIAL ACQUISITION CORPORATION, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | Docket No. 2:21-cv-120-wks |
| | ) | |
| LINDA JOY SULLIVAN in her capacity as the dissolution receiver for Koffee Kup Bakery, Inc., Vermont Bread Company, Inc. and Superior Bakery, Inc., | ) ) ) ) ) | |
| Intervenor-Defendant Cross-Claimant, | ) ) ) | |
| v. | ) ) | |
| KK BAKERY INVESTMENT COMPANY, LLC KK BAKERY HOLDING ACQUISITION COMPANY, AND AMERICAN INDUSTRIAL ACQUISITION CORPORATION, | ) ) ) ) ) | |
| Crossclaim-Defendants. | | |

**PLAINTIFFS' RESPONSES TO AIAC DEFENDANTS' STATEMENT OF
UNDISPUTED MATERIAL FACTS AND PLAINTIFFS' STATEMENT OF
<u>ADDITIONAL FACTS</u>**

Plaintiffs, on behalf of themselves and the Class they represent, hereby respond to AIAC

Defendants' "Statement of Undisputed Material Facts" (ECF No. 202-2). AIAC Defendants'

"Statement of Undisputed Material Facts" is based solely on the affidavit of Jeffrey Sands

("Sands Affidavit" (ECF No. 202-4)). Plaintiffs have contemporaneously moved to strike the

Sands Affidavit as sham. In the event the Sands Affidavit is not stricken, or only partially

stricken, in response to Plaintiffs' Motion to Strike, Plaintiffs provide the following responses to

AIAC Defendants' "Statement of Undisputed Material Facts", as well as Plaintiffs' Statement of

Additional Facts:

1.      American Industrial Acquisition Corporation ("AIAC") and KK Bakery

Investment Company LLC ("KKBIC") two of the defendants in the above-referenced  action.

See Complaint, generally.

**RESPONSE:**  Plaintiffs admit that American Industrial Acquisition Corporation

("AIAC") and KK Bakery Investment Company LLC ("KKBIC") are two of the defendants

in the above-referenced action.

3.      KKBIC entered into an agreement to invest in Kup. Co. through the  purchase of

certain shares of stock ("Agreement"). See Affidavit of Jeff Sands, sworn to  on March 31, 2023

("Sands Affidavit"), ¶3.[1]

**RESPONSE:**  Plaintiffs deny that this statement accurately describes the Stock Purchase

Agreement dated April 1, 2021 ("SPA").  Rather, in the SPA, the purchaser (identified in the SPA

as KKBIC, which had been formed by AIAC in order to acquire a majority interest in Kup Co.)

---

[1] There was no Paragraph 2 in AIAC Defendants' "Statement of Undisputed Material Facts" (ECF No. 202-2).

acquired 80% of the stock of Kup Co. for a purchase price of $1. Kup Co. Inc. had no "Tangible Personal Property". The purchaser agreed "to through one or more of its Affiliates to provide up to $2.5 million of guaranties or other form of credit support required over time in order to refinance existing Indebtedness of the Group, execute the current Company programs in process, or for general working capital purposes." "Existing Subordinated Debt" (amounting to $14,314,000) was sold as part of the SPA for $1,000,000. AIAC used its affiliate AMTC to fund the $1 million dollars paid for the Koffee Kup acquisition. See, Plaintiffs' Statement of Undisputed Facts ("Plaintiffs' Facts" (ECF No. 203-3), ¶¶ 71; 133; 87).

4.    The counterparties to the Agreement (collectively "Sellers") were Kup Co., its existing shareholders: Bripan SARL, Socipar SAS, and 9249-9557 Quebec Inc.; and the subordinated debt holders: Jose Aubery, Bertrand Aubery, and Hubert Aubery. See Sands Affidavit, ¶3.

**RESPONSE:** Plaintiffs deny that this statement accurately describes the counterparties to the Stock Purchase Agreement dated April 1, 2021 ("SPA"), attached as Exhibit A to the Sands Affidavit. According to the SPA, Bripan S.a.r.l., Socipar S.a.s., and 9249-9557 Quebec Inc. were shown as existing shareholders as well as subordinated debt holders. See, Plaintiffs' Facts ¶ 133.

5.    The Sellers' broker was G2 Capital Advisors LLC ("G2 Capital Advisors"). See Sands Affidavit, ¶4.

**RESPONSE:** Plaintiffs deny that this conclusory statement accurately reflects G2 Capital Advisors' engagement. G2 Capital Advisors' engagement was with Koffee Kup. See, Plaintiffs' Facts, ¶ 51.

6.      Kup Co. owned Koffee Kup Bakery, Inc. ("KKB"), which owned VBC, Inc. and Superior Bakery, Inc. (collectively "Company").  See Sands Affidavit, ¶5.

**RESPONSE:**  Plaintiffs admit for purposes of AIAC Defendants' motion for summary judgment - and for no other purpose - that this statement is accurate.

7.      AIAC owned no equity or debt in KKBIC, Kup Co. or in Kup Co.'s subsidiaries. See Sands Affidavit, ¶7.

**RESPONSE:**   Plaintiffs deny that this conclusory statement accurately describes AIAC's ownership of KKBIC, Kup Co. and the Kup Co. subsidiaries.  Rather, the record in this case has established that after AIAC explored the possibility of acquiring Koffee Kup and its subsidiaries, it formed a special purpose entity, KKBIC, in order to acquire a majority interest in Kup Co., which was Koffee Kup's 100% owner. [Plaintiffs' Facts, ¶ 71]. AIAC stated in writing that, "[o]n April 1, 2021 it made a control investment in Koffee Kup Bakery" and that "AIAC closed on the acquisition yesterday (4/1) and today is our first day on the job. . ." [Plaintiffs' Facts ¶114, Exhibit 35, p. 64, 78 of 92, from "Sands 4/2/21 email with Vendor Powerpoint"].  AIAC used its affiliate AMTC to fund the $1 million dollars paid for the Koffee Kup acquisition. [Plaintiffs' Facts, ¶ 87].  AIAC provided Sands with 15% of the equity of KKBIC. This compensation was provided to Sands pursuant to his commission agreement with AIAC.  [Plaintiffs' Facts, ¶¶ 92-93].  KKBIC had no bank account and is insolvent.  [Plaintiffs' Facts, ¶¶ 144-145].  In Exhibit F to Sands' affidavit, Sands referenced AIAC as the "buyer" in the Koffee Kup acquisition.  [ECF No. 202-10; Plaintiffs' Facts ¶ 159].  AIAC contends it was defrauded in the acquisition and sought to quickly sell the KUP Co. subsidiaries.  AIAC hired Caren Turner to assist in finding potential buyers for Koffee Kup Bakery.  [See, Plaintiffs' Facts, ¶¶ 127; 129].  Sands, as the 30(b)(6) representative for AIAC, testified that AIAC was defrauded

