# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

MATTHEW CHANEY, NADIE MILLER
and ARTHUR GUSTAFSON on behalf of
themselves and all others similarly
situated,

                Plaintiffs,

       v.

VERMONT BREAD COMPANY,
SUPERIOR BAKERY, INC., KOFFEE
KUP BAKERY, INC., KOFFEE KUP
DISTRIBUTION, LLC, KK BAKERY
INVESTMENT COMPANY LLC, KK
BAKERY HOLDING ACQUISITION
COMPANY, AND AMERICAN
INDUSTRIAL ACQUISITION
CORPORATION,

                Defendants.

---

LINDA JOY SULLIVAN in her capacity
as the dissolution receiver for Koffee Kup
Bakery, Inc., Vermont Bread Company,
Inc. and Superior Bakery, Inc.,

           Intervenor-Defendant
           Cross-Claimant,

       v.

KK BAKERY INVESTMENT
COMPANY, LLC KK BAKERY
HOLDING ACQUISITION COMPANY,
AND AMERICAN INDUSTRIAL
ACQUISITION CORPORATION,

           Crossclaim-Defendants.

**MEMORANDUM OF LAW
IN OPPOSITION TO
PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT
PURSUANT TO F.R.C.P.
RULE 56**

Docket No. 2:21-cv-120-wks

## TABLE OF CONTENTS

Table of Authorities …………………………………………………………………    3

Introduction ………………………………………………………………………    4

Factual Background ………………………………………………………………    4-12

      AIAC's Absence of Involvement …………………………………………..    4-5

      Hidden Financials and the Company's Insolvency …………………….    5-6

      Realization of the Sellers' Fraud …………………………………………...    6-8

      Lender's Reaction ………………………………………………………....    8

      Anticipated Negative Effect of WARN Notice …………………………..    9

      Attempt to Keep the Company Operational …………………………….    9-11

      Distribution of the WARN Act Notice …………………………………...    11

      Vermont Labor of Department Conclusion that the
      Closure was Exempt From the 60-Day WARN Act-Period …………….    11-12

Rule 56 Standard …………………………………………………………………    12-13

Closures Under the WARN Act …………………………………………………..    13-14

Argument …………………………………………………………………………    14-23

      Point I – The Company and KKBIC Are Not a Single Employer ………    14-17

      Point II - KKBIC is Exempt from the WARN Act 60-Day
            Notice Requirement ……………………………………..    17-23

          A.      Business Circumstances …………………………………    19-21

          B.      Faltering Company ……………………………………    21-23

Conclusion ………………………………………………………………………..    24

## TABLE OF AUTHORITIES

**CASES**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) …………………………… 12

Amore v. Novarro, 624 F.3d 522 (2d Cir. 2010) ………………………………….. 13

Carpenters Dist. Council of New Orleans & Vicinity v.
      Dillard Dep't Stores, Inc., 15 F.3d 1275, 1286 (5th Cir. 1994) ………… 17,23

D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998) ……………….. 13

Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988) ………………….. 13

In re AE Liquidation, Inc., 866 F.3d 515 (3d Cir. 2017) ………………………….. 19

In re APA Transp. Corp. Consol. Litig., 541 F.3d 233 (3d Cir. 2008) ………….. 14,15,17,21

Guippone v. BH S & B Holdings LLC, 737 F.3d 221 (2d Cir. 2013) …………… 15,16

James v. Fleet/Norstar Fin. Grp., Inc., 992 F.2d 463, 465 (2d Cir. 1993) ……… 17

Jurcev v. Central Community Hospital, 7 F.3d 618 (7th Cir. 1993) …………….. 23

Loehrer v. McDonnell Douglas Corp., 98 F.3d 1056, 1061 (8th Cir. 1996) …….. 20

Pearson v. Component Tech. Corp., 247 F.3d 471 (3d Cir. 2001) ………………. 15

Grimmer v. Lord Day & Lord, 937 F. Supp. 255 (S.D.N.Y. 1996) ……………… 22

Wagner v. Swarts, 827 F. Supp. 2d 85 (N.D.N.Y. 2011) …………………………. 13

In re Tweeter OPCO, LLC., 453 B.R. 534 (Bankr. D. Del. 2011) ………………… 16,23

**STATUTES**

F.R.C.P Rule 56 ……………………………………………………………. 12-13
29 U.S.C. § 2101(a) ……………………………………………………….. 13,14
29 U.S.C. § 2102(b) ……………………………………………………….. 18,19,20
29 U.S.C. § 2104(a) ……………………………………………………….. 16
N.Y. Comp. Codes R. & Regs. tit. 12, § 921-6.2 …………………………………. 22

## INTRODUCTION

Defendants, KK Bakery Investment Company, LLC ("KKBIC") and American Industrial Acquisition Corporation ("AIAC"), by and through their counsel, Kirwan Law, Terry J. Kirwan, Jr., of counsel, submits this Memorandum of Law in opposition to Plaintiffs' motion for summary judgment pursuant to F.R.C.P Rule 56.

