UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Matthew Chaney, Nadine          )
Miller and Arthur Gustafson,    )
on behalf of themselves and     )
all others similarly            )
situated,                       )
                                )
        Plaintiffs,             )
                                )
            v.                  )   Case No. 2:21-cv-120
                                )
Vermont Bread Company,          )
Superior Bakery, Inc., Koffee   )
Kup Bakery, Inc., Koffee Kup    )
Distribution LLC, KK Bakery     )
Investment Company LLC, KK      )
Bakery Holding Acquisition      )
Company, and American           )
Industrial Acquisition          )
Corporation,                    )
                                )
        Defendants,             )
                                )
and                             )
                                )
Linda Joy Sullivan, in her      )
capacity as the Dissolution     )
Receiver for Koffee Kup         )
Bakery, Inc., Vermont Bread     )
Company, Inc. and Superior      )
Bakery, Inc.,                   )
                                )
        Intervenor-Defendant-   )
        Crossclaimant,          )
                                )
            v.                  )
                                )
KK Bakery Investment Company,   )
LLC, KK Bakery Holding          )
Acquisition Company, and        )
American Industrial             )
Acquisition Corporation,        )
                                )
        Crossclaim Defendants.  )

## OPINION AND ORDER

Plaintiffs Matthew Chaney, Nadine Miller, and Arthur Gustafson, on behalf of themselves and a class of similarly-situated persons, bring this action alleging violations of the Worker Adjustment and Retraining Notification ("WARN") Act of 1988, 29 U.S.C. §§ 2101-2109, *et seq.*  Plaintiffs and other class members are former employees of Koffee Kup Bakery, Inc. ("Koffee Kup"), Vermont Bread Company, Inc. ("Vermont Bread"), and/or Superior Bakery, Inc. ("Superior") (collectively the "Koffee Kup Entities").  Those Koffee Kup Entities appear in this case through the intervening, state-court-appointed Dissolution Receiver of their assets, Linda Joy Sullivan (the "DR").  Other defendants include the alleged purchasers of the Koffee Kup Entities, American Industrial Acquisition Corporation ("AIAC") and Koffee Kup Bakery Investment Company, Inc. ("KKBIC").[1]  The DR has asserted a crossclaim against AIAC and KKBIC seeking indemnification.

Several motions are pending before the Court, including motions for summary judgment filed by Plaintiffs, the DR, and AIAC/KKBIC, respectively, and Plaintiffs' two motions to strike

---

[1] The case caption includes two additional parties.  The Court has granted Plaintiffs' motion to dismiss their claims against KK Bakery Holding Acquisition Company without prejudice.  ECF No. 232.  Crossclaims against that entity are still pending. Koffee Kup Distribution LLC had not appeared in the case.

certain affidavits.  For the reasons set forth below,
Plaintiffs' motions to strike are denied without prejudice;
their motion for summary judgment is granted in part and denied
in part; the DR's motion for summary judgment is granted in part
and denied in part; and AIAC/KKBIC's motion for summary judgment
is denied.

## Factual Background

    On or about April 26, 2021, three bakeries – Koffee Kup,
Vermont Bread, and Superior - ceased operations.  As a result,
hundreds of people lost their jobs.  Plaintiffs, representing a
class of those former bakery employees, allege that they were
not provided advance notice of their terminations as required by
the WARN Act.  If Plaintiffs succeed on their claims, including
the allegation that all three bakeries were owned and operated
by a single employer, the employer may be subject to civil
liability in the form of back pay and benefits for up to a
maximum of 60 days for each of the over 400 members of the
class.  *See* 29 U.S.C. § 2104(a)(1).

    The three bakeries were owned by Kup Co., a holding
company.  More specifically, Vermont Bread and Superior were
subsidiaries of Koffee Kup, and Koffee Kup was wholly owned by
Kup Co.  ECF No. 87-8.  None of the three bakeries had their own
board of directors.  ECF No. 203-11 at 27.  Kup Co. had a board
of directors, and during the period in question the bakeries

shared the same upper management, including a single Chief Executive Officer ("CEO").

Prior to April 2021, Kup Co. was in poor financial condition and was in default to its primary lender, Key Bank. The company's forbearance agreement with Key Bank had lapsed and was not renewed.  In late 2020 and the first quarter of 2021, Koffee Kup hired G2 Capital Advisors, LLC ("G2 Capital Advisors") to search for a purchaser or partner to provide the company with working capital.  ECF No. 203-11 at 26.  In the course of that effort, G2 Capital Advisors provided financial information to Jeffrey Sands.  Sands was working with Leonard Levie and Levie's company, AIAC.  ECF No. 203-18 at 2-4.  Sands' company, Dorset Partners, LLC, had an engagement agreement with AIAC.  ECF No. 203-5 at 3.  It was Sands who brought Koffee Kup to AIAC's attention.  ECF No. 203-13 at 9.

AIAC specializes in purchasing underperforming companies and working to make them profitable.  ECF No. 203-23 at 3. Sands pitched AIAC as the best potential buyer for Kup Co., describing AIAC as

> a family office with no limited partners.  They invest their own funds to build strong companies which they hold for the long term.  AIAC is an active owner.  Our Chairman receives daily cash, working capital and loan data from each company.  We manage professionally and conservatively to build strong businesses.  AIAC has over 8,500 employees with deep pools of talent to solve complex operational and financial problems.

*Id.*  An email sent by Sands to G2 Capital Advisors dated
December 31, 2020 outlined a new Koffee Kup management team that
would "report to Leonard [Levie] at AIAC headquarters....
Leonard is the founder and sole shareholder of AIAC.  He wants
to buy KK, has owned other commercial bakeries and two of his
most successful companies are in Vermont."  ECF No. 203-27.  A
PowerPoint presentation offered by Sands identified "AIAC
Executive Leadership for Koffee Kup" as Sands and new CEO Mark
Gauthier.  ECF 203-23.

Prior to the purchase of Kup Co., Sands reportedly
requested financial information about Kup Co.'s sales and
earnings for the third financial period of 2021 ("P3"), ending
March 21, 2021.  ECF No. 202-4 at 3-4.  On March 18, 2021, G2
Capital Advisors sent Sands copies of Kup Co.'s 2021 budget.
*Id.* at 3.  Sands' affidavit attests that when he inquired in
late March 2021 about the company's performance during P3,
Koffee Kup's Mark Coles reported that sales "were slightly off
for the period while G2 Capital Advisors also indicated that
there was no material change [from the budgeted projections]."
*Id.* at 4.

Evidence submitted by the DR suggests that AIAC
representatives were given full access to the bakeries' sales
data.  ECF No. 214-5 at 5.  According to the testimony of Koffee
Kup's Coles, on March 12, 2021, Koffee Kup gave AIAC access to

and training on the company's "BIRST" system, which tracked sales. *Id.* Coles testified that information from the BIRST system would have allowed AIAC to predict any net revenue shortfall in the P3 financials. *Id.* at 8-9.

The offer to purchase Kup Co. was submitted on AIAC letterhead signed by Levie as "Chairman AIAC." ECF No. 203-30. Levie authorized the formation of KKBIC on March 29, 2021. ECF No. 203-25. Levie ultimately owned 85% of KKBIC and Sands the other 15%. Pursuant to a Stock Purchase Agreement ("SPA") dated April 1, 2021, KKBIC purchased 80% of the stock of Kup Co. for a price of $1.00. ECF No. 198-10 at 6, 13. KKBIC also purchased $14,314,000 of Kup Co.'s subordinated debt for $1,000,000. *Id.* at 13, 35.[2] After KKBIC purchased the majority of Kup Co.'s shares, Levie and Sands occupied two of the three seats on Kup Co.'s board of directors.