4

in the acquisition "by the parties who withheld the third period information from us"—namely "G2 and the seller. . . the owners. . . and their executives. . .Mark Coles." When Sands, as AIAC's 30(b)(6) representative was asked whether AIAC has done anything to recoup its losses as a result of the fraud that it contends happened as a result of the acquisition process, Sands stated "not yet. . .AIAC is looking at all their options, civil and criminal." [Plaintiffs' Facts ¶ 130; see also Responses to ¶¶ 8-9]. According to a November 4, 2021 email from Leonard Levie to Key Bank personnel and others, Levie stated:

> Shortly after purchasing the company AIAC discovered that the company was much worse than had been described by the selling shareholders or its investment bankers and a turnaround was unlikely. AIAC notified Key Bank of the situation immediately. . . AIAC professionals swiftly developed a vigorous national sales process which pitted Bimbo Bakeries, the largest privately held bakery in the world against Flowers Bakeries, the largest publicly traded baked goods company in the world. This battle of the giants for Koffee Kup resulted in an astonishing $21 million in cash proceeds, including $16 million in cash from Flowers and $5 million in cash from the collection of the accounts receivable. The receiver, Ron Teplitsky, who was appointed by Key Bank, did not find Flowers. AIAC found Flowers. We contacted Flowers' head of mergers and acquisitions originally, held his hand for weeks and helped him to understand and appreciate the value of the assets of the company, particularly the brand name "Vermont Bread". . .
> [Plaintiffs' Facts ¶ 134].

    8.    AIAC did not loan any funds to KKBIC for its investment in Kup Co. See Sands Affidavit, ¶7.

    **RESPONSE:** As demonstrated in the Responses to ¶¶ 3 and 7 above, AIAC used its affiliate AMTC to fund the $1 million dollars paid for the Koffee Kup acquisition. AIAC and KKBIC repeatedly testified during their November 10 and 11, 2022 30(b)(6) depositions that AMTC loaned KKBIC the funds for the Koffee Kup acquisition. Within a matter of weeks AIAC and KKBIC however each recanted these sworn statements in a sworn errata sheet, stating instead that "there was no formal loan between AMTC and KKBIC" and that AMTC provided

(rather than loaned) the funds to KKBIC. Plaintiffs hereby incorporate their Responses to ¶¶ 3, 7 and 9, as well as Plaintiffs' Facts, ¶¶ 87; 91.

      9.     AIAC was not involved in the ownership, management and/or operation of the Company. See Sands Affidavit, ¶7.

     **RESPONSE:** Denied. Plaintiffs hereby incorporate their Responses to ¶¶ 3, 7 and 8 above. Further, according to AIAC's owner and chairman, Levie, when testifying as its Rule 30(b)(6) witness, AIAC "operates through affiliates." [Plaintiffs' Facts, ¶ 65-66]. As noted above, AIAC created a new affiliate, KKBIC, as the vehicle to buy the controlling interest in Kup Co. (which owned the bakeries) for one dollar, with Mr. Levie personally owning 85 percent of KKBIC and Mr. Sands owning the other 15 percent (which AIAC provided Sands pursuant to Sands' commission agreement with AIAC). [Plaintiffs' Facts, ¶¶ 71; 85; 92-94]. AIAC used another affiliate, AMTC to fund the purchase of the insider debt that was a related part of the purchase of the controlling interest. [Plaintiffs' Facts, ¶¶ 87; 133]. AIAC had touted itself, to the prior owners of Kup Co., as "The Best Future Owner of Koffee Kup Bakery," a "long term holder" with turnaround, long term and investment plans for Koffee Kup. It identified the people to consist of "AIAC Executive Leadership for Koffee Kup." AIAC described itself as an "active owner," stating "We manage professionally and conservatively to build strong businesses." [Plaintiffs' Facts ¶¶ 69-70, 114]. AIAC made similar statements to the purchasers in an attachment to its offer letter, touting the team that AIAC would put into place – including a team-member over human resource matters. [Plaintiffs' Facts ¶ 82]. And, as Sands indicated in an email to Pat Reinhardt of G2, the "New Team" would "all report to Leonard at AIAC headquarters." [Plaintiffs' Facts ¶ 78]. AIAC (through Sands), post-acquisition, prepared a similar pitch for Koffee Kup suppliers, which included the following April 2 update: "AIAC closed on the acquisition yesterday (4/1) and today is our first day on the job. . ." [Plaintiffs' Facts ¶ 114]. . AIAC made similar statements to key Koffee Kup executives, in writing, shortly after the purchase, emphasizing that it "manages" the companies in its portfolio, and had brought in its "turnaround team." [Plaintiffs' Facts ¶¶ 108-110]. Sands, in his capacity as AIAC 30(b)(6) representative, specifically verified the accuracy of