## FACTUAL BACKGROUND

KKBIC entered into the Agreement ("Agreement") to purchase certain shares of stock in Kup Co., which owned Koffee Kup Bakery, Inc. ("KKB"), which owned VBC, Inc. ("VBC") and Superior Bakery, Inc. ("SBI") (for clarity, KKB, VBC are collectively defined as the "Company").

Pursuant to the Agreement, on April 1, 2021, KKBIC acquired 992 shares of Kup Co.'s common stock, comprising 80% of Kup Co's outstanding shares. KKBIC also purchased $14,314,000 of Kup Co.'s subordinated debt for $1,000,000 in cash and a $2,000,000 note.

The counterparties to the Agreement (collectively "Sellers") were Kup Co., its existing shareholders: Bripan SARL, Socipar SAS, and 9249-9557 Quebec Inc.; and the subordinated debt holders: Jose Aubery, Bertrand Aubery, and Hubert Aubery. The Sellers' and Kup Co. and Subsidiaries' investment banker was G2 Capital Advisors LLC ("G2 Capital Advisors").  During late 2020 and the first quarter of 2021, G2 Capital Advisors was charged with the task of actively searching for a purchaser or a partner who could provide working capital to the Company.

4

**AIAC's Absence of Involvement**

AIAC owned absolutely no equity or debt in Kup Co. or in Kup Co.'s subsidiaries. AIAC did not provide or loan any funds to KKBIC for its investment in Kup Co. AIAC was not involved in the ownership, management and/or operation of the Company. As such, AIAC is not a proper party to this action.

**Hidden Financials and the Company's Insolvency**

Prior to funding the investment, pursuant to the Agreement ("Closing"), KKBIC's representative, Jeff Sands ("Sands"), requested financial information concerning the sales and earnings of the Company for the third financial period of 2021 ("P3"), which ended March 21, 2021. The purpose was to determine if the Company was achieving its projected sales and earnings before interest, taxes, depreciation, and amortization ("EBITDA").

On March 18, 2021, G2 Capital Advisors sent KKBIC copies of the 2021 budget, which still forecast that the Company would nearly break even for P3. The next day, on March 19, 2021, G2 Capital Advisors declared an information "blackout period" and prohibited KKBIC from contacting Kup Co.'s management directly. On March 20, 2021, Sands requested an indication of P3 performance from both G2 Capital Advisors and Mark Coles ("Coles"), Kup Co's CFO. Such requests went unanswered.

On March 21, 2021, Kup Co. finished P3 and had most sales and cost information in hand. The following day, on March 22, 2021, Sands again requested an indication of P3 performance from both G2 Capital Advisors and Coles. As before, such requests went unanswered. Yet again, on March 25, 2021, Sands inquired about the P3 information from

both Coles and G2 Capital Advisors.  Coles and G2 Capital Advisors explicitly indicated that there was no material change in sales from the projections provided.

The following day, on March 26, 2021, Sands requested P3 results again, and G2 Capital Advisors again indicated that there was no material change.  However, Sellers and G2 Capital Advisors failed to provide the true information, which was that the Company was far from meeting such expectations.  Instead, the Sellers and their agents, and the Company's CFO, Coles repeatedly represented to KKBIC that the Company was on target to nearly break even for P3, as budgeted.

**Realization of the Sellers' Fraud**

Three business days after the Closing, after finally gaining access to the Company's true financials, KKBIC first learned that the Company's P3 gross sales were $963,693 below budget and EBITDA was ($919,649), against a budget of ($39,192), a wholly unacceptable variance of negative 2,247%. KKBIC also learned that the Sellers had projected a 10% decline in revenue but failed to factor that information into their financial forecasts.  These changes were material adverse changes.

KKBIC has since realized that on March 30, 2021, nine days after P3 ended and two days before the scheduled sale, Kup Co.'s Controller, Luke Morris, prepared the P3 financials, which he emailed to Coles for review. Coles reviewed and approved the P3 financials that same day. Copies of the relevant emails are attached to the ECF Doc. 202-4 as Exhibit "C."

Later, that same day at 3:31 pm, Sands emailed Coles seeking Kup Co.'s latest balance sheet. Three minutes later at 3:34pm, Coles forwarded Sands' email to Patricia

Reinhardt ("Reinhardt") and Michael Williams ("Williams") of G2 Capital Advisors. In his forwarding email, Coles stated "FYI, I have not responded to him yet." At 4:00 pm, Reinhardt emailed Coles "Let's chat first" and requested that his colleagues schedule a call between G2 Capital Advisors and Coles to discuss the issue. After several scheduling emails, G2 Capital Advisors and Coles agreed to talk at 5:15 pm.

At 5:32 pm, after his conference with Reinhardt and Williams, Coles responded to Sands' 3:31 pm email by lying, indicating that he did not yet have the P3 financials, which as set forth above he had reviewed and approved earlier that day. The following day, March 31, 2021, neither G2 Capital Advisors nor Coles indicated any material change in the P3 results. Thus, they continued their plan to deceive KKBIC.