The $1,000,000 for the purchase was provided by Alliance Manufacturing and Trading Company ("AMTC"), an AIAC affiliate. ECF No. 203-13 at 16-17. Although AIAC and KKBIC initially testified through their designated deponents that AMTC loaned the funds to KKBIC for the acquisition, each entity stated in subsequent errata sheets that no formal loan existed. ECF Nos. 203-35, 203-36. As part of the purchase agreement, KKBIC also

---

[2] Sands attests in his affidavit that the $1 million payment was accompanied by a $2 million note. ECF No. 202-4 at 3.

agreed to contribute up to $2.5 million as needed.  ECF Nos.
198-10 at 13, 203-30 at 3-4.  It is unclear where that money
would come from, since KKBIC had no bank account and is
insolvent.  ECF Nos. 203-26 at 2, 203-6 at 10.

On April 1, 2021, Sands sent an email to Koffee Kup
managerial employees stating that "AIAC has brought in their
inhouse turnaround team to restructure the business, manage it
through a transition and then establish a long-term strategic
plan to guide the business in the decades which follow."  ECF
No. 203-38 at 58.  Sands also sent employees a PowerPoint
presentation that included the statement: "On April 1, 2021,
AIAC made a control investment in Koffee Kup Bakery."  ECF No.
203-38 at 64.

Sands attests that within days of the purchase, he
discovered Kup Co.'s financial situation was much worse than
previously disclosed.  Sands' affidavit states that on April 5,
2021, he learned that the company's P3 gross sales were $963,693
below budget.  ECF No. 202-4 at 4.  He further contends that the
P3 financials were prepared prior the SPA closing, and were
wrongfully withheld until after the sale was finalized.  *Id.* at
5.  According to Sands, a new "forecast based upon the true
financials projected substantial, multi-million-dollar losses
and a negative cash balance by the end of 2021."  *Id.* at 6.

The DR contests Sands' accusations, asserting that Sands and CEO Gauthier had access to all of the company's financials, including access to the BIRST system, prior to the SPA closing. ECF No. 198-23 at 2 (Coles Timeline, to which Coles attested in his deposition at ECF No. 203-12 at 25). Those financials reportedly showed significant losses through 2021 P2, requiring the former shareholders to advance over $14 million to keep the company operating. When asked for the P3 financials in late March 2021, Coles responded to Sands that the company did not have complete sales data at that time, and that the information would not be final until April 1. ECF No. 198-23 at 2.

The P3 financials were emailed to Coles at 4:29 p.m. on April 1. ECF No. 209-22 at 2. The DR submits that there is no evidentiary support, aside from Sands' own statement, for the claim that G2 Capital Advisors delayed those financials or misled anyone about the strength of the company. The DR further contends that if access to the P3 financials was critical for closing, the buyer could have waited a few more days before completing the deal.

In his deposition, Sands recalled that in light of the P3 data he received "a call from [newly-appointed CFO] Dave Cryer and Leonard [Levie] saying, '[t]here's no way this company is saveable.'" ECF. No. 203-18 at 25-26. Sands has also testified:

> [O]nce the Period 3 was revealed and how bad the
> company truly was, we realized somebody would need to
> . . . bring in $10 million worth of improvements to
> make the company viable; and the only one that could
> possibly do that would be a strategic buyer, another
> bakery.
>
> So basically, that evening we told Key our opinion's
> changed on this, the business is -- is dead.  It's not
> something we think we can be successful with, but
> somebody can be.
>
> And pretty much from the 7th to whenever it was, the
> 26th, I was killing myself trying to find a strategic
> buyer, talking to every other bakery I could think of
> to try to get somebody to come in and – and take it
> off our hands.

ECF No. 203-39 at 7.

Indeed, on April 6, 2021 KKBIC informed Key Bank of what it had allegedly learned about the company's financial situation. ECF No. 202-4 at 7.  On April 9, 2021, Key Bank issued a default notice and hired an outside advisor to serve as the bank's receiver.  *Id.*  Key Bank also reportedly informed the company that it would not extend the forbearance agreement or fund the company's payroll unless the company cooperated with the appointment of a receiver and with the liquidation of the bank's collateral.  *Id.*  The DR asserts that the notice of default was sent after Sands told Key Bank that Levie would not be meeting his agreed-upon obligation to provide $2.5 million in funds to the company.  ECF No. 209-23 at 2.

In his efforts to sell the company, Sands reached out to potential buyers.  ECF Nos. 202-4 at 7, 203-39 at 7.  Related

sales materials characterized AIAC's involvement in Kup Co. as: "affiliate of AIAC owns 80%, individuals own 20%; AIAC controls board."  ECF No. 203-41 at 6.  Sands attests that while two interested parties were identified, one was rejected by Key Bank and the other failed to make an offer the bank found acceptable. ECF No. 202-4 at 8.

On April 22, 2021, Key Bank issued a formal notice of default and communicated its intent to foreclose.  On Friday, April 23, 2021, Sands told Coles to inform workers that the bakeries were closing and they should not continue coming to work.  ECF No. 203-12 at 41.  Coles, the only upper management person remaining from the pre-sale Koffee Kup team, refused to sign the proposed notice of closure.  ECF No. 198-5 at 17.

Notices of the layoff were dated April 26, 2021 and signed by Sands on behalf of "Dorset Partners, LLC, agent for Koffee Kup Bakery By: Jeffrey Sands, Member."  ECF No. 198-31.[3]  The letters stated that Koffee Kup Bakery, Inc., and its respective subsidiaries (Vermont Bread in Vermont, and Superior in Connecticut) would be terminating all operations effective that date.  The notice of layoff letters also explained:

> although many promising avenues were explored that we
> were cautiously optimistic would have allowed Koffee
> Kup to survive, those efforts have now been exhausted

---

[3]  Plaintiffs assert that Sands had no engagement agreement with any of the Koffee Kup Entities, and thus was not an "agent for Koffee Kup Bakery."  ECF No. 203-2 at 13.

10

> without success and Koffee Kup no longer has
> sufficient capital to continue operations.  We were
> unable to provide you with this notice any earlier as
> we were uncertain of the success of the efforts that
> we have been making to continue operating.  Earlier
> notice of this unfortunate outcome would have been
> premature and would have jeopardized those very
> efforts.

ECF Nos. 198-31 at 2, 202-11 at 3.  The notices were handed out

to some employees on April 27, 2021, and mailed to all employees

between April 27 and April 29, 2021.  ECF Nos. 198-26 at 20;

203-8 at 3, 5; 217-7 at 12 (Kup Co. board minutes stating that

notices were sent on "Tuesday," April 27, 2021).

On May 6, 2021, the Commissioner of the Vermont Department

of Labor wrote to Sands and requested an explanation as to why

notice was not given in accordance with Vermont's Notice of

Potential Layoffs Act, 21 V.S.A. §§ 414(a)(3).  Based upon a

letter received from the company's counsel, the Department of

Labor's General Counsel subsequently concluded that the

company's invocation of the "faltering business" and "unforeseen

business circumstance" exceptions to the notice requirement were

each "sufficiently justified," and no further action was taken

by the State of Vermont.  ECF No. 198-33.  Plaintiffs and the DR

disagree with that conclusion, noting that the Department of

Labor relied solely on corporate counsel's representations and

did not conduct its own investigation.  ECF No. 223 at 9.

11

Plaintiffs filed their Class Action Complaint on April 29, 2021, and their First Amended Class Action Complaint on June 15, 2021, alleging violations of the WARN Act.  On March 17, 2022, Linda Joy Sullivan moved to intervene as the DR for the Koffee Kup Entities.  The Court granted her unopposed motion on March 30, 2022.  The Court granted Plaintiffs' motion to certify the class on August 17, 2022.