the statement from the FAQs Memo provided to Koffee Kup managerial employees Morin, Coles, Susan Leonard, Ben Richards and Leo De Serres that "AIAC has brought in their in-house turnaround team". [Plaintiffs' Facts ¶110]. AIAC, again through Sands, wrote to Key Bank shortly after the stock purchase, giving details of an "AIAC turnaround plan" for the bakeries, which included AIAC control over employment-related decisions such as staffing, terms and conditions of employment, and pay raises. [Plaintiffs' Facts ¶ 117]. The same email touted the prospect of significant "AIAC Net New Profitability." [*Id*. ]. AIAC replaced the Koffee Kup CEO, and proposed a new employment agreement on AIAC letterhead to Koffee Kup's VP for manufacturing. [Plaintiffs' Facts ¶ 101; 106-107; 112-114]. When AIAC Defendants quickly decided that they didn't want the bakeries after all, AIAC looked for a new purchaser. [Plaintiffs' Facts ¶ 120-122; 125-129]. Even though Levie and Sands constituted the majority of the Kup Co. board of directors, they did not even bother to adopt a resolution for Kup Co. that the bakeries would shut down. [Plaintiffs' Facts ¶ 160]. Sands' conclusory affidavit says that Kup Co. made the decision to shut down, but that conclusory statement is worth nothing as it contains no detail, and is contradicted by the absence of any formal action by Kup Co. to that effect. The WARN Act letters provided to the State of Vermont and Connecticut contain no reference to Kup Co. or its board of directors, at all. [Plaintiffs' Facts ¶ 6]. AIAC hired WARN Act counsel to represent them and Kup Co., with Levie taking care to handwrite on the retainer agreement (which was kept in AIAC's records) that he was signing as Chairman of AIAC. [Plaintiffs' Facts ¶ 170]. The Epstein Becker retainer was paid—not by Kup Co. or KKBIC--but by an AIAC affiliate, Titanium Fabrication Corporation. That payment from Titanium Fabrication Corporation to Epstein Becker was authorized by Levie. [Plaintiffs' Facts, ¶ 170]. Titanium Fabrication Corporation has also paid for Koffee Kup-related work by other professionals including the law firms of Cummings & Lockwood (a firm that represented AIAC/KKBIC in arbitration proceedings commenced by the former owners of Kup Co. against AIAC/KKBIC); Dinse (retained by AIAC in Koffee Kup related matters). These payments were authorized by Levie from Titanium Fabrication Corporation. [Plaintiffs' Facts, Exhibit 26, pp. 45, 73 of 95; Exhibit 21, p. 20 of 21; Exhibit 19, AIAC/KKBIC 30(b)(6) Deposition (Levie) Excerpts, p. 87, Lines 9-23]. And Titanium Fabrication Corporation has paid for services *provided to AIAC* by David

Cryer (recall that Cryer was described by Sands as "AIAC CFO") including services Cryer performed *specifically related* to Koffee Kup, pre- and post-acquisition, which were invoiced *to AIAC*. [Additional Facts ¶ 1; Plaintiffs' Facts, ¶ 78; Exhibit 26, p. 44 of 95].    AIAC Defendants withheld documents/communications in this matter on the basis of "Attorney Client Privilege", described in their March 2, 2023 "privilege log." [*Id.*] Many of these documents/communications withheld on the basis of "Attorney Client Privilege", involved the Epstein Becker lawyers (Cannavino and Mandelman) and concerned the closure of the bakeries and WARN issues. [*Id.*]  Sands signed the too-late and non-compliant WARN Act notice, purporting to do so on behalf of Koffee Kup though he had never been retained by Koffee Kup or by any of the bakeries. [Plaintiffs' Facts ¶¶ 7-9; 96-97; ECF No. 201-29].  As AIAC trumpeted while attempting to sell Kup Co, "AIAC controls board."  And as Sands testified as 30(b)(6) witness, KKBIC controlled the board of Kup Co. [Plaintiffs' Facts ¶¶ 132; 161].  These are just some of the highlights of an enormous amount of undisputed evidence about concrete involvement by AIAC.

10.    AIAC had absolutely no interest in, or control of, KKBIC or the Company.  See Sands Affidavit, ¶7.

**RESPONSE:** Denied.  Plaintiffs hereby incorporate their Responses to ¶¶ 3, 7-9. Additionally, Sands and Levie were the sole members of KKBIC-- Levie is the managing member and Jeff Sands is a "member".  [Plaintiffs' Facts ¶ 75]. Sands and Levie were two of the three board members of Kup Co. [Plaintiffs' Facts ¶ 169].  AIAC retained Sands, and promised to pay him directly or through an affiliate.  [Plaintiffs' Facts ¶¶ 98-99, 141-142]. Levie testified that he, as chairman of AIAC had the authority to promise Jeff Sands, as he did in the directive email, to pay him either from AIAC or its affiliates.  [Plaintiffs' Facts ¶ 141].  AIAC produced proof of this payment made via wire transfer-- through AIAC's affiliate piggybank AMTC for

Sands' work on the closure of the facilities, among other things [Plaintiffs' Facts ¶¶ 143, 147-150].

11.    Prior to the closing on the Agreement ("Closing"), as a representative of KKBIC, Sands requested financial information concerning the sales & earnings of the Company for the third financial period of 2021 ("P3"), which ended March 21, 2021. The purpose was to determine if the Company was achieving its projected sales and earnings before interest, taxes, depreciation, and amortization ("EBITDA"). See Sands Affidavit, ¶8.

**RESPONSE:**  KKBIC did not exist until March 29, 2021. [Plaintiffs' Facts, ¶ 74]. Sands admitted, as 30(b)(6) representative of AIAC, that when he was asking for information about Koffee Kup prior to the birth of KKBIC, he was doing so on behalf of AIAC. [Additional Facts, ¶ 2]. In fact, some four months before KKBIC's formation, Sands, on behalf of AIAC as its Senior Advisor, signed a non-disclosure agreement with Koffee Kup in November 2020. This was the only non-disclosure agreement executed between Koffee Kup and AIAC. The purpose of the non-disclosure agreement was to give AIAC access to the portal that G2 Capital Advisors created containing all the Koffee Kup financial information. [Plaintiffs' Facts ¶ 76, Exhibit 11, Coles Deposition Select Exhibits, Ex. 4 ("AIAC Non-disclosure Agreement"). Further, Coles testified that "[A]t the time they were asking right before the close, [the P3 financials] were not done. But that was in the same timetable that we always ran our financials in. … They wanted me to give them tentative estimated final numbers for Period 3 and I told them I did not like giving estimated numbers." [Additional Facts, ¶ 3].  Coles testified that Koffee Kup gave AIAC access to BIRST on March 12, 2021, as well as training on how to use the BIRST system. BIRST was a sales reporting platform reflecting the company's sales data.  Using BIRST, one "can see sales by region, by route, by week, historically, within a week of the data actually taking