Based upon representations made by officers of the Company and by G2 that the Company was meeting its projections, on April 1, 2021 KKBIC closed on the Agreement to purchase the common stock and note in Kup Co., believing that the projections had held true. On April 2, 2021, KKBIC representatives arrived on site for the first time since the "blackout period." This is when Coles first admitted that the Company's sales had fallen dramatically short of the projections supplied to the KKBIC. The following workday, April 5, 2021, Coles finally shared the hidden and true P3 financial information with KKBIC.

After discovering that the Sellers, their agents, and the Company had withheld material financial information to induce KKBIC to complete its investment transaction, KKBIC prepared a revised forecast of EBITDA and cash flow, which projected multi-million-dollar losses and a negative cash balance by the end of 2021. These hidden losses

and negative cash flow issues revealed that the Company was deeply insolvent and unable to continue its operations without a massive infusion of external capital, far beyond what KKBIC had been led to believe a required investment would be to sustain the business.

In short, the new projections based on the actual P3 results showed that instead of $500,000.00 to $1,000,000.00 million in cash required to fix the business, the Company actually required at least $4,000,000.00 in new cash injections (4 times what KKBIC was led to believe).

As a brief summary of the Company finances, it averaged around $70,000,000.00 in annual revenues and lost $3,600,000.00 in 2020. KKBIC believed that progress and changes made by management of KupCo, in 2021 could improve profits by $5,000,000.00, netting the Company a modest profit. This is what induced KKBIC to make an investment in the Company. After the true P3 results were revealed, it became obvious that the Company would lose millions more than the Sellers' projections indicated. Moreover, keeping the Company operational required a profit improvement of nearly $10,000,000.00. This magnitude of profit improvement was simply not feasible by KKBIC and could only be accomplished with a truly strategic buyer with overlapping and redundant bakeries, distribution routes, sales staff and administration. It was possible that a larger bakery could cut out these redundancies and collapse the business enough to achieve a sustainable level of profitability. KKBIC tried to rescind the purchase. The Sellers refused to do so.

**Lender's Reaction**

The following day, April 6, 2021, KKBIC informed Key Bank, KKB's senior secured lender, of both the Sellers' deception and the deeply insolvent state of the Company. In response to the newly revealed P3 financial information, on April 9, 2021, Key Bank issued a default notice to the Company and hired an outside advisor, Ron Teplitsky, who, ultimately, became the Key Bank Receiver. Key Bank also informed Kup Co. that it would not extend or renew its forbearance agreement and would not fund the Company's payroll unless the Company cooperated with the bank in the assignment of a Key Bank Receiver and the liquidation of the bank's collateral. To ensure that its employees would be paid, the directors of Kup Co. acquiesced to Key Bank's requirement for a shutdown of the Company. Key Bank's default notice meant that to save the business, a prospective partner, purchaser or lender needed to inject an additional $7.5 million into the Company to save it. This, in combination with the $10 million cited above to cover losses, restructuring expenses and working capital, totaled $17 million in required capital, an amount which far exceeded any investment which KKBIC had ever contemplated making in the Company.

**Anticipated Negative Effect of WARN Notice**

A public WARN notice issued by Kup Co. would have absolutely prohibited an external investment and prevented a possible future sale of the Company as a going concern. Going concern status requires keeping the Company's supply chain intact and flowing with baking ingredients. It also required an assembled workforce to keep daily production of fresh baked goods in the stores. Going concern value also required the

existing customers and shelf space which Kup Co's. bread was sold from.   A public WARN Notice would have scared suppliers enough to restrict sales, even cash sales.   A public WARN Notice would have scared employees enough to exacerbate our post-covid labor shortages and risk daily production to customers.  Lastly, A public WARN Notice might have cemented concerns our customers were having and caused them to reduce Kup Co. shelf space and reduce sales further below a sustainable level.   Maintaining the operating mode of the Company with intact suppliers, workforce and customers was critical for any new outside investor or buyer, which they made clear.

**Attempt to Keep the Company Operational**

Upon finding itself deceived into investing in a shockingly insolvent business, unable to rescind its investment and without bank support, Kup Co. sought additional ways to solve its financial problems and to save the Company and the jobs.  Not being able to justify the necessary massive infusion of funds, the only feasible solution was to intensively search for a large regional, national or international bakery industry buyer with overlapping production, distribution and administrative costs.  Such a buyer could merge Kup Co. into its existing business, eliminating redundancies and achieving the necessary profit improvement.   Such a buyer would have the capital and the economic motivation to invest in the company.

Issuing a WARN notice would have scared off the Company's employees and customers, killing the Company's going-concern-value. Without maintaining a going-concern-value, any potential buyers would lose interest in purchasing the Company, which Kup Co. was attempting to avoid.