In addition to Plaintiffs' claims, pending before the Court is the DR's crossclaim against AIAC and KKBIC for indemnification.

## **Discussion**

### I.   **Plaintiffs' Motions to Strike**

Among the motions now before the Court are Plaintiffs' motions to strike each of two Sands affidavits, submitted in support of the motion for summary judgment filed by AIAC and KKBIC.  As discussed more fully below, Plaintiffs contend that the affidavits include self-serving statements of fact that are belied by the record and are not credible.  AIAC and KKBIC argue that Sands' sworn affidavits merely offer disputes of fact that prevent Plaintiffs from obtaining summary judgment, and that credibility determinations are inappropriate at this stage in the case.

"Because 'a decision on the motion to strike may affect [the movant's] ability to prevail on summary judgment,' it is

12

appropriate to consider a motion to strike prior to a motion for
summary judgment." *Pugliese v. Verizon New York, Inc*., No. 05-
CV-4005, 2008 WL 2882092, *5 (S.D.N.Y. July 9, 2008) (quoting
*Gucci Am., Inc. v. Ashley Reed Trading, Inc.*, No. 00-CV-6041,
2003 WL 22327162, *2 (S.D.N.Y. Oct. 10, 2003)).  That said, the
Court may choose to review the Sands affidavits solely in the
context of the summary judgment motions, addressing each
statement individually.  *See Coolidge v. United States*, No. 10-
CV-363S, 2015 WL 5714237, at *3 (W.D.N.Y. Sept. 29, 2015)
("Rather than strike a declaration because it contains hearsay,
argument, or statements unsupported by citations to the record,
courts considering a motion for summary judgment are free to
disregard the improper portions, independently review the
record, and consider only that which is admissible.").

The most controversial statements in the Sands affidavits
pertain to the roles of AIAC and KKBIC in the purchase and
subsequent management of Kup Co. and the Koffee Kup Entities.
Sands attests that AIAC was not involved with KKBIC, Kup Co., or
Kup Co.'s subsidiaries.  Sands Aff. ¶ 49.  Sands further states
that KKBIC exercised no control over, and was not involved with,
the operations of the company.  Sands Aff. ¶ 51.  According to
AIAC and KKBIC's statement of facts, "[a]ll decisions regarding
the Company's operations, including the shutdown, were
exclusively discussed and voted upon by the board of Kup Co."

13

ECF No. 202-2 at 8 (citing Sands Aff. ¶ 62).  Sands also accuses
certain persons and entities of lying and committing fraud.
Other statements in the Sands affidavits are not specifically
disputed.

Because the Sands affidavits contain a mix of disputed and
undisputed statements, only some of which are challenged in the
motions to strike, the Court declines to strike the affidavits
entirely and will instead review them in the context of the
entire summary judgment record.  *See, e.g., Kozak v. CSX
Transportation, Inc*., No. 20-CV-184S, 2023 WL 2955851, at *7
(W.D.N.Y. Apr. 14, 2023) ("rather than strike these submissions
in whole, this Court will independently assess their
admissibility and consider only admissible evidence in resolving
CSX's motion for summary judgment"); *Martin v. Town of Westport*,
558 F. Supp. 2d 228, 231 (D. Conn. 2008) ("in the context of
summary judgment, motions to strike are unnecessary and produce
only redundant statements by the court that it has not relied on
such inadmissible evidence in deciding the summary judgment
motion") (cleaned up).  Plaintiffs' motions to strike (ECF Nos.
216, 227) are denied without prejudice.

## II.  Plaintiffs' Motion for Summary Judgment

### A.   Legal Standard

Summary judgment is appropriate when "the movant shows that
there is no genuine dispute as to any material fact and the

14

movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317,
322 (1986).  A genuine dispute exists where "the evidence is
such that a reasonable jury could return a verdict for the
nonmoving party," while a fact is material if it "might affect
the outcome of the suit under the governing law."  *Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant bears
the initial burden of demonstrating "the absence of a genuine
issue of material fact," and, if satisfied, the burden then
shifts to the non-movant to present "evidence sufficient to
satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521
F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323).

In determining whether there exists a genuine dispute as to
a material fact, the Court is "required to resolve all
ambiguities and draw all permissible factual inferences in favor
of the party against whom summary judgment is sought."  *Johnson
v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v.
Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  The Court's job is
not to "weigh the evidence or resolve issues of fact."  *Lucente
v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002)
(citation omitted).  "Assessments of credibility and choices
between conflicting versions of the events are matters for the
jury, not for the court on summary judgment."  *Jeffreys v. City
of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

15

When, as in this case, parties file cross-motions for summary judgment, the Court analyzes the motions separately "in each case construing the evidence in the light most favorable to the non-moving party." *Novella v. Westchester Cnty.*, 661 F.3d 128, 139 (2d Cir. 2011).

**B.   The WARN Act**

The WARN Act prohibits employers of 100 or more employees from ordering "a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order." 29 U.S.C. § 2102(a). WARN Act notice aims to "provide[ ] workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market." 20 C.F.R. § 639.1(a); *see also Guippone v. BH S & B Holdings LLC*, 737 F.3d 221, 225 (2d Cir. 2013). Failure to provide a WARN Act notice may subject an employer to civil liability in the form of back pay and benefits for the period of the WARN Act violation up to a maximum of 60 days. *See* 29 U.S.C. § 2104(a)(1).

**C.   Was There a Single Employer?**

A threshold question is whether the three bakeries were owned and operated by a single employer. The issue is material because the WARN Act applies only to employers of 100 or more

employees, and two of the three bakeries reportedly employed fewer than 100 employees at the time of the closures.  When considered together, however, the Koffee Kup Entities employed over 300 persons.

Plaintiffs argue that Kup Co.'s ownership of Koffee Kup and its subsidiaries, shared upper management, shared operations, and a single Kup Co. board of directors demonstrate that the three bakeries were owned and operated by a single entity. Plaintiffs also highlight the control that Sands and the AIAC team exerted over the three bakeries around the time of the closures.  The DR's motion for summary judgment initially contests the single employer characterization, but alternatively endorses the theory to the extent that the Court finds the single employer was AIAC/KKBIC.  AIAC and KKBIC argue that there was no single employer, and that in any event the layoffs were driven by Kup Co. and not AIAC/KKBIC.

In *Guippone*, the Second Circuit adopted a five-factor test set forth in federal Department of Labor ("DOL") regulations to determine if related entities constitute a single employer.  737 F.3d at 226 (citing 20 C.F.R. § 639.3(a)(3)).  The DOL regulations provide that

> independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as part of the parent or contracting company depending upon the degree of independence from the parent.  Some of the factors to

17

> be considered in making this determination are (i)
> common ownership, (ii) common directors and/or
> officers, (iii) de facto exercise of control, (iv)
> unity of personnel policies emanating from a common
> source, and (v) the dependency of operations.

20 C.F.R. § 639.3(a)(2). "As in any balancing test, application
of these factors requires a fact-specific inquiry, no one factor
set out by the DOL is controlling, and all factors need not be
present for liability to attach." *Guippone*, 737 F.3d at 226.
The Second Circuit has noted that "[t]hese factors are also
sensibly applied to determine whether WARN liability is to be
imposed on an equity investor, who may similarly exercise
control over the termination decision." *Id.*

Prior to the purchase of Kup Co. by KKBIC, the Koffee Kup
Entities operated largely as a single organization with a sole
CEO overseeing operations. Although the bakeries kept separate
accounting records, financial records, and payrolls, Koffee Kup
CEO Morin testified that he was hired to integrate operations,
and that the company was in the process of creating an
integrated IT system for all accounting, sales, manufacturing,
and supply chain. ECF No. 203-11 at 5-7. Morin's duties also
included managing staff at the three bakeries. *Id.* at 3-4.
Coles viewed the three entities as a single enterprise. ECF No.
203-12 at 5. That view was echoed by the Key Bank receiver, who
testified that "the companies were generally operated as a

single enterprise, with substantial comingling of assets, liabilities and financial transactions."  ECF No. 76-5 at 1.