place.. . .anyone who looked was able to see sales for a time range that they wanted to view. The sales data was as real time as was physically available at the time. [Additional Facts, ¶ 4]. Coles testified that he told Sands before the closing that sales for the period had been soft resulting in lower income. [Additional Facts, ¶ 5]. Coles testified that, had AIAC looked at the BIRST information that they had been given access to, that would have indicated to them that sales performance was going to be below what was budgeted for P3. [Additional Facts, ¶ 6]. Coles testified they could have come up with their own estimate that would have been fairly close to the reality, had they looked at the BIRST information and predicted the shortfall in revenue, which was the primary cause of the greater than expected loss for Period 3. [Additional Facts, ¶ 6]. Sands, when testifying in the involuntary bankruptcy proceeding involving Koffee Kup, did not dispute that Gauthier was provided BIRST access on March 12, 2021 through the date of the acquisition. [Additional Facts, ¶ 7]. Further, AIAC Defendants' Fact No. 11 is irrelevant to a determination of WARN Act liability in this matter as there is absolutely no mention of fraud being the basis for the Koffee Kup shutdown in the too-late WARN notice—in fact, the too-late WARN Act letters contain no reference to any unforeseeable or surprising event that was the cause of the layoffs referenced therein.. [Plaintiffs' Facts ¶¶ 7-8; ECF No. 201-29].   In order to be a lawful shortened WARN Act notice due to unforeseeable business circumstances, the notice must explain what the unforeseeable business circumstance is. 29 U.S.C. § 2102(b)(3); *Alarcon v. Keller Indus*., 27 F.3d 386 (9th Cir. 1994). Finally, AIAC Defendants were not under any contractual obligation to close before getting the formal report for the last reporting period before the acquisition—Sands was unaware of any contractual obligation to close by April 1, 2021-- yet, in spite of efforts to get the P3 financials, the closing

on the acquisition occurred without the P3 financials having been provided. [Plaintiffs' Facts ¶ 139].

12.    On March 18, 2021, G2 Capital Advisors sent KKBIC copies of the 2021 budget, which still forecasted that the Company would nearly break even for P3. See Sands Affidavit, ¶ 9.

**RESPONSE:**  Denied.  Plaintiffs hereby incorporate their Response to ¶ 11, above. Further AIAC Defendants' Fact No. 12 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶ 11, above.

13.    On March 19, 2021, G2 Capital Advisors declared an information "blackout period" and prohibited KKBIC from contacting Kup Co.'s management directly. See Sands Affidavit, ¶10.

**RESPONSE:** Denied.  Plaintiffs hereby incorporate their Response to ¶ 11, above. Further AIAC Defendants' Fact No. 13 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶ 11, above.

14.    On March 20, 2021, Sands requested an indication of the Company's P3 performance from both G2 Capital Advisors and Mark Coles ("Coles"), Kup Co.'s CFO.  Such requests went unanswered.  See Sands Affidavit, ¶11.

**RESPONSE:** Denied.  Plaintiffs hereby incorporate their Response to ¶ 11, above.  Further AIAC Defendants' Fact No. 14 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶ 11, above. Additionally, Coles was the Koffee Kup CFO, not the Kup Co. CFO.  Coles testified that Kup Co. did not have a CFO or controller.  [Additional Facts, ¶ 8].

15.    On March 21, 2021, Kup Co. finished P3. See Sands Affidavit, ¶12.

**RESPONSE:** Denied. Plaintiffs hereby incorporate their Response to ¶ 11, above. Further AIAC Defendants' Fact No. 15 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶ 11, above.

16.    On March 22, 2021, Sands again requested an indication of the Company's P3 performance from both G2 Capital Advisors and Coles. Such requests went unanswered. See Sands Affidavit, ¶12.

**RESPONSE:** Denied. Plaintiffs hereby incorporate their Response to ¶ 11, above. Further AIAC Defendants' Fact No. 16 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶ 11, above.

17.    On March 25, 2021, Sands inquired about the Company's P3 information from both Coles and G2 Capital Advisors. Coles indicated that sales were slightly off for the period while G2 Capital Advisors also indicated that there was no material change. See Sands Affidavit, ¶13.

**RESPONSE:** Denied. Plaintiffs hereby incorporate their Response to ¶ 11, above. Further AIAC Defendants' Fact No. 17 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶ 11, above.

18.    On March 26, 2021, Sands again requested the Company's P3 results and again G2 Capital Advisors indicated that there was no material change from the budgeted projections. See Sands Affidavit, ¶14.

**RESPONSE:** Denied. Plaintiffs hereby incorporate their Response to ¶ 11, above. Further AIAC Defendants' Fact No. 18 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶ 11, above.

19.    On April 5, 2021, after having access to the Company's true financials, KKBIC and Sands first learned that the Company's P3 gross sales were $963,693 below budget, and EBITDA was negative $919,649, against a budget of negative $39,192, a variance of 2,247%. See Sands Affidavit, ¶15.

**RESPONSE:** Denied. Plaintiffs hereby incorporate their Response to ¶ 11, above. Further AIAC Defendants' Fact No. 19 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶ 11, above

20.    KKBIC and Sands also subsequently learned that the Sellers had projected a 10% decline in revenue but failed to factor that information into their financial forecasts. See Sands Affidavit, ¶16.

**RESPONSE:** Plaintiffs hereby incorporate their Response to ¶ 11, above. Further AIAC Defendants' Fact No. 20 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶ 11, above.

21.    The Sellers and their agents repeatedly represented to Sands and KKBIC that the Company was on target to nearly break even for P3, as budgeted. See Sands Affidavit, ¶17.