10

In an attempt to save the Company, Kup Co. immediately reached out to two qualified buyers, Gold Coast Bakery ("Gold Coast") and SatisPie Bakery ("SatisPie"). During the week of April 12-16, 2021, Kup Co. presented the opportunity to purchase the Company to both Jeff Black ("Black"), the owner of Gold Coast, and Mike Pinkowski ("Pinkowski"), the owner of SatisPie, trying to sell the Company and maintain its going-concern-value.

While Kup Co. was happy to sell, both Black and Pinkowski knew they needed to negotiate directly with Key Bank on the defaulted debt. Pinkowski promised to tour the facilities and meet with Sands on Saturday April 17, 2021, but he never showed up for the meeting. Thereafter, on April 19, 2021, Key Bank informed Sands that it no longer considered Pinkowski a credible buyer and would not support him in a purchase of the Company. This left Black as the only qualified buyer who could consummate a sale quickly enough to preserve the going-concern-value of the Company. However, Black never made an offer.

On April 20, 2021, Sands sent a memo titled "KKB Viability Assessment with Recommendation" to Kup Co.'s stakeholders including the Buyer, Seller and lenders Key Bank and Vermont Economic Development Agency, informing them that the Company was out of money and that "without a credible white knight buyer, the company is adrift and on a "march to liquidation." A copy of such memo is attached to ECF Doc. 202-4 as Exhibit "F." Sands pleaded for the stakeholders to "preserve going concern value and develop optionality" and suggested this would require an immediate cash infusion of $500,000.00 to "cover payroll and minimal supply needs."

Then, on Thursday April 22, 2021, Key Bank issued a formal notice of default, accelerated the amounts due under its Term Loan and Line of Credit, and communicated that it intended to exercise its rights under the loan agreements and foreclose. Immediately thereafter, the Company retained specialist labor attorneys to guide it through the layoff and WARN process. After a hurried initial attempt to deliver WARN notices on April 23, 2021, which was unsuccessful, the Company terminated its operations and employees, issuing a Worker Adjustment and Retraining Notification Act ("WARN Act") notice to its employees on Monday April 26, 2021.

**Distribution of the WARN Act Notice**

The original plan was to distribute the notices on Friday, April 23, 2021. However, it proved impossible to print and get the notices available for distribution on that Friday before the close of business. Then, upon information & belief, over the weekend, many employees learned about the anticipated closing and chose not to report for work on Monday, April 26, 2021. This somewhat interfered with the Company's plans for physical distribution of the notices to each employee. As such, the Company mailed the notices to the remaining employees on Tuesday, April 27, 2021.

As such the distribution of the notices should be deemed as timely. See Pennington v. Fluor Corp., 19 F.4th 589, 600 (4th Cir. 2021)(deemed notices sent within six business days of "sudden closure" as timely);

**Vermont Department of Labor Conclusion that the
Closure was Exempt From the 60-Day WARN Act-Period**

The Vermont Department of Labor, after investigating the facts and circumstances

surrounding the subject closure found and determined:

> **The Company acted in good faith to fulfill its obligations under the Vermont Notice of Potential Layoffs Act and Federal WARN ACT, and meets the exception requirements for providing less than the required number of days' advance notice of the shutdown due to (1) Faltering Business and (2) Unforeseen Business Circumstances exceptions. The Company provided as much notice as was practicable, here two business days after Key Bank issued a final notice of default, and provided compliant notices to employees and governmental entities, including the notice of the reason for the shortened notice and factual basis for the application of these exceptions**.

See ECF Doc. 198-32 (emphasis added)(citations omitted); ECF Doc. 198-33.

Thus, even if the Court finds that the single employer doctrine applies, which KKBIC and AIAC vehemently deny, KKBIC and AIAC are exempt from liability under the WARN Act because of the "Faltering Business and [] Unforeseen Business Circumstances exceptions." See id. Thus, the Court should deny Plaintiffs' motion for summary judgment pursuant to F.R.C.P Rule 56, in its entirety.

**No material loss of employment**

The purpose of the WARN Act is to provide equitable relief to terminated employees so that they can retrain and find replacement jobs. In this case, nearly all employees were immediately offered and took jobs at local businesses. The directors of Kup Co., Mr. Levie and Mr. Sands, took extraordinary steps to ensure that the Company employees had job offers, by contacting government officials, politicians, the VT Department of Labor, and three successful companies for which Mr. Levie was Chairman in VT and CT. In addition, KKBIC insisted that Key Bank fund the PTO for the workers,

which was approximately $800,000.  Key Bank refused to do so for weeks, then finally relented.  The efforts to find jobs and the PTO funds for the Company employees is lost in the Plaintiffs' defamatory narrative about how AIAC destroyed the Company.

## RULE 56 STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." F.R.C.P. Rule 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.")(emphasis in original).