At the corporate level, Vermont Bread and Superior were subsidiaries of Koffee Kup, which was wholly owned by Kup Co. After the sale to KKBIC, the three entities had a single board of directors.  Two of those three board members were Levie and Sands, who were also the sole owners of KKBIC.  After KKBIC's purchase of a controlling share of Kup Co., the company was again run by a single CEO and CFO, together with Sands as the Chief Restructuring Officer.  Those officers were identified as part of the AIAC team, all of whom reported to Levie.

Other factors further support a single employer theory. Although the record shows that the three bakeries had their own personnel policies, it is clear that the post-sale executive team had plans to uniformly alter those policies by, for example, reducing benefits and staff numbers.  ECF No. 203-38 at 69.  Moreover, the decision to shut down the bakeries came from a single source and impacted all employees.  This latter fact weighs heavily in favor of finding *de facto* control by a single employer, since "[i]n the context of the WARN Act, the decision to effect a mass layoff is the single most important personnel policy."  *Garner v. Berhman Brothers IV, LLC*, 260 F. Supp. 3d 369, 377 (S.D.N.Y. 2017) (quoting *Vogt v. Greenmarine Holding, LLC*, 318 F. Supp. 2d 136, 143 (S.D.N.Y. 2004)).

As to the final factor – dependency of operations – the record shows the bakeries needed a single influx of capital to continue operations.  Moreover, bakery operations were interwoven as, for example, Superior would bake product for the distribution networks of the two others.  ECF No. 203-12 at 5-6. The Court therefore finds that, even when viewing the facts in the light most favorable to the non-moving parties, the undisputed record establishes that there was a single employer in this case.

**D.  Who Was the Employer at the Time of the Closure?**

Also material is the identity of the single employer. Plaintiffs argue that at the time of the layoffs, AIAC and KKBIC, through Levie and others, held controlling ownership and exercised *de facto* control over the company.  Plaintiffs also contend that the Koffee Kup Entities share liability jointly and severally with AIAC and KKBIC, as they were the direct employers.  The DR argues that the closure was controlled exclusively by Sands, Levie, and the AIAC team, and that the Koffee Kup Entities bear no liability.

AIAC submits that it was not involved in either the financial investment or management of the bakeries.  As Levie testified: "AIAC is a brand.  AIAC is a group.  AIAC operates through affiliates."  ECF No. 203-22 at 16.  AIAC concedes that communications from Sands promoted AIAC as being "in the best

position to support" revitalization of the business, but argues
that "support" is not the same as managing or executing a
takeover plan.  ECF No. 217-2 at 3.  AIAC also argues that it
had nothing to do with KKBIC.

The assertions and characterizations by AIAC/KKBIC about
its role in the business, including its involvement in Kup Co.,
are inconsistent with undisputed portions of the summary
judgment record.  That record includes evidence of
communications, including emails and presentations by Sands
himself, demonstrating the significant roles that AIAC, KKBIC,
Levie, and Sands played in the ownership and operation of the
Koffee Kup Entities after April 1, 2021.

As noted above, AIAC is owned exclusively by Levie and
"operates through affiliates."  ECF No. 203-22 at 16.  When
Levie uses the term "affiliates," he means "a corporate entity
with common ownership."  *Id.* at 15.  One AIAC affiliate, KKBIC,
purchased 80% of Kup Co.  Another AIAC affiliate, AMTC, funded
the purchase.

Kup Co. wholly owned the three bakeries.  After April 1,
2021, Levie and Sands held two of the three positions on the Kup
Co. board.  On April 8, 2021, Levie emailed Sands and directed
him to "serve as monitor to [K]up Co on behalf of KK Investment
Company and its Board of Directors."  ECF No. 203-38 at 87.
Sands was to receive payment for that assignment from AIAC.  ECF

21

No. 203-43 at 1.  The record shows that Sands was paid by AIAC

affiliate AMTC.  ECF No. 203-59 at 18.[4]

AIAC ultimately replaced Morin with Gauthier as the new

CEO.  Sands and Gauthier were described as "AIAC Executive

Leadership for Koffee Kup," with others from AIAC listed as

"Additional AIAC Leadership for Koffee Kup."  ECF 203-38 at 67-

68.  AIAC offered a new employment agreement to Koffee Kup Vice

President of Manufacturing Ben Richards, which agreement was

signed "Sincerely, Mark Gauthier AIAC" and was presented on AIAC

letterhead.  ECF 203-38 at 92.

With respect to the closures, the undisputed record shows

that it was Sands who, on April 26, 2021, told Coles and human

resources personnel that it was time to fire all employees.  ECF

No. 203-12 at 41.  Sands also signed the WARN Act letters.  ECF

No. 198-31 at 3.  With Levie signing on behalf of AIAC and as a

Kup Co. board member, AIAC retained the attorneys who provided

counsel regarding plant closures and WARN Act notices.  ECF No.

203-29 at 50-69.  Payments for lawyers working on matters

related to KKBIC were wired from an AMTC account.  ECF No. 203-

29 at 70.  In the course of this litigation, AIAC has asserted

---

[4] The Court cites to sealed portions of the record where it finds
no "compelling reason" barring it from doing so.  *See Joy v.
North*, 692 F.2d 880, 893 (2d Cir. 1982).

attorney-client privilege with regard to its communications with those attorneys.  ECF No. 210 at 54-55.

Plaintiffs highlight the fact that there was never a formal resolution adopted by the Kup Co. board to cease bakery operations.  When asked in written discovery about such board action, Levie, through counsel, answered only that a resolution was adopted to try to negotiate a voluntary foreclosure or turnover of assets to Key Bank.  ECF No. 203-40 at 5. Plaintiffs submit that such a resolution is not the same as a formal board decision on closure.  Nor was there any reference to Kup Co. or its board in the WARN Act letters.  ECF Nos. 198-31.  Plaintiffs contend that this failure to adhere to corporate formalities supports their claim that the AIAC team, including Sands, was in *de facto* control of operations.

In *Guippone*, the Second Circuit noted that the "core" of the *de facto* control factor is "whether one company was the decision-maker responsible for the employment practice giving rise to the litigation."  737 F.3d at 227 (quoting *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 245 (3d Cir. 2008)). Here, that decision-maker was the AIAC team, led by Levie and Sands as owners of KKBIC and controlling board members of Kup Co.  Consequently, AIAC and KKBIC bear responsibility for any WARN Act violations.

In making these determinations, the Court is not directly
challenging the credibility of the Sands affidavits despite
their inconsistencies with other evidence.  Several of Sands'
statements assert conclusions about corporate relationships,
taking a narrow view of those relationships based upon equity
investments.  The undisputed evidence, however, shows that those
relationships must be viewed in the larger context of the people
involved and their various roles.  In some instances, detailed
above, Sands' conclusions contradict his own prior
communications, as when he denies AIAC's involvement in the
operation of Kup Co. or the Koffee Kup Entities.  Given the
undisputed documentary evidence, the Court finds that no jury
could reasonably credit those conclusions.  *See, e.g., Rojas v.
Roman Catholic Diocese of Rochester*, 660 F.3d 98, 105 (2d Cir.
2011) (holding that summary judgment was properly granted to
defendants where plaintiff relied almost entirely on her own
testimony, which was contradicted by contemporaneous letters and
meeting notes).