**RESPONSE:** Denied. Plaintiffs hereby incorporate their Response to ¶ 11, above. Further AIAC Defendants' Fact No. 21 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶ 11, above.

22.    After P3 ended and two days before the scheduled Closing, Kup Co.'s Controller, Luke Morris, prepared the P3 financials, showing the deficits which he sent to Coles. See Sands Affidavit, ¶18.

**RESPONSE:** Denied.  Plaintiffs hereby incorporate their Response to ¶ 11, above.

Further AIAC Defendants' Fact No. 22 is irrelevant to a determination of WARN Act liability

in this matter for the same reasons described in Plaintiffs Response to ¶ 11, above.

     23.    On March 30, 2021 at 5:32 pm, Coles responded to Sands by untruthfully

indicating that he did not yet have the P3 financials.  See Sands Affidavit, ¶20.

**RESPONSE**: Denied.  Plaintiffs hereby incorporate their Response to ¶ 11, above.

Further AIAC Defendants' Fact No. 23 is irrelevant to a determination of WARN Act liability in

this matter for the same reasons described in Plaintiffs Response to ¶ 11, above.

     24.    On March 31, 2021, neither G2 Capital Advisors nor Coles indicated any

material change in the P3 results. See Sands Affidavit, ¶20.

**RESPONSE**: Plaintiffs hereby incorporate their Response to ¶ 11, above.  Further AIAC

Defendants' Fact No. 24 is irrelevant to a determination of WARN Act liability in this matter for

the same reasons described in Plaintiffs Response to ¶ 11, above.

     25.    On April 1, 2021, KKBIC closed on the Agreement.  See Sands Affidavit,

¶21.

    **RESPONSE:** Plaintiffs hereby incorporate their Response to ¶ 7, above.

     26.    On April 2, 2021, KKBIC Coles first admitted that the Company's sales had  fallen

dramatically short of the false projections supplied to KKBIC. See Sands Affidavit,

¶22.

**RESPONSE:** Plaintiffs hereby incorporate their Response to ¶ 11, above.  Further AIAC

Defendants' Fact No. 26 is irrelevant to a determination of WARN Act liability in this matter for

the same reasons described in Plaintiffs Response to ¶ 11, above.

27.    On April 5, 2021, Coles finally shared the hidden and true P3 financial information with KKBIC. See Sands Affidavit, ¶22.

**RESPONSE:** Plaintiffs hereby incorporate their Response to ¶ 11, above. Further AIAC Defendants' Fact No. 27 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶ 11, above.

28.    A forecast based upon the true financials projected substantial, multi- million-dollar losses and a negative cash balance by the end of 2021. See Sands Affidavit, ¶23.

**RESPONSE:** Plaintiffs hereby incorporate their Response to ¶ 11, above. Further AIAC Defendants' Fact No. 28 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶ 11, above

29.    At the time of the Closing, the Company was deeply insolvent and unable to continue its operations or employ a workforce without a massive infusion of external capital. See Sands Affidavit, ¶24.

**RESPONSE:** Plaintiffs hereby incorporate their Response to ¶ 11, above. Further AIAC Defendants' Fact No. 29 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶ 11, above.

30.    The new forecast, which was based on the actual P3 results, showed that instead of requiring around $1,000,000 in new cash to fix the Company, it required closer to $4,000,000 in new cash injections. See Sands Affidavit, ¶25.

**RESPONSE:** Plaintiffs hereby incorporate their Response to ¶ 11, above. Further AIAC Defendants' Fact No. 30 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶ 11, above.

31.    On April 6, 2021, KKBIC informed Key Bank, KKB's senior secured lender, of both the Sellers' deception and the deeply insolvent state of the Company. See Sands Affidavit, ¶28.

**RESPONSE:** Plaintiffs hereby incorporate their Responses to ¶¶ 7 and 11. Further AIAC Defendants' Fact No. 31 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶ 11, above.

32.    On April 9, 2021, Key Bank issued a default notice. See Sands Affidavit, ¶28.

**RESPONSE:** Plaintiffs hereby incorporate their Response to ¶ 11, above. Further AIAC Defendants' Fact No. 32 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶ 11, above.

33.    Key Bank also informed the Company that it would neither extend its forbearance agreement with the Company nor fund the Company's payroll unless the Company cooperated in the assignment of a Key Bank Receiver and the liquidation of the bank's collateral. See Sands Affidavit, ¶29.

**RESPONSE:** Plaintiffs hereby incorporate their Response to ¶ 11, above. Further AIAC Defendants' Fact No. 33 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶ 11, above.

34.    KKBIC attempted to secure external funding or a new investor to keep the Company operational. See Sands Affidavit, ¶30.

**RESPONSE:** Denied. Plaintiffs hereby incorporate their Responses to ¶¶ 7, 9 and 11, above. Further AIAC Defendants' Fact No. 34 is irrelevant to a determination of WARN Act liability in this matter because Defendants are precluded from invoking the "faltering company" exception for all of the reasons set forth in Plaintiffs' motion for summary judgment as well as their opposition to AIAC

Defendants' motion for summary judgment, including that the "faltering company" exception is inapplicable because, beyond genuine dispute, defendants did not do what the statute requires. An employer relying on this exception "shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 29 U.S.C. § 2102(b)(3). Here, it is undisputed that defendants gave <u>no</u> advance or even contemporaneous WARN Act notice. They terminated employees without giving WARN Act notice, and (at best) mailed putative WARN Act notices at least the next day after that. [Facts, ¶ 4]. Thus employees would not have received any putative WARN Act notice until, at best, days *after* the plant closing; and the date of "receipt of notice" is the legal operative question. 20 C.F.R. § 639.8. There is, in this case, absolutely no reason why WARN Act notice could not have been given before the closure, or at least contemporaneous with it. (AIAC's privilege log, ECF No. 193-3, reflects that WARN Act notice was being drafted as early as April 23, but was not mailed until the evening of April 27, the day after the closing. Further, Sands testified the decision to shut down was made prior to April 23, 2021. [Facts, ¶ 123].) Therefore, all of the defendants in this matter are precluded from invoking any exceptions. *See*, *e.g.*, *Torres v. Niche, Inc.*, No. 12-12059-RGS, 2013 U.S. Dist. LEXIS 177228 (D. Mass. Dec. 18, 2013) (explaining that employer that gave written notice only after the fact was precluded from relying on exception, and further explaining very limited circumstances, not present here, in which after-the-fact notice is permitted).