When weighing the material facts, "[t]he court construes all evidence in the light most favorable to the non-moving party, drawing all inferences and resolving all ambiguities in [its] favor." Amore v. Novarro, 624 F.3d 522, 529 (2d Cir. 2010).  Thus, the party seeking summary judgment "must demonstrate the absence of genuine issues of material fact, a burden it can [only] meet if it can point to an absence of evidence to support an essential element of the nonmoving party's claim." Wagner v. Swarts, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), aff'd sub nom (citations omitted).

"A genuine dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)(citations omitted).  However, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation,

but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).

In this case, as more fully provided herein, neither KKBIC nor AIAC is liable under the WARN Act and the Court should deny Plaintiffs' motion for summary judgment pursuant to F.R.C.P. Rule 56, in its entirety.

## CLOSURES UNDER THE WARN ACT

The WARN Act defines a plant closing as the shutdown of a single site of employment that "results in an employment loss [] during any 30-day period for 50 or more employees excluding any part-time employees." 29 U.S.C. § 2101(a)(2).

A "mass layoff [] results in an employment loss at the single site of employment during any 30-day period for -- (i)(I) at least 33 percent of the employees (excluding any part-time employees); and (II) at least 50 employees (excluding any part-time employees); or (ii) at least 500 employees (excluding any part-time employees)." 29 U.S.C. § 2101(a)(3).

In this case, the dire financial P3 performance of the Company, which the Sellers, the Seller's agents, and the Company's officers misrepresented and concealed from KKBIC, was shocking and devastating to the Company. Indeed, the Company was unable to continue operating, so enormous was the level of the losses. Thus, the Company was forced to lay off all its employees.

Thus, neither KKBIC nor AIAC, nor any other defendant is liable under the WARN Act and the Court should deny Plaintiffs' motion for summary judgment pursuant to F.R.C.P. Rule 56, in its entirety.

## ARGUMENT

## POINT I

## NEITHER KKBIC NOR AIAC IS A SINGLE EMPLOYER WITH THE COMPANY

The Second Circuit follows a simple balancing test to determine if related companies comprise a "single employer" for the purposes of the WARN Act. In re APA Transp. Corp. Consol. Litig., 541 F.3d 233, 243 (3d Cir. 2008), as amended (Oct. 27, 2008). Such balancing test involves the review of the following five factors: "(1) common ownership, (2) common directors and/or officers, (3) de facto exercise of control, (4) unity of personnel policies emanating from a common source, and (5) dependency of operations. Id. (citations omitted).

The APA Court further noted:

> the five-factor test [is] a balancing test in which a number of facts and circumstances may be relevant. However, the factors are not balanced equally: the first and second factors, common ownership and common directors and/or officers, are not sufficient to establish that two entities are a single employer. [O]wnership—and even ownership coupled with common management—is not a sufficient basis for liability.

Id. (citations omitted).

In Guippone v. BH S & B Holdings LLC, 737 F.3d 221 (2d Cir. 2013), a case relied upon by Plaintiffs, the Second Circuit followed the same test. Id. at 226. The Guippone Court noted in pertinent part:

> independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as part of the parent or contracting company

> depending upon the degree of independence from the parent.
> Some of the factors to be considered in making this
> determination are (i) common ownership, (ii) common
> directors and/or officers, (iii) de facto exercise of control, (iv)
> unity of personnel policies emanating from a common source,
> and (v) the dependency of operations.

Id.  Moreover, the Guippone Court set forth, "[a]s in any balancing test, application of

these factors requires a fact-specific inquiry, no one factor set out by the DOL is

controlling." Id.

Ultimately, the Guippone Court denied summary judgment because "the record

evidence raises a question of fact as to whether [the parent company] exercised de facto

control over [the subsidiary]. The core of this factor is whether one company was the

decision-maker responsible for the employment practice giving rise to the litigation." Id.

at 227, *citing* APA.

In Pearson v. Component Tech. Corp., 247 F.3d 471 (3d Cir. 2001), a case relied on

by Plaintiffs, the court noted:

> the "de facto exercise of control" factor is not intended to
> support liability based on a parent's exercise of control
> pursuant to the ordinary incidents of stock ownership. Nor
> may this factor be used to create liability for a lender's
> general oversight of its collateral. The factor is appropriately
> utilized, however, if the parent or lender was the decisionmaker
> responsible for the employment practice giving rise to the
> litigation.

Id. at 503-04.

"The core inquiry of the *de facto* exercise of control factor is "whether the parent

[or lender] has specifically directed the allegedly illegal employment practice that forms

the basis for the litigation." In re Tweeter OPCO, LLC., 453 B.R. 534, 543 (Bankr. D. Del.

2011).  In this case, unlike the Defendants in <u>Tweeter</u>, neither KKBIC nor AIAC directed

the closure of the business of KKB, VBC, or SBI.  See ECF Doc. 202-4, ¶57. Nor was KKBIC

nor AIAC controlling the day to day decisions of the KKB, VBC, or SBI.  ECF Doc. 202-4,

¶¶ 7, 47-57.