Plaintiffs submit that the inquiry does not stop at
AIAC/KKBIC, and that the Koffee Kup Entities share liability as
the direct employers.  Indeed, the Koffee Kup Entities played a
significant role in the closure, as their employees informed
workers of the layoffs, stopped assigning shifts, and stopped
payroll.  Liability of the Koffee Kup Entities is addressed more

fully below in the Court's discussion of the exceptions to WARN
Act liability.  Briefly stated, the Court finds that the Koffee
Kup Entities, as the direct employers, share joint and several
liability with AIAC and KKBIC since a direct employer may not
simply avoid all liability by passing it to a corporate parent.
Nonetheless, those Entities' lack of control over the plant
closures entitles them to relief on their crossclaim.

### E.    Application of WARN Act Exceptions

The WARN Act requires an employer to provide 60 days'
advance written notice of a plant closing to employees, as well
as notice to state and local governments.  29 U.S.C. §
2104(a)(1), (2).  There is no dispute that the closures in this
case constituted a plant closing within the meaning of the
statute.  Furthermore, with the single employer issue having
been resolved, the number of employees impacted by the plant
closures triggered WARN Act obligations.  29 U.S.C. §
2104(a)(1).

The WARN Act offers exceptions to the 60-day notice rule.
Those exceptions include the "faltering company" exception, *see*
29 U.S.C. § 2102(b)(1), and the "unforeseen business
circumstance" exception, *see id.* § 2102(b)(2)(A).  The
"unforeseen business circumstance" exception provides that "[a]n
employer may order a plant closing or mass layoff before the
conclusion of the 60-day period if the closing or mass layoff is

caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required."  29 U.S.C. § 2102(b)(2)(a).  The "faltering company" exception applies if "as of the time that notice would have been required the employer was actively seeking capital or business, which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business."  *Id.* § 2102(b)(1).  AIAC and KKBIC argue that they are entitled to application of both exceptions.

The DR contends that the Koffee Kup Entities are entitled to application of the "unforeseen business circumstance" exception because they were surprised by the closure announcement.  She also claims protection under the statute's "sale-of-business" exception.  The latter exception places responsibility for WARN Act compliance upon the buyer of the business if the plant closing or mass layoff took place after the effective date of the sale.  20 C.F.R. § 639.4(c).  An employer relying on a WARN Act exception bears the burden of persuasion.  20 C.F.R. § 639.9.

Plaintiffs submit that no defendant is entitled to an exception because there was no advance notice of the closings. The WARN Act letters were dated April 26, 2021 – the effective

26

date of the closure – and Plaintiffs contend that they were not mailed or handed out until, at the earliest, the next day. Courts have held that although an exception may apply, at least some notice must be provided.  *See, e.g., Sides v. Macon Cnty. Greyhound Park, Inc.*, 725 F.3d 1276, 1284 (11th Cir. 2013) ("it is manifest that a WARN Act employer attempting to circumvent the 60-day notice requirement must still give some notice in accord with 29 U.S.C. § 2102(b)(3).  The unforeseeable business circumstances defense does not jettison this absolute requirement under the WARN Act; even where the defense is properly invoked, some notice must be given.").

The timing of a WARN Act notice must be "as much . . . as is practicable."  29 U.S.C. § 2102(b)(3).  The Department of Labor regulations have interpreted that provision to include "notice after the fact."  20 C.F.R. § 639.9.  Consistent with that interpretation, the Third Circuit noted in dicta that "[i]n the event that an unforeseeable business circumstance arises, the notice period may be reduced or eliminated."  *Hotel Emps. & Rest. Emps. Int'l Union Loc. 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 187 (3d Cir. 1999).  Accordingly, there is authority for the proposition that while an employer must provide WARN Act notice, exceptional circumstances may allow for such notice to occur after a plant closure or mass layoff.

AIAC and KKBIC claim that this case presents such exceptional circumstances in the form of fraud by the selling party.  As a result of that alleged fraud, AIAC and KKBIC were reportedly surprised by the gravity of the company's financial situation.  Plaintiffs counter, in part, that this defense is unavailable because the alleged fraud was not mentioned in the WARN Act notices.  Plaintiffs further argue that the alleged fraud is unsupported by admissible evidence, and that any alleged surprise was not an "unforeseen circumstance" under the statute because it was not beyond the employer's control.

As to the substance of the notice, the WARN Act requires "a brief statement of the basis for reducing the notification period."  29 U.S.C. § 2102(b)(3).  Here, the WARN Act letters did not mention any unforeseen fraud.  The letters instead explained that Koffee Kup had been operating at a loss for some time, was in default on outstanding loans including those with its senior lender, and that the senior lender had allowed the company to continue operations pursuant to a forbearance agreement that had expired.  ECF No. 198-31 at 2.  The letters also referenced failed efforts to obtain additional financing or investors.  *Id.*  There was no reference to insufficient financial information at the time of the sale, or to any fraud by the selling party.

28

The Ninth Circuit has opined that "Congress' purpose in requiring a brief statement must have been to provide employees with information that would assist them in determining whether the notice period was properly shortened." *Alarcon v. Keller Industries, Inc.*, 27 F.3d 386, 389 (9th Cir. 1994). The statement therefore "must give some indication of the factual circumstances that made an exception to the statutory notice requirement applicable, providing an adequate specific explanation to affected workers." *Id.* at 390; *see, e.g., Childress v. Darby Lumber Inc.*, 126 F. Supp. 2d 1310, 1318 (D. Mont. 2001) (holding that notice was inadequate since it only stated that the company had "sustained tremendous losses" and was forced to make "some serious decisions"). The requirement also exists "to prohibit employers who have failed to provide the requisite 60-day notice from asserting litigation-convenient but factually *post hoc* justifications for their actions." *Sides*, 725 F.3d at 1285-86.

Here, with no mention of fraud or surprise in the notices of closure, employees had no opportunity to determine whether, on that basis, the absence of prior notice was reasonable. Consequently, the employer's failure to set forth the statutorily-required "brief statement of [that] basis for reducing the notification period," 29 U.S.C. § 2102(b)(3), disqualifies it from protection under the "unforeseen business

circumstance" exception.  *See In re Dewey & LeBoeuf LLP*, 507
B.R. 522, 533 (Bankr. S.D.N.Y. 2014) ("even under dire
circumstances, employers must deliver written WARN notices
containing the necessary brief statements to qualify for the
WARN Exceptions").

Furthermore, the regulations make clear that "[a]n
important indicator of a business circumstance that is not
reasonably foreseeable is that the circumstance is caused by
some sudden, dramatic, and unexpected action or condition
outside the employer's control."  20 C.F.R. § 639.9(b)(1).

> A principal client's sudden and unexpected termination
> of a major contract with the employer, a strike at a
> major supplier of the employer, and an unanticipated
> and dramatic major economic downturn might each be
> considered a business circumstance that is not
> reasonably foreseeable.  A government ordered closing
> of an employment site that occurs without prior notice
> also may be an unforeseeable business circumstance.

*Id.*  Here, the allegedly "unforeseeable" event occurred entirely
within the company, involving communications between the seller
and the buyer.  There was no outside circumstance or event that
could not have been foreseen.  There is no dispute that
AIAC/KKBIC was given access to sales data, was told that P3
results would be "soft," and knew that it was buying a failing
business.  Financial distress in excess of what was previously
estimated or expected by the buyer, despite the opportunity for
a due diligence review, is not the equivalent of a sudden

contract loss, government closure, or unexpected economic downturn.  Moreover, the company met its demise in part because AIAC/KKBIC decided not to contribute additional money, including the funds it pledged at the outset, to keep the business operating.  *See, e.g.*, ECF No. 219-5 (Kup Co. board minutes reflecting Levie's instruction to "inform the bank that neither the Company nor its shareholders had interest in providing further funding").