35.     To save the Company, Sands, on behalf of Kup Co. reached out to two qualified investors, Gold Coast Bakery ("Gold Coast") and SatisPie Bakery ("SatisPie").  It was realistic to believe either Gold Coast or SatisPie would invest in the Company due  to their existing bakery operations and that each had bid against KKBIC in the recent  auction process. See Sands Affidavit, ¶31

**RESPONSE:** Denied.  Plaintiffs hereby incorporate their Responses to ¶¶ 7, 9-11 and 34 above. Further AIAC Defendants' Fact No. 35 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶ 11, above. Further, with regard to the so-called "two qualified investors,"  Sands previously testified that, of the *buyers* that he spoke to before the shutdown, *only two* proceeded to a level of starting to talk about a potential *price*. Those two potential *buyers* were Mike Pinkowski and Jeff Black (the same ones Sands now references as "two qualified investors," see paragraphs 31-32 of the Sands' Affidavit), but the amount they offered to pay for the company was so little that "Key Bank told them to get lost." [Plaintiffs' Facts ¶ 124]. A defendant invoking the "faltering company" exception must show that there was "a realistic opportunity to obtain the financing or business sought." 20 C.F.R.¶ 639.9(a)(2). AIAC Defendants have not even attempted to show (and cannot show) that they had a realistic likelihood of success in finding a new lender, given the state of the business and given that the business was already deep in the hole with its existing lender, Key Bank. Moreover, as noted in Plaintiffs' prior brief, this provision is not available in this case given that AIAC itself – part of the single employer – had ample funds of its own to infuse into the business. It is just that AIAC had decided to break its promise and not to infuse the business with that capital. *See* 20 C.F.R. § 639.9(a)(4) ("The actions of an employer relying on the 'faltering company' exception will be viewed in a company-wide context. Thus, a company with access to capital markets or with cash reserves may not avail itself of this exception by looking solely at the financial condition of the facility, operating unit, or site to be closed.")

36.     If such a transaction occurred, the Company could have remained operational and maintained its going-concern-value.  See Sands Affidavit, ¶31.

**RESPONSE:** Plaintiffs hereby incorporate their Responses to ¶¶ 7, 9-11 and 34-35, above. Further AIAC Defendants' Fact No. 36 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶¶ 11 and 34-35, above.

37.    Neither Gold Coast nor SatisPie made an offer that was acceptable to Key Bank. See Sands Affidavit, ¶¶ 33-34.

**RESPONSE:** Plaintiffs hereby incorporate their Responses to ¶¶ 7, 9-11 and 34-35, above. Further AIAC Defendants' Fact No. 37 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶¶ 11 and 34-35, above.

38.    On April 22, 2021, Key Bank issued a formal notice of default, accelerated the amounts due under its Term Loan and Line of Credit, and stated that it intended to exercise its rights under the loan agreements and foreclose. See Sands Affidavit, ¶38.

**RESPONSE:** Plaintiffs hereby incorporate their Responses to ¶¶ 7, 9-11 and 34-35, above. Further AIAC Defendants' Fact No. 38 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶¶ 11 and 34-35, above.

39.    The Company due to the Company's insolvency was forced to terminate its operations and employees, issuing a Worker Adjustment and Retraining Notification Act ("WARN Act") notice to its employees, on April 26, 2021. See Sands Affidavit, ¶39.

**RESPONSE:** Denied. Plaintiffs hereby incorporate their Responses to ¶¶ 7, 9-11 and 34-35, above. Sands swears (Affidavit ¶ 39) that WARN Act notices were "issued" to employees

on April 26, 2021. However, Sands previously testified that he did not know what day the notices were mailed. "Q. Is it possible that letters were only sent after employees were terminated? A. It's possible. I didn't send letters to employees, so I just don't know.. . .Q. Did anybody tell you, from the HR teams, that notice was disseminated to employees after their terminations? A. It's the timing that I don't recall." [Additional Facts, ¶ 9].  The record evidence shows that the letters were not mailed until April 27—and Sands *knew this* because *he* was the one who provided the letters to the mailing house for distribution. (*See*, *e.g.*, Plaintiffs' Facts, Exhibit 47, AIAC Defendants' Privilege Log 3/1/2023,  entry 32 (email from Sands, sent April 28, subject line "WARN Letter were mailed last night"; Exhibit 5, AIAC and KKBIC Supplemental Responses to Plaintiffs' Requests For Documents, S-11 (Sands communicated by email with a mailing house on Tuesday, April 27, 2021, and stated "Per federal regulations we have to mail these today. We're willing to pay an expedite [sic] fee to help.").  Additionally, AIAC Defendants' Fact No. 39 is unsupported by the cited material and "Exhibit G" cited therein is, on its face, a notice to the state of Connecticut and not an employee WARN notice.   Further AIAC Defendants' Fact No. 39 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶¶ 11 and 34-35, above.

40.    The State of Vermont's Labor Department determined that the Company  was exempt from the notice requirement of the WARN Act.  See Sands Affidavit, ¶44.