   In this case, the decision to comply with Key Bank's direction to cease operations

was discussed and voted upon by the Board of Kup Co., not by the Board of KKBIC or

AIAC.  See ECF Doc. 202-4, ¶57.  This is abundantly clear from the Kup Co. Board of

Directors Minutes.  Thus, neither KKBIC nor AIAC held de facto control over the decision

to close the plants.  <u>See</u> <u>Guippone.</u>

   Moreover, in this case, as set forth in the Sands Affidavit previously e-filed, ECF

Doc. 202-4:

- Neither AIAC nor KKBIC possessed de facto control over the Company's operations, which, prior to the closing of the Company, was in a financial position under which it could no longer continue operating.

- The Company's personnel policies were established prior to the closing of the Company, by the previous owners, and neither AIAC nor KKBIC changed such policies. Thus, the personnel policies of AIAC, KKBIC and the Company did not and could not have originated from a common source.

- AIAC and each of its affiliates, KKBIC and the Company each "possessed its own employees and its own policies regarding compensation, vacation and sick time; these companies hired and fired employees on an individual basis; and personnel files were maintained separately." <u>See</u> <u>id</u>. at 244.

- The Company was "autonomous in terms of finances because [it] had independent wage rates, pay scales, salaries and payrolls." <u>Id</u>. at 243.

- Neither AIAC nor KKBIC was involved with the operation of the Company, including the Company's employment actions (e.g. hiring, payroll, promotions, terminations, layoffs).

- All decisions were discussed and voted upon by the Board of Kup Co., not KKBIC or AIAC.

- Neither AIAC nor KKBIC had employees, so they had no HR policies and procedures to share with the Company.

See ECF Doc. 202-4, ¶¶ 7, 47-57.

Thus, as represented by the above balancing test, KKBIC and the Company are not a single employer, and KKBIC is not liable for the layoff of the Company's employees. Likewise, AIAC and the Company are not a single employer, and AIAC is not liable for the layoff of the Company's employees. See APA. Moreover, "it is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation is not liable for the acts of its subsidiaries." Pennington v. Fluor Corp., 19 F.4th 589, 598 (4th Cir. 2021)(citations omitted)

As such the Court should deny the Plaintiffs' motion for summary judgment pursuant to F.R.C.P. Rule 56, in its entirety.

### POINT II

### KKBIC IS EXEMPT FROM THE WARN ACT
### 60-DAY NOTICE REQUIREMENT

The WARN Act ("Act") requires employers to provide written notice to its employees 60 days before ordering a plant closing or a mass lay-off. 29 U.S.C. § 2102(a); James v. Fleet/Norstar Fin. Grp., Inc., 992 F.2d 463, 465 (2d Cir. 1993); Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dep't Stores, Inc., 15 F.3d 1275, 1286 (5th Cir. 1994). Employers that fail to provide the 60-day notice, absent one of the recognized exceptions, is liable to the affected employees for back pay and benefits for the extent of

the violation. <u>See</u> 29 U.S.C. § 2104(a); <u>Carpenters Dist.</u> at 1286 ("[I]f an employee receives less than sixty days' notice, then the employee is entitled to back pay for each day of the violation period.")(citations omitted).

Sixty days prior to the liquidation, when the Company determined it was not prudent to issue the WARN Notice, under the exemptions listed below, KKBIC was not an investor in the Company, had never met with management of the Company, shared no common ownership, management, board members or officer positions. Therefore, KKBIC could not even have participated in the preparation of a WARN Notice in compliance with the WARN Act.

Once KKBIC invested in Kup Co., KKBIC and Kup Co. were not a single employer and therefore, since KKBIC was not an employer, KKBIC had no authority to make personnel decisions on behalf of Kup Co. even after making an investment into the Company. Furthermore, as an investor in Kup Co., KKBIC is further exempted from the WARN Act provision.

However, even if the Court decides that the single employer doctrine applies, which KKBIC and AIAC vehemently deny, the subject closing is exempt from the 60-day period set forth in the WARN Act as set forth immediately below.

In addition, the State of Vermont Department of Labor (DOL), conducted an investigation into the facts and circumstances leading to the closing of the business. It concluded that, due to the exceptions set forth below, no Warn Act liability exists. See accompanying Response to Statement of Facts, ¶7 and ECF Doc. 198-32 ("The Company provided as much notice as was practicable, here two business days after Key Bank issued

its final notice of default, and provided complaint notices to employees and governmental agencies, including in the notice the reason for the shortened notice and the factual basis for the application of [the] **Faltering Business and … Unforeseen Business Circumstances exemptions**”); ECF Doc. 198-32; ECF Doc. 198-33.

A.    **Business Circumstances**

Pursuant to the Act “[a]n employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by **business circumstances** that were not reasonably foreseeable as of the time that notice would have been required.” 29 U.S.C. § 2102(b)(2)(A)(emphasis added).