Also without merit is the claim that Key Bank calling its loan constituted an unforeseen circumstance.  The loan with Key Bank had been in default prior to the sale of the company, continued forbearance was in no way guaranteed, and the April 1, 2021 sale was finalized without Key Bank's approval.  ECF No. 210 at 50.  Accordingly, AIAC and KKBIC are not entitled to protection under the "unforeseen business circumstance" exception.

Given the Court's conclusion that the "unforeseen business circumstance" exception is not available to AIAC or KKBIC, it need not fully assess their factual assertions underlying the claims of fraud.  Nor does the Court need to review whether those parties exercised "commercially reasonable business judgment" in failing to accurately assess the company's financial situation.  20 C.F.R. § 639.9(2).  The Court does note, however, that KKBIC allegedly entered into the purchase

31

agreement knowing that the final P3 financials were outstanding,
and closed the deal nonetheless.

AIAC and KKBIC also call for application of the "faltering
company" exception.  The federal regulations set forth four
elements for this exception: (1) the employer must have been
actively seeking capital or business at the time the 60-day
notice would have been required; (2) there must have been a
realistic opportunity to obtain the desired financing or
business; (3) the financing or business would have been
sufficient to either avoid or postpone the shutdown; and (4) as
set forth in the statute, the employer reasonably and in good
faith believed that giving the required notice would have
precluded it from obtaining the necessary capital or business.
20 C.F.R. § 639.9(a).

AIAC and KKBIC argue that a public WARN Act notice prior to
the closure would have prohibited the sale of Kup Co. as a going
concern.  Specifically, they argue that such a notice would have
scared suppliers into restricting sales, frightened employees
into leaving their jobs, and caused customers to reduce shelf
space for Kup Co. products, thereby further damaging the company
and making it unattractive to a potential buyer.  Plaintiffs
note that AIAC and Sands sought a new buyer for the company only
after declining to infuse the bakeries with the promised $2.5
million investment.  Plaintiffs also submit that Levie and AIAC

had significant funds at their disposal and, consistent with
their own attestations prior to the sale, did not need to look
to other sources for investment.  ECF No. 203-18 at 16 (Sands
deposition); ECF No. 203-30 at 8.

As stated in the federal regulations, "[t]he actions of an
employer relying on the 'faltering company' exception will be
viewed in a company-wide context.  Thus, a company with access
to capital markets or with cash reserves may not avail itself of
this exception by looking solely at the financial condition of
the facility, operating unit, or site to be closed."  20 C.F.R.
§ 639.9(a)(4).  Because AIAC, through its affiliates, reportedly
had access to significant additional capital, its efforts to
find another party to make the necessary investment do not
qualify it for the faltering business exception.  ECF No. 203-30
at 8 ("AIAC invests its own financial resources and does not
require financing from third parties.").

Moreover, the faltering business exception applies to
efforts to obtain either capital or new business, and not to
efforts to sell the company.  The regulations limit the
exception to instances where the employer was "seeking financing
or refinancing through the arrangement of loans, the issuance of
stocks, bonds, or other methods of internally generated
financing; or the employer must have been seeking additional
money, credit, or business through any other commercially

33

reasonable method."  20 C.F.R. § 639.9.  Efforts to sell the business do not qualify.  *See, e.g., Reed v. Alecto Healthcare Servs., LLC*, No. 5:19-CV-263, 2022 WL 4119367, at *15 (N.D.W. Va. Aug. 2, 2022) ("Case law makes clear that a sale of the business does not meet this definition."); *Law v. Am. Capital Strategies, Ltd.*, 3:05-0836, 2007 WL 221671 at *10 (M.D. Tenn. 2007) ("This Court concludes that [the faltering company] exception is inapplicable where, as here, the closings and/or layoffs occur as a result of a failed business sale.").

The Sands affidavit states that KKBIC tried to "secure external funding or a new investor to keep the Company operational," but identifies no such investors other than the parties to whom he reached out in an effort to sell the company. ECF No. 202-4 at 7.  Nor is there record evidence that the owners of Kup Co. were actively seeking capital, rather than a new owner, 60 days prior to the closure.  AIAC/KKBIC's briefing concedes that "not being able to raise the necessary infusion of funds, the only feasible solution was to find a buyer with overlapping production, distribution and administrative costs." ECF No. 217 at 10.  And Sands' own testimony, quoted above, makes clear that once Levie and Cryer notified him the business was not "saveable," he focused on selling the company.  ECF No. 203-39 at 7.

Furthermore, in order to meet its burden, a defendant invoking the faltering business exception must show that there was "a realistic opportunity to obtain the financing or business sought."  20 C.F.R. § 639.9(a)(2).  The Sands affidavit offers no evidence of a "realistic opportunity," explaining only that one potential buyer failed to show up to a planned meeting and the other was rejected by Key Bank.  ECF No. 202-4 at 8.  AIAC and KKBIC have therefore failed to meet their burden with respect to this exception.

The DR contends that the Koffee Kup Entities have no liability exposure pursuant to the "sale-of-business" exception set forth at 29 U.S.C. § 2101(b)(1), since the business had been sold to AIAC/KKBIC.  As explained in the federal regulations:

> In the case of a sale of part or all of an employer's business, the seller shall be responsible for providing notice for any plant closing or mass layoff in accordance with section 2102 of this title, up to and including the effective date of the sale.  After the effective date of the sale of all or part of an employer's business, the purchaser shall be responsible for providing notice for any plant closing or mass layoff in accordance with section 2102 of this title.

20 C.F.R. § 639.4(c).

This issue invites a closer look at the "sale-of-business" exception in the context of the sale in this case.  Both before and after the sale, Kup Co. existed as the holding company for the Koffee Kup Entities.  KKBIC took an 80% stake in Kup Co.

35

The sellers in the transaction were those parties who sold their debt and their Kup Co. shares.[5]  It is those selling parties, none of whom are named in this lawsuit, who could most clearly avail themselves of a "sale-of-business" exception.  Kup Co., and thus the Koffee Kup Entities, were not the sellers.

Plaintiffs further argue that control by a corporate entity such as Kup Co., or AIAC/KKBIC, does not insulate the Koffee Kup Entities as the direct employers.  They contend that such insulation would allow actual employers to avoid liability by pointing to ownership by a shell corporation with few or no assets.  Plaintiffs' position is facially supported by the regulations, which treat direct employers/subsidiaries "as part of the parent or contracting company depending upon the degree of independence from the parent."  *Id*. at § 639.3(a)(2); *see also Garner*, 260 F. Supp. 3d at 381 ("A direct employer, in the context of a WARN Act claim brought under a single employer theory, is such a joint tortfeasor.").

The DR also seeks application of the "unforeseeable business circumstance" exception, arguing that the plant closures came as a complete surprise.  When KKBIC took control of Kup Co., the expectation was that Levie and/or AIAC would

---

[5]  Those sellers reportedly included Bripan SRL, Socipar SAS, and 9249-9557.  Subordinated debt holders included those parties as well as Jose Aubery, Bertrand Aubery, and Hubert Aubery.  ECF No. 202-1 at 4.

infuse the business with up to $2.5 million.  The Sands PowerPoint slides also suggested plans for improving business operations in order to return the Koffee Kup Entities to profitability.  The DR submits that after receiving these assurances of investments and operational changes, notice of the plant closings on April 23, 2021 constituted the sort of "sudden, dramatic, and unexpected action or conditions outside the employer's control" that is protected by the statute.  20 C.F.R. § 639.9(b)(1).

Application of this exception would again require a "brief statement" of the reason for the closure.  Here, there was no discussion in the WARN Act letters of a surprising decision to close.  Furthermore, as discussed above with respect to AIAC/KKBIC, the circumstances cited by the DR were not the sort of external events – such as the loss of a major contract or an economic downturn – that qualify for the exception. Accordingly, the "unforeseeable business circumstance" exception does not apply to the Koffee Kup Entities, and Plaintiffs are entitled to judgment as a matter of law against all Defendants.