**RESPONSE:** Denied.  AIAC Defendants' Fact No. 40 is unsupported by the cited material and "Exhibit G" cited therein is, on its face, a notice to the state of Connecticut concerning the Koffee Kup shutdown and not a notice from the State of Vermont's Labor Department.   Further AIAC Defendants' Fact No. 40 is irrelevant to a determination of WARN Act liability in this matter.  AIAC Defendants represent that the State of Vermont

determined that the Company was exempt from the notice requirement under the WARN Act. This is incorrect—there was no determination by the State of Vermont with regard to the applicability of the federal WARN Act in this matter.  . Further, the exhibit cited by the AIAC Defendants is not  a letter from the State Labor Department's General Counsel .  And even if the AIAC Defendants had correctly cited the letter, it is quite obviously not a basis for summary judgment; at most it would be a piece of evidence, against which Plaintiffs can create a genuine issue of material fact. Such a letter is not even admissible as evidence. Its only conceivable basis for admissibility would be Fed. R. Evid. 803(8) (allowing, as a hearsay exception, "A record or statement of a public office if: (A) it sets out: … (iii) … factual findings from a legally authorized investigation; and (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.").  The Rule "bars the admission of statements not based on factual investigation." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169, 109 S. Ct. 439, 450 (1988). "It is the methodology of factual investigation which provides a threshold safeguard against untrustworthiness." *Ariza v. City of N.Y.,* 139 F.3d 132, 134 (2d Cir. 1998). In other words, under *Ariza*, where there is no methodology that creates a threshold safeguard against untrustworthiness – as there is not, here – there is not even an "investigation." But even if there is an investigation, then the question turns more particularly to its lack of trustworthiness.  Here, the miscited letter would show that the only things that led up to it were (1) a query to Sands as to why the normally-required amount of notice had not been given under *Vermont's Notice of Potential Layoffs Act*, and (2) a response from Epstein Becker. That is not an "investigation" (Fed. R. Evid. 803(8)) in any meaningful sense, because there was no "methodology" (*Ariza*, *supra*) that created a threshold safeguard of factual reliability. Even if it were an investigation, "the source of

information or other circumstances" – i.e., relying *solely* on a letter from counsel retained by

AIAC – "indicate a lack of trustworthiness," *id.*

41.    Kup Co., the entity that made all decisions for the Company, maintained

separate and distinct directors and officers from KKBIC.  See Sands Affidavit, ¶49.

**RESPONSE:**  Denied.  Plaintiffs hereby incorporate their Responses to ¶¶ 7-10.

42.    As noted above, AIAC was not involved with either KKBIC, Kup Co., or Kup

Co's subsidiaries.  See Sands Affidavit, ¶49.

**RESPONSE:**  Denied.  Plaintiffs hereby incorporate their Responses to ¶¶ 7-10

43.    Neither KKBIC nor the Company was dependent upon the other and each

operated as a separate and distinct corporate identity.  See Sands Affidavit, ¶50.

**RESPONSE:**  Denied. It was known even at the time of the purchase that, in order to

survive, the bakeries would need the infusion of cash that AIAC/KKBIC promised in connection

with their purchase. They were, literally, dependent on AIAC Defendants for the funds needed to

continue in business, but AIAC Defendants pulled the plug. [Plaintiffs' Facts ¶ 105; 117-121].

44.    KKBIC exercised no control over the operations of the Company. See  Sands

Affidavit, ¶51.

**RESPONSE:**  Denied.  Plaintiffs hereby incorporate their Responses to ¶¶ 7-10.  Further,

AIAC trumpeted while attempting to sell Kup Co, that "AIAC controls board."  And as Sands

testified as 30(b)(6) witness, KKBIC controlled the board of Kup Co. [Plaintiffs' Facts ¶¶ 132;

161].  Further, KKBIC's own answer to Plaintiffs' interrogatory 12 – signed under oath by Sands

himself [See, Plaintiffs' Facts ¶ 89; Exhibit 31 to Plaintiffs' Facts, Interrogatory Response No.

12] – stating in part "While Kup Co. owned KKB, and therefore, SBI and VBC, there was a

period where KKBIC was involved in operational decision-making for KKB, SBI and VBC.

Jeff Sands would have been the person primarily involved on behalf of KKBIC." [Plaintiffs' Facts ¶ 169]. Further, Sands signed two prior affidavits, in which he claimed to "informally serve as chief restructuring officer of KK Investment Company ("KKIC") [sic]. . .the majority shareholder of KUP Co. and its subsidiaries. . ." [Additional Facts ¶¶ 10-11].

45.    KKBIC did not participate in the day-to-day operations of the Company nor did it direct any of the Company's corporate policies or practices. See Sands Affidavit, ¶52.

**RESPONSE:** Denied. Plaintiffs hereby incorporate their Responses to ¶¶ 7-10, 44.

46.    KKBIC and the Company did not share employees. See Sands Affidavit, ¶54.

**RESPONSE:** Denied. Plaintiffs hereby incorporate their Responses to ¶¶ 7-10, 44.

47.    The Company hired and fired their own employees and separately maintained the personnel files of their employees. See Sands Affidavit, ¶58.

**RESPONSE:** Denied. Plaintiffs hereby incorporate their Responses to ¶¶ 7-10.

48.    The Company had independent wage rates, pay scales, salaries and payrolls. See Sands Affidavit, ¶59.

**RESPONSE:** Denied. Plaintiffs hereby incorporate their Responses to ¶¶ 9-10, 44.

49.    Neither AIAC nor KKBIC provided operational funding to the Company. See Sands Affidavit, ¶60.

**RESPONSE:** Denied. Plaintiffs hereby incorporate their Responses to ¶¶ 9-10, 44.

50.    Neither AIAC nor KKBIC was involved with the operation of the Company. See Sands Affidavit, ¶61.

**RESPONSE:** Denied. Plaintiffs hereby incorporate their Responses to ¶¶ 7-10, 44. Further, Sands previously testified he *didn't know* who he was acting on behalf of, when asked about that, point-blank during his May 10, 2022 individual deposition in this matter. [Additional Facts, ¶ 12 (Q. "You don't consider yourself having been representing AIAC throughout all of this?" A. "I don't know. Or Leonard or, quite frankly even myself for my 15 percent.")]

51.     All the decisions regarding the Company's operations, including the shutdown, were exclusively discussed and voted upon by the board of Kup Co. See Sands Affidavit, ¶62.

**RESPONSE:** Denied. Plaintiffs hereby incorporate their Responses to ¶¶ 7-10, 44.

52.     The Dissolution Receiver's reports show that, prior to Closing, the Sellers of the Company secretly and improperly siphoned off millions of dollars from the Company. See Sands Affidavit, ¶63.