“To successfully invoke an unforeseeable business circumstances defense to liability under the Worker Adjustment and Retraining Notification Act (WARN Act), an employer must demonstrate (1) that the business circumstances that caused the layoff were not reasonably foreseeable, and (2) that those circumstances were the cause of the layoff.” In re AE Liquidation, Inc., 866 F.3d 515 (3d Cir. 2017) (citations omitted). The Act allows flexibility based upon the business judgment rule. See Loehrer v. McDonnell Douglas Corp., 98 F.3d 1056, 1061 (8th Cir. 1996), noting:

> [t]he Act … necessarily recognize that even the most conscientious employers are not perfect, and they thus **allow needed flexibility for predictions about ultimate consequences** that, though objectively reasonable, proved wrong.  So long as it may still fairly be said that the eventual plant closing or mass layoff is caused by a sudden, dramatic, and unexpected event outside the employer's control, the exception applies.

Id. (citations omitted) (emphasis added).

21

In this case, the deep, intractable insolvency of the Company, particularly its wildly inaccurate budget, ongoing negative cash flow position and deep capital hole, was an unforeseen business circumstance that KKBIC, as a new Shareholder, could not have realized prior to the Closing. Indeed, the Sellers', the Company's CFO, Mark Coles, and the Company's investment banker, G2, all materially misrepresented the upcoming P3 income statement results to KKBIC. ECF Doc. 202-4, ¶¶ 8,9,11, 14, 16-20. Moreover, as detailed above, once learning the true extent of the Company's financial despair, KKBIC immediately attempted to remedy the situation by actively seeking capital and/or a suitable investor or purchaser to keep the Company operational. See ECF Doc. Doc. 202-4, ¶¶ 30-32. However, such efforts failed (i.e.. no investor sought to maintain the Company as a going concern) through no fault of KKBIC. See ECF Doc. 202-4, ¶33-34.

Moreover, because of the hidden financial despair, the Company's key lender called its loan, accelerating the payment and forcing the Company to liquidate. This unexpected and unforeseen acceleration further diminished the Company's ability to continue its operations, forcing it to terminate its employees. See ECF Doc. 202-4, ¶38.

KKBIC could not have expected that the Company was insolvent, based upon the operating budgets and cash projections presented to the Buyer prior to the Closing. Frankly, KKBIC would never have closed on the investment had it known the full depth of the Company's financial position and its inability to pay its debts, especially payroll. However, as detailed above, KKBIC used its best efforts to obtain financing and/or sell the Company to a qualified buyer or investor to avoid shutting down the Company's operations. In a highly organized effort, KKBIC reached out to every major and minor

bakery company in North America, both private and publicly traded. KKBIC created a summary of the situation and distributed it to all these prospects, then affiliates of KKBIC spoke to them about the asset sale process. [Footnote: KKBIC's efforts paid off: Flowers Foods made a breathtaking bid of $16 million for just the inventory, machinery, real estate and the brands. This, combined with the accounts receivable amount outstanding, reflected a total value of $22 million for the estate, compared with $3.5 million for the next highest bid. Even though Flowers did not hire any workers, all got job offers and jobs from local businesses. By any measure, this was a great outcome for a what could have been tragic for all stakeholders.]

The undisputed facts show that stopping the Company's operations was due to business circumstances which were hidden and not at all foreseeable by KKBIC at the time notice would have been required, February 26, 2021, which was prior to KKBIC purchasing the Company. As such, KKBIC qualifies for the business circumstances exception to the Act and the Court should grant its motion for summary judgment pursuant to F.R.C.P. Rule 56, in its entirety. The State of Vermont's Labor Department reached such a decision concerning the applicability of the exception to the WARN Act. See ECF Doc. 198-32.

B.    **Faltering Company**

Another exception to the Act's notice requirement is the faltering company exception. "In re APA Transp. Corp. Consol. Litig., 541 F.3d 233, 240 (3d Cir. 2008), as amended (Oct. 27, 2008).

Pursuant to the faltering company exception:

> [a]n employer may order the shutdown of a single site of
> employment before the conclusion of the 60-day period if as
> of the time that notice would have been required the
> employer was actively seeking capital or business which, if
> obtained, would have enabled the employer to avoid or
> postpone the shutdown and the employer reasonably and in
> good faith believed that giving the notice required would
> have precluded the employer from obtaining the needed
> capital or business.

29 U.S.C. § 2102(b)(1); see Grimmer v. Lord Day & Lord, 937 F. Supp. 255, 256 (S.D.N.Y.

1996)([T]he altering company exception[] permits an employer to order the shutdown of

a site of employment less than sixty days after giving notice … .")(citations omitted); see

also N.Y. Comp. Codes R. & Regs. tit. 12, § 921-6.2 ("[T]he employer shall establish that

at the time notice of the plant closing, mass layoff, relocation, or covered reduction in

work hours would have been required: (1) the employer was **actively seeking capital** or

business and identifies the specific actions taken to obtain such capital or business. For

example, the employer must demonstrate its efforts to obtain financing or refinancing

through the arrangement of loans, the issuance of stocks, bonds, or other methods, or to

obtain additional money, credit, or business through any other commercially reasonable

method; and (2) there was a **realistic opportunity to obtain the capital** or business

sought; and (3) the capital or business sought would have been **sufficient to enable the**

**facility, operating unit, or site to avoid or postpone the plant closing**, mass layoff,

relocation, or covered reduction in work hours; and (4) the employer reasonably and in

good faith believed that giving notice would have precluded the ability to obtain the

needed capital or business. The employer must be able to objectively demonstrate that a

potential customer or financing source would have been unwilling to provide the new business or capital if notice were given.")(emphasis added).