### F.   Back Pay and Benefits

Plaintiffs also move the Court to award damages, which they set at nearly $3.6 million.  Under the WARN Act, an employer that violates the notice requirement

> shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for —
>
> (A) back pay for each day of violation at a rate of compensation not less than the higher of —
>
> (i) the average regular rate received by such employee during the last 3 years of the employee's employment;
>
> or
>
> (ii) the final regular rate received by such employee[.]

29 U.S.C. § 2104(a)(1). According to an affidavit submitted by class counsel, back pay was calculated based on employee census data as of May 7, 2021, which was provided to Plaintiffs by Coles in response to a subpoena. ECF No. 203-51 at 4. From that census data, class counsel developed a spreadsheet that included each employee's name, hire date, employment site, and annual salary. ECF No. 203-53. The spreadsheet does not include the nine employees who opted out of the class action. Using the annual salary figure for each employee, counsel then calculated the wages due for the 60-day period, with reductions for those who were employed for fewer than 120 days. *See* 29 U.S.C. § 2104(a)(1) (limiting WARN Act liability to no more than one-half the number of days the employee was employed).

The DR objects to the back pay calculation as unsupported by admissible evidence and insufficiently individualized. As to the question of admissibility, the DR does not dispute that the

data upon which the calculations are based were produced by
Coles and constitute business records.  *See* Fed. R. Evid.
803(6).  The DR also cites no authority for its argument that
Plaintiffs may not use the average rate of earnings for each
employee.  In fact, such averaging is what the statute appears
to allow in developing a "rate" of compensation.  29 U.S.C. §
2104(a)(1)(A)(i).

AIAC and KKBIC assert that they undertook significant
efforts to try to help employees find new jobs within the 60-day
period.  Plaintiffs' damages do not appear to address or
incorporate those mitigative efforts, and the parties have not
fully briefed whether incorporation of such mitigation is
appropriate under the WARN Act.[6]

The DR also contests Plaintiffs' calculation of benefits.
To calculate benefits, class counsel used DOL statistics for
"production" workers' average insurance and retirements
benefits.  ECF No. 203-51 at 4.  The DR submits that national
averages are not acceptable, and that payroll records show most
of the bakery workers received no such benefits.  Plaintiffs
respond only that their efforts were reasonable, and that any
shortcomings in their approach are due to inadequate discovery

---

[6]   In their second motion to strike, Plaintiffs contend that the
question of mitigation is irrelevant to WARN Act liability and
is not supported by admissible evidence.  ECF No. 227 at 2.

responses by defendants.  Plaintiffs have not moved to compel
that additional discovery, and have failed to show that the
benefits calculations were individualized.  *See* 29 U.S.C. §
2104(a)(2) (providing for individualized reductions related to
health and pension benefits).

The DR's final damages defense asks the Court to apply the
good faith exception set forth at 29 U.S.C. § 2104(a)(4).  That
exception provides:

> If an employer which has violated this chapter proves
> to the satisfaction of the court that the act or
> omission that violated this chapter was in good faith
> and that the employer had reasonable grounds for
> believing that the act or omission was not a violation
> of this chapter the court may, in its discretion,
> reduce the amount of the liability or penalty provided
> for in this section.

29 U.S.C. § 2104(a)(4).  The DR submits that the Koffee Kup
Entities qualify for a reduction of liability under this
exception because (1) they played no role in the decision to
shut down the facilities, and (2) the WARN Act notices were
provided almost immediately thereafter.  The DR further argues
that, at the very least, the good faith of the Koffee Kup
Entities is a disputed question of material fact precluding
summary judgment on the amount of liability.

The Court agrees that, assuming the facts set forth by the
DR fit within the exception, and although resolution of the DR's
crossclaim may render the issue moot as a practical matter,

40

questions of subjective and objective belief raised by the good
faith defense are not sufficiently established to rule out
disputed issues of fact.  Accordingly, and for the several
reasons set forth above, the Court cannot grant Plaintiffs'
motion for summary judgment with respect to damages.

**III. The Dissolution Receiver's Motion for Summary Judgment**

The DR also moves for summary judgment, based upon many of
the same undisputed facts cited by Plaintiffs.  In its motion,
the DR reiterates her arguments for application of the "sale-of-
business" exception and the "unforeseeable business
circumstance" exception.  The Court has rejected application of
those exceptions for reasons set forth above.  The DR also
submits that the Koffee Kup Entities have no liability because
they were not involved in the decision to close the plants.

The DR cites case law for the proposition that a direct
employer is, at most, a joint tortfeasor and not a necessary
party.  As discussed previously, the controlling role of the
corporate parents, in this case Kup Co. and KKBIC, does not
necessarily relieve the direct employer from joint liability.
Indeed, under the single employer doctrine, subsidiaries are
treated "as part of the parent."  *Guippone*, 737 F.3d at 226.

The DR cites *Guippone* and the Third Circuit's decision in
*Pearson*, which was quoted at length in *Guippone*, for the
proposition that a corporate parent in *de facto* control of the

company relieves the direct employer from liability.  Neither
case supports that proposition.  Both *Guippone* and *Pearson*
focused on the liability of the parent, and said nothing about
releasing the subsidiary from joint liability.  *See, e.g.,*
*Guippone*, 73 F.3d at 227 (holding that the *de facto* prong
"allows the factfinder to consider whether the parent has
specifically directed the allegedly illegal employment practice
that forms the basis for the litigation"); *Pearson*, 247 F.3d at
487 ("if the parent has sufficiently overwhelmed its subsidiary
in taking the challenged action, such a showing is sufficient to
create liability").

Turning to the DR's crossclaim, however, the Court
considers the relative roles of the parent and its subsidiaries.
There is no question that the Koffee Kup Entities had little
control over the events that give rise to WARN Act liability.
At the time of the plant closures, those entities had no
directors and almost no upper management aside from the AIAC
team.  With the exceptions of Coles and CEO Morin, all officers
of the Koffee Kup Entities resigned as of the sale of the
company.  Morin ceased being the Koffee Kup CEO in mid-April
2021.  ECF 203-38 at 82-83.  The only holdover director of Kup
Co., Hubert Aubery, objected to the plant closures.  ECF No.
198-16 at 3.  Coles refused to sign the WARN Act notices.  And
on Friday, April 23, 2021, it was Sands who told Coles to inform

workers that the bakeries were closing and they should not continue coming to work.

The DR alleges the Koffee Kup Entities' lack of control over the company entitles them to indemnification.  As this Court has held previously, under Vermont law "[a] right of indemnity will be afforded a party who, without active fault, has been compelled, by reason of some legal obligation to pay damages caused by the negligence of another." *Loli of Vermont, Inc. v. Stefandl*, 968 F. Supp. 158, 161 (D. Vt. 1997) (citing *Viens v. Anthony Co.*, 282 F. Supp. 983, 986 (D. Vt. 1968)).  Furthermore, "the WARN Act creates a system that allocates notice responsibility between the seller of the business and the buyer of the business, and only the party actually causing employment loss due to a plant closing is required to provide WARN Act notice." *Wilson v. Airtherm Prod., Inc.*, 436 F.3d 906, 909 (8th Cir. 2006).  Indeed, "the WARN Act takes a 'functional, common sense approach,' attempting to determine who actually effects the plant closing." *Id.* at 912 (quoting *Smullin v. Mity Enter., Inc.*, 420 F.3d 836, 837 (8th Cir. 2005)).  Here, that party was clearly AIAC/KKBIC through Sands and the management team reporting to Levie.