**RESPONSE:** Plaintiffs hereby incorporate their Response to ¶ 11, above. Further AIAC Defendants' Fact No. 52 is irrelevant to a determination of WARN Act liability in this matter for the same reasons described in Plaintiffs Response to ¶ 11, above.

## PLAINTIFFS' ADDITIONAL FACTS

1.     Titanium Fabrication Corporation has paid for services *provided to AIAC* by David Cryer (recall that Cryer was described by Sands as "AIAC CFO" ) including services Cryer performed *specifically related* to Koffee Kup, pre- and post-acquisition, which were invoiced *to AIAC*. Additional Facts Exhibit 1, Levie 30(b)(6) Deposition Excerpts, p. 59, Lines 14-16, p. 60, Lines 4-11; p. 154, Line 1- p. 156, Line 2; Additional Facts Exhibit 2, AIAC/KKBIC 30(b)(6) Deposition (Levie) Select Exhibits, Ex. 10, Cryer Invoice to AIAC.

2.      Sands admitted, as 30(b)(6) representative of AIAC, that when he was asking for information about Koffee Kup prior to the birth of KKBIC, he was doing so on behalf of AIAC. Additional Facts Exhibit 3, AIAC 30(b)(6) Deposition (Sands)  Excerpts, p. 200, Lines 22-14.

3.      Coles testified that "[A]t the time they were asking right before the close, [the P3 financials] were not done. But that was in the same timetable that we always ran our financials in. … They wanted me to give them tentative estimated final numbers for Period 3 and I told them I did not like giving estimated numbers." Additional Facts Exhibit 4, Coles Deposition Excerpts, p. 173, Line 17- p. 174, Line 8.

4.      Coles testified that Koffee Kup gave AIAC access to BIRST on March 12, 2021, as well as training on how to use the BIRST system.  BIRST was a sales reporting platform reflecting the company's sales data.  Using BIRST, one "can see sales by region, by route, by week, historically, within a week of the data actually taking place.. . .anyone who looked was able to see sales for a time range that they wanted to view.  The sales data was as real time as was physically available at the time.  Additional Facts Exhibit 4, Coles Deposition Excerpts, p. 171, Line 5- 20; p. 197, Line 15- p. 198, Line 3; p. 62, Line 18- p. 64, Line 7.

5.      Coles testified that he told Sands before the closing that sales for the period had been soft resulting in lower income. Additional Facts Exhibit 4, Coles Deposition Excerpts, p. 210, Line 10- p. 211, Line 16.

6.      Coles testified that, had AIAC looked at the BIRST information that they had been given access to, that would have indicated to them that sales performance was going to be below what was budgeted for P3. Additional Facts Exhibit 4, Coles Deposition Excerpts, p. 172, Lines 10-20.  Coles testified they could have come up with their own estimate that would have been fairly close to the reality, had they looked at the BIRST information and predicted the

shortfall in revenue, which was the primary cause of the greater than expected loss for Period 3. Additional Facts Exhibit 4, Coles Deposition Excerpts, p. 174, Line 16- p. 175, Line 7.

7.    Sands, when testifying in the involuntary bankruptcy proceeding involving Koffee Kup, did not dispute that Gauthier was provided BIRST access on March 12, 2021 through the date of the acquisition.   Additional Facts Exhibit 5, Sands Bankruptcy Deposition Excerpts, p. 39, Line 13- p, 40, Line 6.

8.    Coles testified that Kup Co. did not have a CFO or controller.  Additional Facts Exhibit 6, Coles Receivership Deposition Excerpts, p. 6, Lines 10-12.

9.    Sands testified that he did not know what day the notices were mailed. "Q. Is it possible that letters were only sent after employees were terminated? A. It's possible. I didn't send letters to employees, so I just don't know. . . "Q. Did anybody tell you, from the HR teams, that notice was disseminated to employees after their terminations? A. It's the timing that I don't recall." Additional Facts Exhibit 7, Sands Deposition Excerpts, p. 87, Lines 10-13; p. 88, Lines 4- 7.

10.    Sands claimed in a May 10, 2021 affidavit to "informally serve as chief restructuring officer of KK Investment Company ("KKIC") [sic]. . .the majority shareholder of KUP Co. and its subsidiaries. . ." Additional Facts Exhibit 8, Sands Prior Affidavit May 10, 2021.

11.    Sands claimed in a September 7, 2021 affidavit to "informally serve as chief restructuring officer of KK Investment Company ("KKIC") [sic]. . .the majority shareholder of KUP Co. and its subsidiaries. . ." Additional Facts Exhibit 9, Sands Prior Affidavit September 7, 2021.

12.    Sands previously testified he *didn't know* who he was acting on behalf of, when asked about that, point-blank during his May 10, 2022 individual deposition in this matter.

Additional Facts Exhibit 7, Sands Deposition Excerpts, p. 220, Lines 1-4 (Q. "You don't

consider yourself having been representing AIAC throughout all of this?" A. "I don't know. Or

Leonard or, quite frankly even myself for my 15 percent.")]


Dated:  May 1, 2023

                                          Respectfully submitted,

                           By:      /s/     Mary E. Olsen_____
                                THE GARDNER FIRM
                                Mary E. Olsen (OLSEM4818)
                                M. Vance McCrary (MCCRM4402)
                                182 St. Francis Street
                                Suite 103
                                Mobile, Alabama 36602
                                P: (251) 433-8100
                                F: (251) 433-8181

                                LANKENAU & MILLER, LLP
                                Stuart J. Miller (SJM 4276)
                                Johnathan Miller
                                100 Church Street, 8th FL
                                New York, NY 10007
                                P: (212) 581-5005
                                F: (212) 581-2122

                                CLEARY SHAHI & AICHER P.C.
                                Thomas P. Aicher, Esq.
                                110 Merchants Row, Third Floor
                                Rutland, VT 05701
                                (802) 775-8800
                                tpa@clearyshahi.com

                                *Counsel for the Class*