The faltering business exception applies when a mass layoff or shutdown is caused by the employer's failure to obtain sufficient capital. <u>Carpenters District Council of New Orleans v. Dillard Dept. Stores</u>, 15 F.3d 1275, 1281 (5th Cir. 1994). The exception was created because it is not the purpose of the WARN Act to require an employer to continue in business to its detriment for 60 days simply because it is economically feasible or possible to do so. <u>Jurcev v. Central Community Hospital</u>, 7 F.3d 618 (7th Cir. 1993).

A "WARN Act employer must meet specific requirements to invoke the faltering company exception to liability under the WARN Act for failing to provide employees with 60-day notice of termination by (1) giving as much notice as is practicable, and (2) setting forth specific facts in notice that explain reason for reducing notice period." <u>In re Tweeter OPCO, LLC.</u>, 453 B.R. 534 (Bankr. D. Del. 2011)(citations omitted).

In this case, Kup Co. sought outside capital investment, and in fact, had induced KKBIC to invest in Kup Co. with the hopes of saving the operations. Once it was determined that KKBIC received fraudulent information during its underwriting and due diligence, KKBIC realized the Company would require additional capital beyond its resources to sustain the operations. KKBIC then worked with Kup Co. seeking external infusion of funds to raise the needed capital to continue the Company's operations. See ECF Doc. 202-4, ¶30.

Having not been able to raise the necessary infusion of funds, KKBIC sought a true strategic buyer, another bakery with overlapping production, distribution and

administration who could realize up to $10,000,000.00 in savings by eliminating redundancies. See ECF Doc, 202-4, ¶¶27, 30-34.

Once such efforts failed, the Company provided the required notice as soon as possible. See ECF Doc. 202-4, ¶39. This notice ("Notice") provided facts sufficient to explain the reduction in notice period. A copy of the Notice is attached ECF Doc. 202-4, as Exhibit "G."

As such, the subject closure qualifies for the faltering business exception to the Act and the Court should deny Plaintiffs' motion for summary judgment pursuant to F.R.C.P. Rule 56, in its entirety.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary

judgment pursuant to F.R.C.P Rule 56, in its entirety.

Dated:  May 1, 2023
      Syracuse, New York        Respectfully submitted,

                      **McCormick, Fitzpatrick, Kasper & Burchard P.C**
                      *Attorney for Defendants*
                      *American Industrial Acquisition Corporation and KK Bakery Investment Company, LLC*

                      By: <u>/s/ Daniel L. Burchard</u>
                      Daniel L. Burchard, Esq.
                      40 George Street, P.O Box 638
                      Burlington, Vermont 05402-0638
                      (802) 863-3494 x127

                      **KIRWAN LAW**
                      *Attorneys for Defendants*
                      *American Industrial Acquisition Corporation and KK Bakery Investment Company, LLC*

                    By: <u>/s/ Terry J. Kirwan, Jr.</u>
                      Terry J. Kirwan, Jr.
                      (Bar Roll #501821)
                      2401 Burnet Avenue
                      Syracuse, New York 13206
                      Telephone: 315.452.2443
                      tkirwan@kirwanlawpc.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2023, I caused to be filed the annexed Reply Memorandum of Law in opposition to the Plaintiffs' motion and in further support of Defendants' motion to dismiss the Complaint pursuant to F.R.C.P. Rule 56 together with the accompanying documents using the CM/ECF system, which sent notification of such filing to the attorneys of record.

Dated: May 1, 2023
      Syracuse, New York          Respectfully submitted,

**McCormick, Fitzpatrick, Kasper & Burchard P.C**
*Attorney for Defendants*
*American Industrial Acquisition*
*Corporation and KK Bakery Investment*
*Company, LLC*

By: /s/ Daniel L. Burchard
Daniel L. Burchard, Esq.
40 George Street, P.O Box 638
Burlington, Vermont 05402-0638
(802) 863-3494 x127

**KIRWAN LAW**
*Attorneys for Defendants*
*American Industrial Acquisition*
*Corporation and KK Bakery Investment*
*Company, LLC*

By: /s/ Terry J. Kirwan, Jr.
Terry J. Kirwan, Jr.
(Bar Roll #501821)
2401 Burnet Avenue
Syracuse, New York 13206
Telephone: 315.452.2443
tkirwan@kirwanlawpc.com