AIAC and KKBIC oppose the DR's motion for summary judgment, asserting two arguments: (1) that neither AIAC nor KKBIC constituted a single employer, and (2) that they are each

43

entitled to the "unforeseen business circumstance" and
"faltering business" exceptions.  ECF No. 217 at 15-23.  The
Court has concluded that the single employer included AIAC and
KKBIC, has rejected application of those exceptions in this
case, and finds that the Koffee Kup Entities' lack of control
over the closure calls for indemnification.  The DR is therefore
granted summary judgment on her crossclaim.

IV.  **AIAC/KKBIC Motion for Summary Judgment**

     AIAC and KKBIC have also moved for summary judgment.  Their
fundamental contention is that AIAC owned no equity or debt in
Kup Co. or its subsidiaries, did not provide any loans or funds
to KKBIC for its investment, and was not involved in the
ownership, management, or operation of the Company.  They argue
that AIAC is not a proper party, that all relevant decisions
were made by Kup Co., not KKBIC, and that they are both entitled
to judgment as a matter of law.

     Plaintiffs and the DR each oppose the summary judgment
motion.  Their positions are supported by a host of undisputed
and disputed facts.  The undisputed facts demonstrate that AIAC,
through Levie, Sands, and AIAC affiliates, was very much
involved in the operation of the company during the weeks up to
and including the plant closures.  AIAC retained Sands.  AIAC
brought in the new Koffee Kup leadership team.  Levie and Sands
controlled the Kup Co. board.  A wire transfer of over $30,000

was made by AMTC to pay for "[t]he Board monitoring fees for Dorset Partners [Sands] from Kup Co." ECF No. 203-13 at 2. The invoice for that "monitoring work" included work descriptions such as "closure," "shutdown," "WARN Prep" and "WARN." ECF No. 203-45. AIAC and Levie hired attorneys to prepare WARN Act notices. ECF No. 203-29 at 50-69. The undisputed record thus shows that Sands, with AIAC/Levie's approval and support, shut down operations. And KKBIC, as the majority owner of Kup Co., shares liability as part of the single employer.

AIAC and KKBIC argue that they cannot be held liable because the Koffee Kup Entities wrongfully withheld critical financial information from KKBIC prior to the sale. Sands' affidavit recounts his efforts to obtain financial information from G2 Capital Advisors. After providing copies of the 2021 budget on March 18, 2021, G2 Capital Advisors allegedly declared an information "blackout" and, according to Sands, "prohibited KKBIC from contacting Kup Co.'s management directly." ECF No. 202-4 at 3.

The Court notes that KKBIC did not exist on March 18, 2021. The DR submits that it is not clear what Sands means by a "blackout," and that such "blackout" did not prevent him from continuing to request financial information between mid-March and April 1, 2021. Moreover, as discussed previously, Coles testified that Sands and AIAC had full access to the company's

sales data through the date of the closing.  In a related
bankruptcy proceeding, Sands did not dispute having such access.
ECF No. 214-6 at 2-3.  Coles further testified that Sands and
AIAC could have looked at that sales data and developed their
own estimated P3 shortfall.  ECF No. 214-5 at 6.

Sands attests in his affidavit that after the closing, he
"discovered that on March 30, 2021, nine days after P3 ended and
two days before the scheduled Closing, Kup Co.'s controller,
Luke Morris, prepared the P3 financials, showing deficits, which
he emailed to Coles."  ECF No. 202-4 at 4-5.  Yet when Sands
asked Coles for the "latest balance sheet," Coles responded "by
lying to me, indicating that he did not yet have the P3
financials."  *Id.* at 5.  The DR disputes this fact, offering an
email reflecting Coles' receipt of the P3 financials from Morris
at 4:29 p.m. on April 1, 2021.  ECF No. 209-32.  Other emails
among Koffee Kup personnel reflect internal discussions of "the
balance sheet" on March 30, 2021, Sands' request for "the latest
balance sheet," and Coles informing his coworkers that "I have
not responded to [Sands] yet."  ECF No. 202-8.  Coles testified
that when Sands asked for the P3 financials "right before the
close, they were not done.  But that was in the same timetable
that we always ran our financials in....  They wanted me to give
them tentative estimated final numbers for Period 3 and I told

them I did not like giving estimated numbers." ECF No. 214-5 at 7-8.

AIAC and KKBIC also contend, without citation to record evidence, that "prior to Closing, the Sellers of the Company secretly and improperly siphoned off millions of dollars from the Company." ECF No. 202-2 at 8 (citing Sands Affidavit, ECF No. 202-4 at 12). The DR disputes this allegation as well, citing state court records. ECF No. 211 at 19. The DR further notes that the prior owners advanced over $14 million to the company, which debt was acknowledged and purchased by KKBIC through the SPA.

Even if the Court were to accept AIAC/KKBIC's allegations of fraud, that claim does not relieve AIAC and KKBIC of WARN Act liability. The motion for summary judgment argues that such fraud was an "unforeseen business circumstance," but the Court has rejected that argument for the reasons set forth above. Again, briefly, that defense is unavailable because there was no mention of fraud in the WARN Act letters, and the "circumstance" alleged was not the sort of event that qualifies for the statutory exception.

AIAC and KKBIC also move for summary judgment based on the "faltering company" exception. That defense, too, is addressed above. The summary judgment record shows that AIAC had significant resources at its disposal, and rather than investing

47

funds or seeking new investment, AIAC and KKBIC tried to sell
the company.  Under those facts, an employer may not avail
itself of the "faltering company" exception.

Finally, AIAC and KKBIC assert that Plaintiffs' claims fail
because they did not include Kup Co. as a defendant.  "A
plaintiff asserting a single employer claim under the WARN Act,
however, may choose not to name a direct employer without
foundering on Rule 19, as the Supreme Court has held that joint
tortfeasors are not indispensable parties under Rule 19(a)."
*Garner*, 260 F. Supp. 3d at 381 (citing *Temple v. Synthes Corp.
Ltd.*, 498 U.S. 5, 8 (1990)).  Furthermore, Kup Co. was merely a
holding company controlled by AIAC, Levie, and Sands, and
viewing the facts in a light most favorable to the non-moving
parties, there was no formal action by the Kup Co. board to
order the plant closures.

AIAC and KKBIC rely on two cases, neither of which support
their indispensable party argument.  The first, *Freeman v. New
Acceptance Corp.*, 754 F.2d 553 (5th Cir. 1985), involved a suit
against a parent company under an "alter ego" theory where the
subsidiary was the actual alleged tortfeasor.  *Id.* at 559.  The
second, *Rubler v. Unum Provident Corp.*, No. 04 Civ. 7102, 2007
WL 188024, at *3 (S.D.N.Y. Jan. 25, 2007), similarly centered on
the parent's liability where the subsidiary was the alleged
wrongdoer.  Here, AIAC and KKBIC are alleged to have violated

the WARN Act themselves, and not merely through a subsidiary such as Kup Co.  The cited cases are inapposite, and the motion for summary judgment filed by AIAC and KKBIC is denied.

## Conclusion

For the reasons set forth above, Plaintiffs' motions to strike (ECF Nos. 216, 227) are denied without prejudice, their motion for summary judgment (ECF No. 203) is granted in part and denied in part, the DR's motion for summary judgment (ECF No. 197) is granted in part and denied in part, and AIAC/KKBIC's motion for summary judgment (ECF No. 202) is denied.  Plaintiffs are granted judgment on the question of WARN Act liability, with damages to be determined in future proceedings.  While Defendants are jointly and severally liable for such damages, the Dissolution Receiver (as Receiver of the Koffee Kup Entities' assets) is entitled to indemnification by AIAC and KKBIC.

DATED at Burlington, in the District of Vermont, this 23rd day of August, 2023.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge
